**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEW ORLEANS WORKERS' CENTER FOR
RACIAL JUSTICE
217 N. Prieur St.
New Orleans, LA 70112,

SANTOS ALVARADO
9018 Atreus Dr.
Chalmette, LA 70042,

MARIA AMAYA
2525 N. Derbigny St.
New Orleans, LA 70117,

MELVIN BARDALES-DERAS
4068 E. Louisiana State Dr.
Kenner, LA 70065,

JIMMY BARRAZA-BONILLA
2213 Giuffrias Ave.
Metairie, LA 70001,

ALFREDO CARRERA
711 Gallier St.
New Orleans, LA 70117,

DENIS CHIRINOS-AVILA
247 Marmandie Ave. Lot No. 50
River Ridge, LA 70123,

IRMA LEMUS
2207 Pasadena Ave.
Metairie, LA 70001,

ERLIN SAN MARTIN-GOMEZ
3513 Edenborn Ave., Apt #206
Metairie, LA 70002,

RONALD MARTINEZ-RIVERA
3700 Division St., Apt #116
Metairie, LA 70003,

Civil Case No. _____

MARIO MENDOZA
115 E. Saint Peter Street
Belle Chase, LA 70037,

ILDA SARMIENTO
3929 Red Cypress Dr.
Harvey, LA 70058,

                                    Plaintiffs,


                    v.


UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT
500 12th St., SW
Washington, D.C. 20536

                                    Defendant.


**COMPLAINT**

## PRELIMINARY STATEMENT

All allegations made herein are made upon information and belief unless stated otherwise:

1. Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, the New Orleans Workers' Center for Racial Justice ("NOWCRJ") and New Orleans Community Civil Rights Monitors Santos Alvarado, Maria Amaya, Melvin Bardales-Deras, Jimmy Barraza-Bonilla, Alfredo Carrera, Denis Chirinos-Avila, Irma Lemus, Erlin San Martin-Gomez, Ronald Martinez-Rivera, Mario Mendoza, Ilda Sarmiento (collectively "Community Civil Rights Monitors") (collectively with NOWCRJ "Plaintiffs") file this action demanding Defendant United States Immigration and Customs Enforcement ("ICE") ("Defendant") release the requested agency records related to the Criminal Alien Removal Initiative[1] and other community immigration enforcement programs (collectively "CARI documents") which ICE has unlawfully withheld for over one year. NOWCRJ and the Community Civil Rights Monitors also demand that ICE produce the records on an expedited basis, waive processing fees, and pay Plaintiffs' attorneys' fees and costs.

2. ICE's failure to release the CARI documents follows a series of actions that violate the constitutional and civil rights of New Orleans community members as well as the Department of Homeland Security's governing statutes, regulations, and stated public policies.

3. In 2012, ICE coordinated with local law enforcement to expand immigration enforcement actions through racial profiling-based immigration raids and

---

[1] For more information on CARI, *see* NOWCRJ, THE CRIMINAL ALIEN REMOVAL INITIATIVE IN NEW ORLEANS, THE NEW ORLEANS WORKERS' CENTER FOR RACIAL JUSTICE (Dec. 19, 2013), http://nowcrj.org/wp-content/uploads/2008/11/CARI-report-final.pdf.

area sweeps in neighborhoods, under the auspices of a new and national ICE enforcement program called the Criminal Alien Removal Initiative or "CARI".

4.     Under CARI and related community immigration enforcement programs (collectively herein "CARI program"), ICE has coordinated with local police departments to plan and carry out unconstitutional, racial profiling-based community raids across the New Orleans metro area resulting in the immediate arrest and attempted deportation of many parents, reconstruction workers, and community members. ICE has further targeted community leaders for speaking out publicly in support of reform of the immigration laws and against ICE's CARI program. Reports by NBC News and other national news sources indicate that the CARI program is a national ICE enforcement program created in May 2012 in response to political pressure to boost arrest numbers, rather than in response to real concerns over public safety.[2] In a cover article, The Nation termed the CARI raids "Stop and Frisk for Latinos."[3] According to an investigation by the National Journal, ICE raids outside a Latino supermarket chain in New Orleans have been a routine, monthly occurrence.[4]

5.     The CARI program has raised national alarm among affected and potentially affected communities, press, and lawmakers for its broad use of law enforcement raids and area sweeps targeting Latino communities. ICE agents operating under the CARI program, usually accompanied by local police, descend on locations where Latino community members gather—apartment complexes, grocery stores,

---

[2] Hannah Rappleye, *Does High Tech Dragnet to Deport Immigrants Go Too Far*, NBC NEWS, Feb. 28, 2014; Brian Bennett, *U.S. Steps Up Deportation Efforts For Criminal Immigrants*, L.A. TIMES, May 26, 2012; Zoe Carpenter, *How the Government Created Stop-and-Frisk for Latinos*, THE NATION, Sept. 3, 2014; Julia Preston, *Amid Steady Deportations, Fears Among Immigrants Multiply*, N.Y. TIMES, Dec. 23, 2013. .
[3] Zoë Carpenter, *How the Government Created Stop-and-Frisk for Latinos*, THE NATION, Sept. 3, 2014.
[4] Alexia Fernández Campbell, *Is New Orleans Trying to Deport Undocumented Workers Now That the Rebuilding Is Over?*, NATIONAL JOURNAL, Oct. 7, 2014.

laundromats, and even Bible study groups—conducting racial profiling-based stop-and-frisk-type arrests. During these ICE raids, ICE agents seize and handcuff any individual who appears Latino (without individualized suspicion) and subject each individual to on-site biometric fingerprinting using high-tech mobile biometric devices created for U.S. military use in Iraq and Afghanistan. Based on the results of the fingerprinting, many individuals are then immediately placed into ICE vehicles, transported to detention centers and quickly deported. ICE has conducted these raids and arrest procedures in public places resulting in children, spouses, and community members watching as individuals are ripped from their families and sent to rural detention centers in the midst of buying groceries, doing laundry, or going to Bible study groups.

6.     The CARI program also continues to raise serious concerns regarding unconstitutional and discriminatory police practices by ICE agents in collaboration with local law enforcement. For Latino communities across the New Orleans metropolitan area, appearing Latino is a ground for being stopped, handcuffed and fingerprinted. Far from enhancing public safety, the CARI program has made residents fearful of contact with law enforcement and has thereby undermined community policing efforts, making the entire community less safe.

7.     NOWCRJ and the Community Civil Rights Monitors urge the Court to order expedited production of the CARI documents by ICE given an increasingly robust public dialogue about ICE enforcement programs and whether and to what extent local police should be involved with federal immigration enforcement efforts in the wake of

the President's November 2014 Executive Action on Immigration Enforcement.[5] As part of this Executive Action, ICE issued new policy guidance resetting its priorities.[6] At present, an increasing number of reports suggest both that ICE's local agents are acting in contravention of their own policies _and_ that their policies are ineffective towards their stated goals and are inhumane.[7] Upon information and belief, the CARI documents will inform this debate on ICE's policies and practices. For example, the requested records may reveal how rogue ICE agents reject headquarters mandates, and how policies which purport to target "felons not families"[8] are inhumane and ineffective in all forms and lead to serious constitutional violations.

8.    The ICE documents are also critical to public policy-making at the local level. There is serious concern from local governments and law enforcement departments over the legality of ICE's immigration enforcement programs and their impact on families, communities, and community policing. Based on such concerns, many state and local authorities have adopted or are currently considering policies curtailing their voluntary assistance with ICE. Upon information and belief, the rollout of the CARI program was ICE's response to the decision of local communities and law enforcement to

---

[5] Press Release, The White House, Office of the Press Sec'y, FACT SHEET: Immigration Accountability Executive Action (Nov. 20, 2014), _available at_ https://www.whitehouse.gov/the-press-office/2014/11/20/fact-sheet-immigration-accountability-executive-action.

[6] Memorandum from Jeh Charles Johnson, Sec'y, Dep't of Homeland Sec., Policies for the Apprehension, Detention and Removal of Undocumented Immigrants (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[7] _See e.g._ Kourtney Liepelt, _Iowa Community Rallies Around Max Villatoro, A Pastor Facing Deportation To Honduras_, HUFFINGTON POST, Mar. 9, 2015; Brian Lee, _Immigration Reform: Authorities No Longer Shielding DAPA-Eligible Immigrants From Deportation Cases_, INTERNATIONAL BUSINESS TIMES, Feb. 27, 2015; Roque Planas, _DAPA-Eligible Immigrants Face Threat Of Deportation, Advocates Say_, HUFFINGTON POST, Feb. 27, 2015.

[8] Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), _available at_ https://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration.

withdraw from ICE's voluntary assistance programs, such as Secured Communities, and the resultant decline in ICE arrests and deportations.

9.     Therefore, because ICE has refused to produce a single document since Plaintiffs' original request was filed on November 13, 2013 ("Plaintiffs' FOIA Request"), NOWCRJ and the Community Civil Rights Monitors file this litigation asking this Court to order ICE to turn over the records on an expedited basis. NOWCRJ and the Community Civil Rights Monitors need the records at a time of robust public debate on ICE's enforcement practices and whether and to what extent local police should be involved with federal immigration enforcement efforts. NOWCRJ and the Community Civil Rights Monitors will use the documents to deepen community understanding, organize public "know-your-rights" trainings, enhance civil rights monitoring and government accountability over its police practices, promote reasoned debate over the government's activities, and engage in public policy advocacy.

10.     The CARI documents are also necessary to protect certain Civil Rights Monitors' and other affected residents' fundamental right to defend themselves against the immigration consequences of these programs. Certain Community Civil Rights Monitors and their families are victims of CARI raids and could be deported at any time based on orders for removal obtained through these CARI raids. Accordingly, the production of CARI documents sought herein is also necessary to vindicate the civil rights of the Individual Plaintiffs. Evidence obtained through "egregious" or "widespread" violations of the Constitution by law enforcement can be subject to suppression in removal proceedings before immigration court. *See I.N.S. v. Lopez Mendoza*, 486 U.S. 1032, 1050 (1984). ICE should also consider information related to

civil rights violations as part of its prosecutorial discretion determinations.[9] For the aforementioned reasons, Plaintiffs seek an order compelling ICE to immediately process Plaintiffs' Request and immediately release records that have been unlawfully withheld.

## JURISDICTION

11.     This court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B).

## PARTIES

12.     Plaintiff the New Orleans Workers' Center for Racial Justice ("NOWCRJ"), an original requester on Plaintiffs' FOIA Request, is a non-profit organization founded in the aftermath of Hurricane Katrina that works to protect and defend the civil, labor, and human rights of low-income workers. The NOWCRJ supports the Congress of Day Laborers, a membership organization engaged in community organizing on civil, labor, and human rights issues with thousands of members including reconstruction workers, low-income Latino community members in the New Orleans metro area, and their families.

13.     Plaintiff Santos Alvarado was an original requester in Plaintiffs' FOIA Request and is a civil rights monitor and member of the Congress of Day Laborers.

14.     Plaintiff Maria Amaya was an original requester in Plaintiffs' FOIA Request and is a civil rights monitor and member of the Congress of Day Laborers.

15.     Plaintiff Melvin Bardales-Deras is a dedicated father, worker, civil rights monitor and member of the Congress of Day Laborers. Mr. Bardales-Deras was a victim of a CARI program operation that is the subject of Plaintiffs' FOIA Request. In October 2013, a CARI team detained Plaintiff when he was stopped during an ICE vehicular

---

[9] Memorandum from John Morton, Dir., Immigration And Customs Enforcement, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (Jun. 17, 2011), *available at* http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf.

checkpoint in Kenner, Louisiana. He was arrested in front of his crying children, fingerprinted and detained. While ICE released Mr. Bardales-Deras from detention after significant public concern over his case, ICE continues to pursue his deportation and Plaintiff could be deported and separated from family and community at any time at the discretion of ICE. Mr. Bardarles-Deras was an original requester in Plaintiffs' FOIA Request.

16.     Plaintiff Jimmy Barraza-Bonilla is the father of four U.S. Citizen children and is a civil rights monitor and member of the Congress of Day Laborers. Mr. Barraza-Bonilla was a victim of a CARI program operation that is the subject of Plaintiffs' FOIA Request. He was detained in a CARI operation in front of his apartment when agents approached him and his family with guns drawn while they were unloading groceries from the car. ICE immediately detained and arrested him, handcuffed his teenage son, and continued to aggressively verbally harass his partner. Mr. Barraza-Bonilla came to New Orleans over nine years ago to help with the reconstruction effort after Hurricane Katrina. While ICE released Plaintiff from detention after significant public concern over his case, ICE continues to pursue his deportation and Plaintiff could be deported and separated from family and community at any time at the discretion of ICE. Mr. Barraza-Bonilla was an original requester in Plaintiffs' FOIA Request.

17.     Plaintiff Alfredo Carrera was an original requester in Plaintiffs' FOIA Request and is a civil rights monitor and member of the Congress of Day Laborers.

18.     Plaintiff Denis Chirinos-Avila is a reconstruction worker, father to an infant U.S. Citizen son, and a civil rights monitor and member of the Congress of Day Laborers. Mr. Chirinos-Avila was a victim of a CARI program operation that is the

7

subject of Plaintiffs' FOIA Request. ICE arrested Mr. Chirinos-Avila during a CARI sweep in an apartment complex where he was looking for a new home with his pregnant partner who was weeks away from her due date. While ICE released Plaintiff from detention after significant public concern over his case, ICE continues to pursue his deportation and Plaintiff could be deported and separated from family and community at any time at the discretion of ICE. Mr. Chirinos-Avila was an original requester in Plaintiffs' FOIA Request.

19.     Plaintiff Irma Lemus is the mother of two U.S. Citizen children and one nine-year-old son with recurrent and persistent chalazia in both eyes. Ms. Lemus is a civil rights monitor and member of the Congress of Day Laborers. Plaintiff Ms. Lemus was a victim of a CARI program operation that is the subject of Plaintiffs' FOIA Request. She is a dedicated parent and poses no threat to public safety. On September 25, 2013, a CARI team pulled up outside of her home while the family was packing for a fishing trip and arrested Ms. Lemus in front of her young children. While ICE released Plaintiff from detention after significant public concern over her case, ICE continues to pursue her deportation and Plaintiff could be deported and separated from family and community at any time at the discretion of ICE. Ms. Lemus was an original requester in Plaintiffs' FOIA Request.

20.     Plaintiff Erlin San Martin-Gomez is a reconstruction worker and father of a U.S. Citizen infant who has been diagnosed with "failure to thrive," a serious developmental condition. Mr. San Martin-Gomez is also a civil rights monitor and member of the Congress of Day Laborers. Plaintiff was a victim of a CARI program operation that is the subject of Plaintiffs' FOIA Request. A CARI team accompanied by

the Jefferson Parish Sheriff's Office detained Mr. San Martin-Gomez in the parking lot of an apartment complex while he was in route to pick up his son. Based solely on racial profiling, ICE agents approached Mr. San Martin-Gomez, handcuffed and fingerprinted him using their mobile biometric device. For several hours after detaining Mr. San Martin-Gomez, the ICE agents drove the van around arresting people with Latino appearance in other neighborhood parking lots and in a laundromat before driving him to an ICE detention center. While ICE released Plaintiff from detention after significant public concern over his case, ICE continues to pursue his deportation and Plaintiff could be deported and separated from family and community at any time at the discretion of ICE. Mr. San Martin-Gomez was an original requester in Plaintiffs' FOIA Request.

21.     Plaintiff Ronald Martinez-Rivera is the father of a U.S. Citizen child, sole provider for his family, and a civil rights monitor and member of the Congress of Day Laborers. Mr. Martinez-Rivera was a victim of a CARI program operation that is the subject of Plaintiffs' FOIA Request. In August 2013, Mr. Martinez-Rivera and his co-worker were driving to work when a CARI team accompanied by the Jefferson Parish Sheriff's Office racially profiled them and pulled over their vehicle, detaining, fingerprinting, and arresting Mr. Martinez-Rivera. While ICE released Plaintiff from detention after significant public concern over his case, ICE continues to pursue his deportation and Plaintiff could be deported and separated from family and community at any time at the discretion of ICE. Mr. Martinez-Rivera was an original requester in Plaintiffs' FOIA Request.

22.     Plaintiff Mario Mendoza was an original requester in Plaintiffs' FOIA Request and is a civil rights monitor and member of the Congress of Day Laborers.

23.     Plaintiff Ilda Sarmiento was an original requester in Plaintiffs' FOIA Request and is a civil rights monitor and member of the Congress of Day Laborers.

24.     Defendant ICE is a subdivision of the U.S. Department of Homeland Security ("DHS") and is a federal "agency" within the meaning of 5 U.S.C. § 552(f)(l) and has possession of the records requested by Plaintiffs in the Plaintiffs' FOIA Request.

## STATEMENT OF FACTS

### Background on the CARI Program

25.     In 2012, ICE Headquarters was under intense pressure to increase ICE arrest numbers in order to correct a shortfall in anticipated numbers of deportations for the fiscal year.

26.     In New Orleans, in 2012, prior to the deployment of the CARI program, ICE was reporting declining arrests and deportation numbers as compared to previous fiscal years.

27.     Other ICE regional field offices across the country were also reporting declines in ICE arrests and deportation as compared to previous fiscal years.

28.     In 2012, ICE Headquarters created the CARI program in order to increase the number of ICE arrests and deportations.

29.     The CARI program is a national ICE enforcement program active in the New Orleans regional field office and other regional ICE field offices across the United States.

30.     The CARI program is operated by Enforcement and Removal Operations (ERO), a division of ICE.

31.     The CARI program is part of a series of enforcement priorities initiatives within ERO's National Fugitive Operations Program.

32.     The CARI program was created in conjunction with ICE's Operation Cross Check initiative.

33.     The CARI Program involves close coordination with ICE Chief Counsel, Homeland Security Investigations (HSI), and local law enforcement.

34.     The ICE New Orleans regional field office covers the following 5 states: Alabama, Arkansas, Louisiana, Mississippi, and Tennessee.

35.     In 2012, the ICE New Orleans regional field office began operationalizing the ICE Headquarters' CARI program in the New Orleans metro region.

36.     In the ICE New Orleans regional field office, the CARI program increased the number of ICE field operation teams and/or agents in the field.

37.     In the ICE New Orleans regional field office, the CARI program increased the number of arrests overall from the ICE field office.

38.     In the ICE New Orleans regional field office, the CARI program increased the number of individuals against whom ICE pursued removal.

39.     ICE's stated goals in the CARI program are to deport "dangerous criminals" who purportedly posed a threat to public safety.

40.     At times, ICE CARI program operations have been conducted in the presence and/or with the assistance of the New Orleans Police Department ("NOPD").

41.     During the time that the ICE New Orleans regional field office was conducting CARI program operations with the presence and/or assistance of the NOPD, the NOPD was negotiating a consent decree with the United States Department of Justice

after a finding of a pattern and practice of racial profiling, unlawful search and seizure, and excessive use of force including taking enforcement actions based on perceived immigration status and racial stereotyping of Latinos.[10]

42.     At times, ICE CARI program operations have been conducted in the presence and/or with the assistance of the Jefferson Parish Sheriff's Office.

43.     At times, ICE CARI program operations have been conducted in the presence and/or with the assistance of the Kenner Police Department.

44.     At times, ICE CARI program operations have been conducted in the presence and/or with the assistance of the St. Bernard Parish Sheriff's Office.

45.     At times, ICE CARI program operations have been conducted in the presence and/or with the assistance of the St. Tammany Parish Sheriff's Office.

46.     At times, ICE CARI program operations have been conducted in the presence and/or with the assistance of the Louisiana State Police.

47.     Under the CARI Program, ICE agents with the ICE New Orleans Field office have used racial profiling-based area sweeps to identify community members for arrest and questioning.

48.     Under the CARI Program, ICE agents with the ICE New Orleans regional field office have handcuffed individuals and subjected them to fingerprinting and checks of their identity against federal databases using mobile biometrics devices for fingerprinting.

49.     Under the CARI Program, the ICE New Orleans regional field office acquired additional mobile biometrics devices.

---

[10] Civil Rights Div., U.S. Dep't of Justice, Investigation of New Orleans Police Department, (Mar. 16, 2011) at viii and x, *available at* http://www.justice/gov/crt/about/ spl/nopd_report.pdf.

50. ICE New Orleans regional field office releases approximately 75 percent of the people that its agents subject to fingerprinting.

51. Enforcement operations under the CARI program have taken place in locations across the New Orleans metro area including but not limited to: supermarkets, restaurants, laundromats, public parks, parking lots of apartment complexes, and Bible study groups. They have involved vehicular checkpoints, vehicular stops, street stops, and warrantless home entries.

52. ICE's CARI raids have terrorized Latinos in the New Orleans metro area and made them fearful that at any time—while shopping for groceries, walking their children to the school bus stop, or taking their car to the auto shop—they could be targeted by ICE because they appear to be Latino, arrested, and immediately separated from their family and community, transferred to a rural detention center, and quickly deported.

53. In May 2014, under the CARI program, ICE, coordinating with the Kenner Police Department, conducted a raid of an auto shop in Kenner, Louisiana, a suburb of New Orleans with a significant and expanding Latino community. ICE agents surrounded the workplace blocking off all exits and making sweeping arrests of all Latinos. More than ten individuals were detained and fingerprinted—including customers and workers, men and women. Among others, ICE arrested and detained Yestel Velasquez, a member of the Congress of Day Laborers and a customer who was waiting for his car to be fixed.

54. In August 2013, under the CARI program, ICE, coordinating with the New Orleans Police Department, conducted a raid in the parking lot of an Ideal

Supermarket, a Latino supermarket chain in New Orleans. ICE agents blocked customers in the parking lot with their vehicles and pulled customers from their cars and off the sidewalk. Among others, ICE arrested Congress of Day Laborers member Mr. Ernesto Zacarias-Lopez who had gone to the supermarket to buy food for his pregnant wife.

55.     The CARI program, as implemented by the ICE New Orleans regional field office, has made residents afraid of contact with any law enforcement agency. This fear inhibits the cooperation of witness and victims of crimes, generally undermining community policing efforts and public safety.

56.     Publicly, ICE claims that the CARI program focuses ICE's limited enforcement resources on identifying, arresting, and removing at-large criminal aliens who pose a risk to community safety, and further claims that ICE does not conduct sweeps or raids to target undocumented immigrants indiscriminately.[11]

57.     The CARI documents would expose the inaccuracies in ICE's public statements that the CARI program is focused on improving community safety and does not involve indiscriminate sweeps and raids that violate civil and constitutional rights, and would contribute to reasoned and robust public debate on the efficacy and impact of ICE enforcement programs.

<u>Plaintiffs' FOIA Request to ICE and ICE's Responses</u>

58.     On November 13, 2013, NOWCRJ and other requestors including the Community Civil Rights Monitors, submitted Plaintiffs' FOIA request pursuant to FOIA, 5 U.S.C. §552, *et seq.*, for documents relating to the Criminal Alien Removal Initiative

---

[11] *See, e.g,.* Alexia Fernandez Campbell, *Is New Orleans Trying to Deport Undocumented Workers Now That the Rebuilding Is Over?*, NATIONAL JOURNAL, Oct. 7, 2014.

(CARI) and related community raids programs which have become the norm in New Orleans.

59.     Plaintiffs requested specific records within ICE control and satisfied the statutory requirements under FOIA.

60.     Plaintiffs' Request specifically sought records concerning, among other categories, the policies, procedures and objectives related to CARI, records concerning the scope of CARI, information on CARI arrests, records regarding CARI's cost and fiscal impact, records containing communications within the federal government relating to CARI, and recorded assessments of CARI and Prosecutorial Discretion Requests by CARI arrestees.

61.     Plaintiffs' Request sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(i)(I), citing a "compelling need" for the ICE documents based on the public's urgent need for information regarding ICE's enforcement policies.

62.     Plaintiffs' Request also sought a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii), citing the public's "significant interest" in having access to the CARI documents and NOWCRJ's intention and proven ability to disseminate the information.

63.     On November 26, 2013, ICE denied Plaintiffs' request for a fee waiver and expedited processing.

64.     On December 13, 2013, ICE reconsidered Plaintiffs' request for expedited processing and reversed its position, granting the request for expedited processing.

65.     The non-expedited time limit for agency response to a FOIA request is twenty days from receipt of the FOIA request under 5 U.S.C. § 552(a)(6)(A). The statutory time limit for expedited processing for an agency pursuant to FOIA, when the

information is needed in less than twenty days, is "as soon as practicable" from the date on which the Defendant granted Plaintiffs' Request for expedited processing pursuant to 5 U.S.C. § 552(a)(6)(A)(E)(i).

66.     As of the date of this filing, more than sixteen months after the filing of the request, notwithstanding its expedited processing ruling and its acknowledgement of the compelling need for the documents, ICE has failed to produce a single record in response to the substance of Plaintiffs' Request.

67.     Moreover, ICE has failed to show that the requested records are exempt and failed to segregate out and release responsive records not subject to an exemption claim.

68.     The failure of ICE to substantively respond to Plaintiffs' Request within the statutorily prescribed period results in constructive denial of Plaintiffs' Request pursuant to 5 U.S.C. § 552(a)(6)(A)(E)(i). Therefore, Plaintiffs have exhausted administrative remedies against ICE on the substantive FOIA request.

69.     Plaintiffs filed an administrative appeal challenging ICE's denial of the fee waiver on January 25, 2014.

70.     On February 20, 2014, ICE denied the appeal requesting fee waiver.

71.     On October 9, 2014, Plaintiffs submitted a Letter of Reconsideration addressing ICE's stated grounds for denial of the requested fee waiver. This letter restated the proven track record of national dissemination of information by NOWCRJ, described the methods by which NOWCRJ will disseminate the information obtained from the CARI documents, and explained how the requested information will significantly contribute to the public's understanding of governmental activities.

16

Plaintiffs' FOIA request and subsequent appeals also demonstrated that NOWCRJ has no commercial interest in the disclosure of the requested documents.

72.     On November 21, 2014, in response to Plaintiff's Letter of Reconsideration, ICE determined the denial of Plaintiff's request for a fee waiver was proper.

73.     Therefore, Plaintiffs have exhausted administrative remedies against ICE on the fee waiver request.

74.     ICE's withholding of records is unlawful both in refusing to release documents and in causing unreasonable delay in the time it takes Plaintiffs to receive documents.

75.     Plaintiffs have a statutory right to the CARI documents they seek, and there is no legal basis for ICE's failure to timely disclose the records in full.

76.     ICE has offered no defense for its failure to respond to Plaintiffs' request.

77.     ICE's failure to timely produce the CARI documents has no reasonable basis in law.

78.     ICE's refusal to release the CARI documents in a timely fashion compromises the safety and constitutional rights of thousands of New Orleans residents who live in communities where ICE continues to conduct community raids.

79.     Plaintiffs have no commercial interest in the CARI documents.

80.     ICE's release of the CARI documents is in the public interest and will contribute to a robust public dialogue on immigration enforcement, constitutional rights, and whether and to what extent local police should be involved in federal immigration enforcement efforts, leading to an "informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

81.     When ICE produces the documents, NOWCRJ and the Community Civil Rights Monitors will make them public and use them to deepen community understanding, organize public know your rights trainings, enhance civil rights monitoring and government accountability over police practices, promote reasoned debate over the government's activities, and engage in public policy advocacy.

### FIRST CLAIM FOR RELIEF

Violation of FOIA for Failure to Disclose and

Release Records Responsive to Plaintiffs' Request

82.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 81 as if repeated and incorporated herein.

83.     By failing to expeditiously disclose and release the requested records, ICE has violated the public's right to obtain information on how their government operates under 5 U.S.C. § 552, as advanced by Plaintiffs.

### SECOND CLAIM FOR RELIEF

ICE Improperly Constructively Denied

Plaintiffs' Request for Expedited Processing

84.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 83 as if repeated and incorporated herein.

85.     Notwithstanding the administrative ruling granting expedited processing, ICE has constructively denied the request for expedited processing by failing to produce any records for over sixteen months.

## THIRD CLAIM FOR RELIEF

<u>ICE Improperly Denied Plaintiffs' Request for a Fee Waiver</u>

86.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 85 as if repeated and incorporated herein.

87.    Defendant ICE has violated Plaintiffs' rights to a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii) and Defendant's own regulations, 6 C.F.R. § 5.11(k).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request and pray that this Court:

1)    Order Defendant ICE immediately to make a full, adequate, and expedited search for the requested documents;

2)    Order Defendant to engage in expedited processing in this action;

3)    Enjoin Defendant from assessing fees or costs for the processing of Plaintiffs' FOIA Request;

4)    Order Defendant, upon completion of expedited processing, to disclose the non-exempt requested records, and any non-exempt portions of records, and make copies available to Plaintiffs no later than ten days after the Court's order;

5)    Order Defendant to produce a *Vaughn* index describing with particularity the content of any documents withheld, in whole or in part, and identifying the FOIA exemptions Defendant asserts to justify such withholding;

6)    Award Plaintiff's their costs and reasonable attorney's fees incurred in this action as provided by 5 U.S.C. § 552(a)(4)(E); and

7)    Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,


____/s/ Michael T. Kirkpatrick____
Michael T. Kirkpatrick (DC Bar #486293)
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Tel: 202-661-6582
michael.kirkpatrick@law.georgetown.edu
*Attorney for Plaintiffs*


____/s/ Peter L. Markowitz_____
Peter L. Markowitz, Esq. (NY Bar #4092276)
*Motion for DC Bar Admission Pending*
BENJAMIN N. CARDOZO SCHOOL OF LAW IMMIGRATION JUSTICE CLINIC
55 5th Avenue, 11th Floor
New York, New York 10003
Tel: 212-790-0895
peter.markowitz@yu.edu
*Attorney for Plaintiff, New Orleans Workers' Center for Racial Justice*


____/s/ Jennifer Rosenbaum_____
Jennifer Rosenbaum (Louisiana Bar #31946)
*Pro Hac Vice motion to be submitted*
Yihong "Julie" Mao (Louisiana Bar #34191)
*Pro Hac Vice motion to be submitted*
NEW ORLEANS WORKERS' CENTER FOR RACIAL JUSTICE
217 N. Prieur St.
New Orleans, LA 70112
Tel: 504-309-5165
jjrosenbaum@nowcrj.org; jmao@nowcrj.org

*Attorneys for Plaintiffs*

Dated:  March 25, 2015