**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEW ORLEANS WORKERS' CENTER FOR RACIAL JUSTICE, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) ) ) |
| Defendant. | ) ) ) |

Civil Action No.1:15-cv-00431-RBW

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Jennifer Rosenbaum (LA Bar #31946)
NEW ORLEANS WORKERS' CENTER FOR
RACIAL JUSTICE
217 N. Prieur St.
New Orleans, LA 70112
Tel: 504-309-5165
Email: jjrosenbaum@nowcrj.org


Michael T. Kirkpatrick (D.C. Bar #486293)
Samantha Ondrade, Student Attorney
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Tel: 202-661-6582
Email: michael.kirkpatrick@law.georgetown.edu

Peter L. Markowitz (NY Bar #4092276)
Thomas P. Fritzsche (D.D.C. Bar #NY0203)
Farah Egal, Student Attorney
Dara Gell, Student Attorney
Sam Stanton, Student Attorney
BENJAMIN N. CARDOZO SCHOOL OF
LAW IMMIGRATION JUSTICE CLINIC
55 5th Avenue, 11th Floor
New York, New York 10003
Tel: 212-790-0895
Email: peter.markowitz@yu.edu,
thomas.fritzsche@yu.edu

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**……………………………………………………...……………iv

**INTRODUCTION**…………………………………………………………………....…..1

**PROCEDURAL HISTORY**……………………………………………………………....1

**LEGAL STANDARDS**……………………………………………………………………...3
    I.     The Freedom of Information Act……………………………………………...3
    II.    Federal Rule of Civil Procedure 56……………………………………………..4

**ARGUMENT** ...................................................................................................... 4

**I.**     **ICE Failed to Conduct an Adequate Search for Relevant Records.** .................. ……4

    **A.**     **ICE Did Not Conduct Its Search in a Manner Reasonably Calculated to Uncover All Responsive Documents and Has Submitted Declarations Insufficient to Show Adequate Searches.** ................................................................................... 4

        1.    ICE's Search Terms Were Unreasonable, Overly Literal and Limited in Scope. ....... 5

        2.    ICE Unreasonably Limited its Search to Two Component Offices. .......................... 8

        3.    ICE Unreasonably Limited the Scope of its Search by Failing to Search Critical Record Systems........................................................................................ 11

        4.    ICE Failed to Systematically Search for Several Critical Substantive Categories of Records Demonstrated to Exist and Specifically Requested by Plaintiffs. ......................... 15

    **B.**     **ICE Cannot Justify its Inadequate Search by Relying on an Unreasonable Interpretation of Plaintiffs' Request.** ...................................................................... 20

        1.    ICE Is Foreclosed from Arguing that Plaintiffs' Request Was Inadequate Because ICE Violated its Own Regulation by Failing to Collaborate with Plaintiffs to Resolve any Issues with the Request............................................................................. 20

        2.    Plaintiffs' Request Reasonably Described the Records Sought ................................ 22

**II.**  **ICE Has Failed to Meet Its Burden to Show That It Properly Withheld Information under Exemptions 5, 6, 7(C) and (7)(E).** ....................................................... 23

    **A.**     **ICE Improperly Asserts Exemption 5 based on Deliberative Process and Has Failed to Meet Its Burden to Establish that Nondisclosed Information Is Pre-Decisional and Deliberative.** ........................................................................... 24

1.      ICE Has Failed to Meet Its Burden to Establish that Certain Documents It Subjected to Exemption 5 Were in Fact Inter- or Intra-Agency Memoranda. ..................................... 25

2.      ICE Has Not Met Its Burden to Establish Either Prong of the Exemption 5 Deliberative Process Privilege. ......................................................................................... 26

a.      ICE Claims Exemptions over Materials That Are Not Pre-Decisional. .................... 26

b.      ICE Improperly Redacted Many Documents under Exemption 5 that Are Not Deliberative in Nature. ........................................................................................................ 28

3.      ICE Fails to Meet Its Burden to Prove that It Could Not Have Segregated and Released Redacted Non-Exempt Factual Material. ............................................................. 30

**B.      ICE Improperly Asserted Exemptions 6 and 7(C) on Information Not Compiled for Law Enforcement Purposes, Whose Disclosure Posed at Most a *de Minimis* Invasion of Privacy Clearly Outweighed by the Public Interest in Disclosure.** ............................... 31

1.      ICE Failed to Satisfy Its Burden to Establish the Applicability of Exemptions 6 and 7(C)……………………………………………………………………………………32

a.      All Work Email Addresses and Names Were Improperly Withheld under Exemption 6……………………………………………………………………………………….33

b.      ICE Improperly Invoked Exemption 7(C) for Non-Law Enforcement Records. ....... 34

c.   Disclosure of Names and Work Email Addresses Withheld under Exemption 7(C) on Records Compiled for Law Enforcement Purposes Do Not Constitute an Unwarranted Invasion of Personal Privacy. ............................................................................................. 36

2.      Disclosure is Warranted Because the Public Interest Overwhelmingly Outweighs the Privacy Interests ................................................................................................................. 37

**C.      ICE Improperly Asserts Exemption 7(E) over Information not Compiled for Law Enforcement Purposes, that Is Already Generally Known to the Public, or Whose Disclosure Poses no Reasonable Risk of Circumvention of the Law.** ................................ 39

1.      ICE Improperly Withheld Information on Records not Compiled for Law Enforcement Purposes. ..................................................................................................... 40

2.      ICE Improperly Applied the (B)(7)(E) Exemption to Information Where Disclosure Posed no Risk of Circumvention of the Law. ..................................................................... 41

**D.    ICE's Generalized and Inadequate *Vaughn* Index of its Redactions Further Shows that ICE Has Applied Exemptions Indiscriminately and Overbroadly.** ........................... 43

Conclusion ..................................................................................................................... 44

## TABLE OF AUTHORITIES

### CASES

*Abtew v. U.S. Dep't of Homeland Sec.*,
    808 F.3d 895 (D.C. Cir. 2015) ..................................................................... 26, 28, 29, 30

*Adamowicz v. IRS*,
    672 F. Supp. 2d 454 (S.D.N.Y. 2009) .............................................................. 26

*Akin, Gump, Strauss, Hauer & Feld, LLP v. DOJ*,
    503 F. Supp. 2d 373 (D.D.C. 2007) .................................................................. 36

*Am. Immigration Council v. U.S. Dep't of Homeland Sec.*,
    950 F. Supp. 2d 221 (D.D.C. 2013) .................................................... 25, 39, 40

*Amnesty Int'l USA v. CIA*,
    No. 07 CIV 5435, 2008 WL 2519908 (S.D.N.Y. June 19, 2008) ...................... 6

*Armstrong v. Exec. Office of the President*,
    97 F.3d 575 (D.C. Cir. 1996) ............................................................................ 33

*Arthur Andersen & Co. v. IRS*,
    679 F.2d 254 (D.C. Cir. 1982) .......................................................................... 27

*Campbell v. DOJ*,
    164 F.3d 20 (D.C. Cir. 1998) ........................................................ 9, 11, 34, 35, 40

*Cause of Action v. IRS*,
    125 F. Supp. 3d 145 (D.D.C. 2015) ................................................................ 7, 9

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ......................................................................................... 24

*Church of Scientology of Calif. v. IRS*,
    792 F.2d 146 (D.C. Cir. 1986) ........................................................................... 9

*Citizen, Inc. v. Dep't of Educ.*,
    292 F. Supp. 2d 1 (D.D.C. 2003) ..................................................................... 14

*Citizens for Responsibility & Ethics in Washington v. DOJ,*
    746 F.3d 1082 (D.C. Cir. 2014) ................................................................. 36, 43

*Coastal States Gas Corp. v. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) .......................................................... 24, 27, 29

*Consumers' Checkbook Ctr. for the Study of Servs. v. HHS,*
    554 F.3d 1046 (D.C. Cir. 2009) ...................................................................... 33

*Cooper v. DOJ,*
    No. CV 99-2513, 2016 WL 1048756 (D.D.C. Mar. 14, 2016) ......................... 34

*Ctr. for Nat'l Sec. Studies v. DOJ,*
    215 F. Supp. 2d 94 (D.D.C. 2002) ................................................................. 19

*Dale v. IRS,*
    238 F. Supp. 2d 99 (D.D.C. 2002) ........................................................... 21, 23

*Davis v. DOJ,*
    968 F.2d 1276 (D.C. Cir. 1992) ...................................................................... 33

*DeBrew v. Atwood,*
    792 F.3d 118 (D.C. Cir. 2015) ................................................................... 4, 21

*Dep't of Air Force v. Rose,*
    425 U.S. 352 (1976) ......................................................................................... 3

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ....................................................................................... 3, 25

*Families for Freedom v. U.S. Customs & Border Prot.,*
    837 F. Supp. 2d 331 (S.D.N.Y. 2011) ............................................................. 6

*FBI v. Abramson,*
    456 U.S. 615 (1982) ................................................................................... 3, 35

*Ferri v. Bell,*
    645 F.2d 1213 (3d Cir. 1981) ......................................................................... 39

*Fox News Network v. U.S. Dep't of Treasury*,
    911 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................. 29

*Goland v. CIA*,
    607 F.2d 339 (D.C. Cir. 1978) ........................................................................... 4

*Hall & Assoc. v. EPA*,
    83 F. Supp. 3d 92 (D.D.C. 2015) ................................................................. 7, 21

*Hansen v. U.S. Dep't of the Air Force*,
    817 F. Supp. 123 (D.D.C. 1992) ....................................................................... 27

*Int'l Counsel Bureau v. DOD*,
    101 F. Supp. 3d 48 (D.D.C. 2015) ................................................................... 10

*Iturralde v. Comptroller of Currency*,
    315 F.3d 311 (D.C. Cir. 2003) ................................................................... 15, 23

*Jefferson v. BOP*,
    No. 05-00848, 2006 WL 3208666 (D.D.C. Nov. 7, 2006) ............................... 12

*Judicial Watch, Inc. v. U.S. Postal Serv.*,
    297 F. Supp. 2d 252 (D.D.C. 2004) ................................................................. 29

*King v. DOJ*,
    830 F.2d 210 (D.C. Cir. 1987) ................................................................... 41, 44

*\*Kowalczyk v. DOJ*,
    73 F.3d 386 (D.C. Cir. 1996) .............................................................. 8, 11, 17

*LaCedra v. Exec. Office for U.S. Attorneys*,
    317 F.3d 345 (D.C. Cir. 2003) ........................................................................... 6

*Leadership Conference on Civil Rights v. Gonzales*,
    404 F. Supp. 2d 246 (D.D.C. 2005) ........................................................... 34, 35

*Mapother v. DOJ*,
    3 F.3d 1533 (D.C. Cir. 1993) ........................................................................... 30

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009) ............................................................................ 41, 42

*McGehee v. CIA*,
    697 F.2d 1095 (D.C. Cir. 1983) .................................................................................... 4

*McGrady v. Mabus*,
    635 F. Supp. 2d 6 (D.D.C. 2009) ............................................................................... 30

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
    575 F.2d 932 (D.C. Cir. 1978) .................................................................................... 30

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) ...................................................................................................... 3

*Montgomery v. Chao*,
    546 F.3d 703 (D.C. Cir. 2008) ...................................................................................... 4

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007) .................................................................................... 5

*Multi AG Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (2008) .................................................................................................. 33

*Nat'l Air Traffic Controllers Ass'n v. FAA*,
    No. CIV.A.06 53, 2007 WL 495798 (D.D.C. Feb. 12, 2007) .......................................... 4

*\*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) ....................................................................................... 23, 36, 37

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't*,
    877 F. Supp. 2d 87 (S.D.N.Y. 2012) ........................................................................... 13

*Nat'l Sec. Counselors v. CIA*,
    898 F. Supp. 2d 233 (D.D.C. 2012) ...................................................................... 12, 14

*Nation Magazine, Wash. Bureau v. United States*,
    71 F.3d 885 (D.C. Cir. 1995) .................................................................................... 9, 23

*Navarro Hernandez v. U.S. Customs & Border Prot. Agency*,
　　No. 10-4602, 2012 WL 398328 (E.D. La. Feb. 7, 2012) .................................................. 44

*NLRB v. Robbins Tire & Rubber Co.*,
　　437 U.S. 214 (1978) ....................................................................................................... 3

*Oglesby v. U.S. Dep't of Army*,
　　920 F.2d 57 (D.C. Cir. 1990) ........................................................................................ 14

*Parker v. DOJ Exec. Office for U.S. Attorneys*,
　　852 F. Supp. 2d 1 (D.D.C. 2012) ............................................................................ 21, 22

*PHE, Inc. v. DOJ*,
　　983 F.2d 248 (D.C. Cir. 1993) ...................................................................................... 41

*Pub. Citizen v. HHS*,
　　975 F. Supp. 2d 81 (D.D.C. 2013) ................................................................................ 15

*Quinon v. FBI*,
　　86 F.3d 1222 (D.C. Cir. 1996) ...................................................................................... 35

*S. All. for Clean Energy v. U.S. Dep't of Energy*,
　　853 F. Supp. 2d 60 (D.D.C. 2012) ................................................................................ 44

*SafeCard Servs., Inc. v. SEC*,
　　926 F.2d 1197 (D.C. Cir. 1991) ...................................................................................... 5

*Summers v. DOJ*,
　　934 F. Supp. 458 (D.D.C. 1996) ..................................................................................... 8

*Tigue v. DOJ*,
　　312 F.3d 70 (2d Cir. 2002) ............................................................................................ 26

*Truitt v. Dep't of State*,
　　897 F.2d 540 (D.C. Cir. 1990) ...................................................................................... 20

*U.S. Dep't of State v. Ray*,
　　502 U.S. 164 (1991) ...................................................................................................... 23

*U.S. Dep't of State v. Wash. Post Co.*,
    456 U.S. 595 (1982) ........................................................................... 33

*Valencia-Lucena v. U.S. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999) ........................................................ 17

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ................................................. 27, 29

*Weisberg v. DOJ*,
    627 F.2d 365 (D.C. Cir. 1980) .......................................................... 5

*Weissman v. CIA*,
    565 F.2d 692 (D.C. Cir. 1977) ................................................. 37, 43

*Whitaker v. CIA*,
    31 F. Supp. 3d 23 (D.D.C. 2014) ................................................... 11

*Willis v. DOJ*,
    581 F. Supp. 2d 57 (D.D.C. 2008) .................................................. 7

*Wolf v. CIA*,
    357 F. Supp. 2d 112 (D.D.C. 2004) ........................................... 9, 11

*Authorities on which we chiefly rely are marked with asterisks*

## STATUTES

Freedom of Information Act
    5 U.S.C. § 552(a)(3)(A) ................................................................. 22
    5 U.S.C. § 552(a)(4)(B) ................................................................... 4
    5 U.S.C. § 552(a)(6)(E)(i)(I) .......................................................... 2
    5 U.S.C. § 552(b) ................................................................. passim
    5 U.S.C. § 552(b)(5) ..................................................................... 24
    5 U.S.C. § 552(b)(6) ........................................................ 24, 31, 34
    5 U.S.C. § 552(b)(7) ..................................................................... 39
    5 U.S.C. § 552(b)(7)(C) ........................................................ 24, 36
    5 U.S.C. § 552(b)(7)(E) ........................................................ 24, 39

Fed. R. Civ. P. 56(a) .......................................................................... 4

## REGULATIONS

6 C.F.R. § 5.3(b) ......................................................................................................... 21

6 C.F.R. § 5.5(d)(1) ...................................................................................................... 2

x

## INTRODUCTION

Plaintiffs submit this Memorandum in Opposition to Defendant U.S. Immigration and Customs Enforcement (ICE)'s Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment. ICE has failed to adequately respond to Plaintiffs' Request under the Freedom of Information Act (FOIA) regarding ICE's Criminal Alien Removal Initiative (CARI). Through CARI, ICE has raided predominantly Latino communities by fingerprinting, arresting, and detaining individuals, with limited focus on ostensible targets, and often in cooperation with local law enforcement officers. *See* Pls.' Statement of Undisputed Material Facts ("Pl. SUMF") ¶¶ 20–24. Plaintiffs filed their FOIA Request to uncover for the public crucial information about CARI's scope, impact, and implications for civil rights. Pl. SUMF ¶ 25. However, ICE's interpretation of Plaintiffs' Request was unreasonably narrow and overly literal, its search was not designed or conducted in a manner reasonably calculated to uncover all responsive documents, and its withholding of information through FOIA exemptions was unlawfully overbroad and against the interest of public disclosure. Plaintiffs respectfully request that the Court deny ICE's Motion for Summary Judgment, grant Plaintiffs' Cross-Motion, and order ICE to conduct a new, adequate search for responsive documents within a reasonable time frame and to produce all responsive records without improper redactions.

## PROCEDURAL HISTORY

Plaintiffs submitted a FOIA Request on November 13, 2013, seeking records relating to CARI, a nationwide federal immigration enforcement initiative. Pl. SUMF ¶¶ 20, 25. ICE operations under CARI have involved serious civil rights abuses and constitutional violations, including the use of mobile fingerprint devices to target Latino community members for unconstitutional seizures leading to arrest, detention, and deportation. Pl. SUMF ¶¶ 20–24.

Plaintiffs have consistently raised concerns regarding the scope and sufficiency of ICE's search for documents responsive to the Request and have challenged ICE's overbroad and inappropriate use of FOIA exemptions. Pl. SUMF ¶ 31; Ex. 22 at 7–8.

The Request's urgency cannot be overstated. Public attention to and concerns over ICE's use of racial profiling and illegal search and seizure methods are growing, as documented by media attention. Pl. SUMF ¶¶ 20–21, 108. CARI was purportedly aimed at targeting dangerous criminals, but it has instead resulted in the arrest and detention of many immigrants with minor or no criminal records. *See* Compl. ¶ 23; Ex. 8; Pl. SUMF ¶¶ 20–24. The individuals arrested included parents, workers, and community leaders. *Id.* Those detained describe intolerable police practices that violated their Fourth and Fourteenth Amendment rights. *Id.* The issues at the heart of this case—serious constitutional and dignitary harms that create community distrust of law enforcement—are of the utmost importance and the need for truth has only grown.

The history of this case is a story of delay, in direct contravention of FOIA's purpose. When Plaintiffs filed their Request, ICE did not raise any issues with the scope or reasonableness of Plaintiffs' Request. Pl. SUMF ¶ 27. Instead, in acknowledgment of the urgency of this subject matter, on December 13, 2013, one month after Plaintiffs filed their Request, ICE granted expedited processing. Pl. SUMF ¶¶ 25–26. Under FOIA, expedited processing is warranted when requesters show a "compelling need" for the records, 5 U.S.C. § 552(a)(6)(E)(i)(I), and "an urgency to inform the public concerning actual or alleged federal government activity." 6 C.F.R. § 5.5(d)(1). However, despite granting expedited processing, ICE waited 1.5 years, until after the start of litigation, before producing any documents. Pl. SUMF ¶¶ 25, 28, 30.

Plaintiffs filed their Complaint on March 25, 2015, sixteen months after submitting their Request and after having received no documents. *Id.* ¶ 28. ICE released its first production set to

Plaintiffs on May 7, 2015. *Id.* ¶ 30. In total, between May 7, 2015 and November 18, 2015, ICE produced 3,680 pages of documents, as well as various spreadsheets.[1] *Id.* ¶ 35. Plaintiffs sent ICE two letters identifying particular responsive records, along with data systems, search terms and offices with files likely to yield relevant records. *Id.* ¶¶ 31–32. However, the scope and methodology of ICE's search was wholly inadequate. *Id.* ¶¶ 31–32, 37–78. On many of the records that ICE did produce, ICE's exemption claims are overbroad, improper, and asserted in vague boilerplate. *Id.* ¶¶ 79–100. Thus, ICE's Motion for Summary Judgment should be denied and Plaintiffs' Cross-Motion should be granted.

## LEGAL STANDARDS

### I.   The Freedom of Information Act

FOIA's purpose is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). To that end, "Congress intended FOIA to 'permit access to official information long shielded unnecessarily from public view.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)). FOIA mandates broad disclosure of government records to the public, subject to nine enumerated exceptions which are to be narrowly construed. *See* 5 U.S.C. § 552(b); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)). FOIA is an essential tool for the public "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

---

[1] On February 17, 2016, ICE re-released 167 pages of previously produced documents with *slightly* fewer redactions, and on March 10, 2016, it re-released four additional pages with fewer redactions. Pl. SUMF ¶ 36.

## II.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).

Under FOIA, the district court reviews *de novo* the agency's actions in response to a FOIA request. 5 U.S.C. § 552(a)(4)(B). To prevail on a FOIA motion for summary judgment, the responding agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *See Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978). "The agency bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation." *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983). In FOIA cases, "[i]f the government does not satisfy its burden, the requester is entitled to summary judgment." *Nat'l Air Traffic Controllers Ass'n v. FAA*, No. CIV.A.06 53, 2007 WL 495798, at *2 (D.D.C. Feb. 12, 2007).

### ARGUMENT

## I.   ICE Failed to Conduct an Adequate Search for Relevant Records.

### A.   ICE Did Not Conduct Its Search in a Manner Reasonably Calculated to Uncover All Responsive Documents and Has Submitted Declarations Insufficient to Show Adequate Searches.

To prevail at summary judgment, the agency bears the burden of showing "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (internal citations omitted).

4

While "[a]gency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), a requester "may nonetheless produce countervailing evidence" as to the adequacy of the search. *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007). "[I]f the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Weisberg v. DOJ*, 627 F.2d 365, 370 (D.C. Cir. 1980).

The record and ICE's search declarations reveal substantial deficiencies in the methodology and scope of ICE's search. Pl. SUMF ¶¶ 37–78. ICE neglected its duty to develop appropriate search terms based on Plaintiffs' Request and conducted the corresponding search in an arbitrary manner; illogically restrained its search to only two ICE component offices even after additional, unsearched component offices were referenced frequently in the uncovered records.[2] It failed to search critical types of record storage systems where responsive information is stored. ICE failed to search adequately for several categories of clearly responsive records, such as (1) most enforcement data and case information for CARI arrestees, (2) most policy, planning and training records, (3) records relating to local law enforcement's involvement in CARI, and records relating to (4) monitoring of CARI or to (5) CARI's fiscal impact. *Id.*

## 1. ICE's Search Terms Were Unreasonable, Overly Literal and Limited in Scope.

ICE has failed to generate reasonable and obvious search terms related to Plaintiffs' Request. Plaintiffs sought, *inter alia*, data about ICE's practices of fingerprinting individuals in the field and records of ICE's communications about CARI. *Id.* ¶ 25. ICE did not conduct a

---

[2] While ICE initially sent the FOIA Request to its Office of the Principal Legal Advisor (OPLA) as well, ICE later declined to search OPLA's records based on what has since been proven to be an inaccurate claim by OPLA that it had no involvement in CARI. *See* Section III.A.2, *infra*.

search reasonably planned to actually retrieve these records, and instead relied on a narrow range of search terms extracted verbatim from section headings in the FOIA Request, such as "Total number of individuals fingerprinted using ICE's mobile fingering units;" "What the federal government is saying about CARI;" "What ICE is saying re: CARI." *Id.* ¶ 39. Further, despite presenting a list of eighty-eight search terms as evidence of the sufficiency of its search, forty of the terms identified by ICE include the word "CARI." *Id.* ¶ 40.[3] ICE has searched for little more than the term "CARI" and has thus failed to conduct an adequate search under FOIA. *See LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003) (concluding that the agency acted unreasonably by narrowly construing a FOIA request that was "reasonably susceptible to [a] broader reading").[4]

The inadequacy of ICE's search terms is apparent even from internal documentation produced. ICE officials understood CARI to be an expansive initiative that subsumed the entirety of ICE's National Fugitive Operations Program and that involved arresting persons without criminal histories. Pl. SUMF ¶ 42. ICE's failure to construct its search accordingly in a manner calculated to locate records and to ensure that its agents tasked with searching for responsive documents carried out such a search is indefensible. Plaintiffs drafted a request that enables "a professional agency employee familiar with [CARI] to locate the record with a reasonable

---

[3] Further, no custodian actually searched using all of these listed terms. Pl. SUMF ¶ 41. Many custodians searched only for the acronym "CARI" or the initiative name "Criminal Alien Removal Initiative." *Id.* No ERO custodian searched using more than ten of the terms that ICE provides in its search term list, and those ten terms were "CARI" and nine phrases containing "CARI." *Id.* ¶ 38. OPA custodians searched using twelve terms. Pineiro Decl. ¶ 31.

[4] ICE also limited its searches to exact phrases, without regard to proximity connectors, spelling variations, or case-sensitivity. Pl. SUMF ¶ 73. For example, custodians searched for "CARI detainees," Harrington Decl. ¶ 14, but not other common sense variations of the phrase. *See Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 331, 335 (S.D.N.Y. 2011) (finding search declaration inadequate because "search results will change dramatically depending on which logical connectives – such as "and," "or," "w/10," – are used. In order to determine adequacy, it is not enough to know the search terms. The method in which they are combined and deployed is central to the inquiry."); *Amnesty Int'l USA v. CIA*, No. 07 CIV 5435, 2008 WL 2519908, at *15 (S.D.N.Y. June 19, 2008) ("a search that is designed to return documents containing the phrase 'CIA detainees' *but not* 'CIA detainee' or 'detainee of the CIA' is not reasonably calculated to uncover *all* relevant documents.").

amount of effort," but ICE has failed to fulfill its corresponding duty to distill the language of such a request in a manner that would lead to meaningful searches for the records clearly encompassed by the request. *See Hall & Assoc. v. EPA*, 83 F. Supp. 3d 92, 101 (D.D.C. 2015).

ICE's poorly constructed and unreasonably limited set of search terms was exacerbated by ICE's haphazard use of the search terms. Notably, in responding to Plaintiffs' Request, ICE failed to issue search memoranda to individuals or offices likely to possess responsive records. Pl. SUMF ¶ 68. This omission is further indication that ICE conducted an unreasonably limited search. *See Cause of Action v. IRS*, 125 F. Supp. 3d 145, 157 (D.D.C. 2015) (concluding that IRS's FOIA search was adequate for category where agency identified and issued search memoranda to individuals and offices likely to possess additional records but inadequate for categories where agency did not do so). Utilizing search memoranda could have prevented the arbitrary and insufficient search ICE conducted here. *See, e.g.*, *Willis v. DOJ*, 581 F. Supp. 2d 57, 71 (D.D.C. 2008) (concluding that "[agency's] declaration and these search memoranda demonstrate that the [agency] undertook an extensive search to find . . . records" requested).

ICE improperly allowed its custodians to apply different search terms without coordination. Pl. SUMF ¶ 68–70; Ex. 15. To aid the Court in its review, Plaintiffs have compiled a chart based on ICE's search declarations to demonstrate the random manner in which search were applied to different custodians. *See* Ex. 15. For example, of all ICE officers to search, only two conducted a search for an organizational chart responsive to Plaintiffs' Request: one in the New Orleans ERO Field Office searched for "org chart," and one in the Atlanta Field Office searched for "organizational chart." Pl. SUMF ¶ 71. ICE proffers no rationale for why those two officers were the only ones to look for these records. *Id.* This arbitrary decision is further compounded by the custodians' failure to use other terms reasonably designed to retrieve

responsive records, such as "organizational map," *see Summers v. DOJ*, 934 F. Supp. 458, 461 (D.D.C. 1996), and refutes ICE's contention that it conducted an adequate search.

Thus, by failing to interpret Plaintiffs' Request to develop appropriate search terms reasonably calculated to uncover responsive documents and by indiscriminately distributing these terms among its field officers, ICE has violated FOIA. Plaintiffs respectfully ask the Court to remedy ICE's inadequate searches by ordering ICE to search using, at minimum, the terms listed in Appendix B of Plaintiffs' September 2, 2015 letter, along with any other terms ICE identifies that are necessary to capture the records described in Plaintiffs' Request. *See* Ex. 24.

### 2. ICE Unreasonably Limited its Search to Two Component Offices.

CARI is a nationwide enforcement initiative implemented in all twenty-four local ICE Enforcement and Removal Operations (ERO) field offices. Pl. SUMF ¶ 20. A search reasonably calculated to uncover all relevant documents responsive to Plaintiffs' Request would require ICE to search any and all agency offices that were involved with the creation, implementation, or administration of the program. *See Kowalczyk v. DOJ*, 73 F.3d 386, 388 (D.C. Cir. 1996). Plaintiffs identified a list of such ICE component offices in their June 22, 2015 and September 2, 2015 letters to ICE.[5] *See* Exs. 23–24. ICE searched only ERO and the Office of Public Affairs (OPA). Harrington Decl. ¶¶ 8–10; Pineiro Decl. ¶¶ 25–31; Pl. SUMF ¶ 43. ICE states that it considered searching the Office of the principal Legal Advisor (OPLA) but decided it was unnecessary after an official said that OPLA was not involved in CARI. Def. SUMF ¶ 9.

---

[5] The full list included: Office of the Director, Office of the Executive Secretariat, Office of the Principal Legal Advisor, Office of the Deputy Director, Office of the Chief of Staff, Office of Detention Policy and Planning, Enforcement and Removal Operations, Homeland Security Investigations, Office of Professional Responsibility, Office of State, Local and Tribal Coordination, Office of Congressional Relations, Office of Public Affairs, Management and Administration, and Offices of Chief Counsel. Exs. 23–24.

However, "[t]he reasonableness of an agency's search is based on what the agency knew at the conclusion of the search and not on what it speculated at the beginning." *Wolf v. CIA*, 357 F. Supp. 2d 112, 118 (D.D.C. 2004) (citing *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998)). To meet its burden to show a search was adequate when not searching other file systems, the agency must "identify the searched files and describe at least generally the structure of the agency's file system which makes further search difficult." *Church of Scientology of Calif. v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986). "Conclusory statements that the agency has reviewed relevant files are insufficient to support summary judgment." *Nation Magazine, Wash. Bureau v. United States*, 71 F.3d 885, 890 (D.C. Cir. 1995) (citation omitted). Search declarations "should include the rationale for searching certain locations and not others." *Cause of Action*, 125 F. Supp. 3d at 154 (internal citation omitted).

ICE failed to search its headquarters and at least five essential components whose involvement in CARI has been confirmed by records ICE produced and whose missions are closely related to the clear themes in Plaintiffs' Request. Pl. SUMF ¶¶ 42–58. Plaintiffs sought, *inter alia*, records of policies and targeting under CARI, trainings, communications about CARI, and the program's fiscal impact. *See* FOIA Req. Homeland Security Investigations (HSI) referred target leads to CARI officers, assisting CARI agents in the program's alleged main function: to arrest and detain immigrants with criminal histories, yet was not searched at all. Pl. SUMF ¶¶ 44, 46, 53–54; Ex. 14. ICE did not search its Office of the Principal Legal Advisor (OPLA), even though it was responsible for providing the Fourth Amendment trainings in which each CARI officer was required to participate in order to work in the CARI program. Pl. SUMF ¶¶ 44, 46, 55, 57. Further, an ICE official emailed another while planning a CARI enforcement operation, stating "[c]oordination with OPLA is essential . . . ." *Id.* ¶ 56. ICE did not search its

Office of Firearms and Tactical Programs (OFTP) and National Firearms and Tactical Training Unit, even though they provided trainings to prospective and current CARI officers from across the country, including trainings of all officers from the New Orleans CARI program. *Id.* ¶¶ 46, 49–50. The Office of Congressional Relations (OCR) was not searched, even though it worked with CARI personnel to respond to congressional inquiries regarding officers' arrest tactics. *Id.* ¶¶ 44, 46, 51–52; Ex. 12. The Office of the Chief Financial Officer (OCFO) was also referenced in several communications ICE produced about CARI-related budgetary issues, yet ICE failed to search OCFO. *Id.* ¶¶ 44, 46–48; Ex. 9.

ICE also failed to search its headquarters offices, even though CARI was a nationwide initiative. *Id.* ¶¶ 20, 44. It strains credulity for ICE to assert that ICE ERO could implement a nationwide enforcement initiative across all twenty-four Field Offices without any involvement whatsoever of any ICE Headquarters office, making unreasonable ICE's thin justification for choosing not to search at all within the offices of its Director, Deputy Director, Chief of Staff and Executive Secretariat, Assistant Deputy Director, or Management and Administration. *Id.*; *see also* Ex. 8 at Bates 2852–53 (ICE Director John Morton was briefed about CARI, and issued directions relating to its implementation).

ICE states that it did not search the aforementioned offices because CARI "was implemented within ERO . . . . The Initiative was not implemented by ICE HQ, nor did it have any association with the other offices listed above." Harrington Decl. ¶ 28. ICE's statements are at best conclusory. *See Int'l Counsel Bureau v. DOD*, 101 F. Supp. 3d 48, 51 (D.D.C. 2015) (finding agency statement that it "has no reason to believe that any records responsive to the request at issue in this case would have been stored in a system other than the CRS, nor has

plaintiff provided any particular information that would tend to indicate responsive records even exist," to fall short of the agency's burden).

Given the evidence of these five ICE components' connection to CARI, ICE should have conducted a full search of their records. *See Kowalczyk*, 73 F.3d at 389; *see Whitaker v. CIA*, 31 F. Supp. 3d 23, 45 (D.D.C. 2014) (finding an agency's search inadequate when it failed to follow up on a clear lead in its document production). Plaintiffs ask the Court to order ICE to search the offices listed in Appendix A of Plaintiffs' September 2, 2015 letter, *see* Ex. 24, especially ICE's headquarters offices and the five components referenced in ICE's production as discussed herein.

### 3.  ICE Unreasonably Limited the Scope of its Search by Failing to Search Critical Record Systems.

ICE searched an unreasonably limited set of record storage systems and failed to search databases that the record confirms exist and are searchable for CARI-related records.  Pl. SUMF ¶¶ 60–62. ICE, which primarily searched email records, used deficient methodology for searching them, including by failing to adequately search archived emails and by omitting attachments to many emails from its production to Plaintiffs. *Id.* ¶¶ 37, 69, 74. ICE's searches of most other types of records storage systems, including databases, hard drives and servers, paper files, USBs, and DVDs were either inadequate or nonexistent. *Id.* ¶¶ 60–62, 73, 75–76; Ex. 15.

An agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Campbell*, 164 F.3d at 28. Similarly, a search is inadequate when an agency excludes entire systems known to contain information responsive to a request. *See Wolf*, 357 F. Supp. 2d at 118–19, *aff'd in part, rev'd in part on other grounds*, 473 F.3d 370 (D.C. Cir. 2007).

Evidence within ICE's productions reveals that ICE has failed to systematically search key electronic storage systems containing responsive records. Pl. SUMF ¶¶ 60–63; Ex. 10; *see Jefferson v. BOP*, No. 05-00848, 2006 WL 3208666, at *6 (D.D.C. Nov. 7, 2006) (finding search not reasonable when agency searched only its Central Records System database, where breadth of request warranted search of another database). ICE asserts that it did not search its databases because it allegedly does not keep electronic records of arrests that are searchable by relationship to CARI. Harrington Decl. ¶ 30.[6] However, the record is replete with proof of ICE's ability to identify data relevant to persons arrested through CARI. Pl. SUMF ¶¶ 66–67; Ex. 10. ICE has produced records showing searches in spreadsheets and databases containing information on CARI arrests. *See* Pl. SUMF ¶¶ 66–67; Ex. 10 at Bates 3235–37 (emails among ICE officials stating, *inter alia*, that "[a] spreadsheet is kept on CARI" and discussing how to search the spreadsheet and other databases for CARI arrest-related information). Further, four officers searched Plaintiffs' A-Numbers in the EARM database, indicating that a search of the database was possible. Pl. SUMF ¶ 62 (only four custodians out of 160 searched EARM).  ICE also produced numerous records showing ERO offices explaining to ICE personnel how to enter CARI arrests into databases. Pl. SUMF ¶ 66; Ex. 10 at, *e.g.*, Bates 3099, 3411.

ICE could have simply run a report in its databases (one similar to that used to produce the scattered CARI Reports received by Plaintiffs) and provided Plaintiffs with the full set of information responsive to their request. *See Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 270 (D.D.C. 2012) (holding that "sorting a pre-existing database of information to make information intelligible . . . is just another form of searching that is within the scope of an

---

[6] Plaintiffs suggested in their June 22, 2015 letter that ICE would likely find responsive records in the following databases: EARM database, EADM database, ATD database, GEMS database, Fingerprint databases, and/or Mobile IDENT.  Pl. SUMF ¶ 31; Ex. 24.

agency's duties in responding to FOIA requests"). ICE's search was not reasonably calculated to uncover relevant results, as it excluded entire data systems in its searches without explanation and failed to search its databases in spite of clear leads.

ICE appears to have focused its search efforts on email records. *See* Pl. SUMF ¶ 37. However, those searches were inadequately conducted. Many emails that ICE has produced indicated that they included an attachment, but, without explanation, ICE failed to produce the attachments. Pl. SUMF ¶ 74; Ex. 21. ICE's Search Declarations also reveal inadequate efforts to search custodians' email accounts. *See* Ex. 15. They fail to describe with any detail ICE's methodologies for searching with the limited search terms it devised, and reflect searches that likely skipped over archived emails. Pineiro Decl. ¶¶ 21–23; Harrington Decl. ¶¶ 8–11. ICE does not address how records were searched when ICE employees "maintain their records in several ways," as some ICE employees archive their email files monthly. Pineiro Decl. ¶ 21. ICE's declarations reveal circular reasoning, do not state which, if any, custodians searched their email archives, and show no systematic effort to ensure that archived emails were searched. *See* Pl. SUMF ¶ 69; Pineiro Decl. ¶¶ 22–23 (implying that custodians only search their email archives when they are already aware, prior to searching, of a responsive record in their archived emails).

ICE further fails to meet its burden to show that it conducted a search reasonably calculated to retrieve all relevant records from hard drives and shared servers, from which few records appear to have been produced. Pl. SUMF ¶ 73. ICE fails to show, for example, whether its methodology for searching hard drives and shared servers was actually calculated to retrieve relevant records, such as by ensuring the search of the full text of stored documents and not only file names. *See Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't*, 877 F. Supp. 2d 87, 108 (S.D.N.Y. 2012) ("[T]he government will not be able to establish the adequacy

of its FOIA searches if it does not record and report the search terms that it used, how it combined them, and whether it searched the full text of documents.").

ICE's search declarations further reveal that it searched almost no paper files, USBs, DVDs, CDs, and other storage systems likely to contain responsive records. *See* Pl. SUMF ¶¶ 75; Ex. 15; Pineiro Decl. ¶¶ 21–23. ICE states that offices are generally instructed to "conduct searches of their file systems, including both paper files and electronic files," and that electronic files may be stored on ICE employees' "individual computer hard drives, their program office's shared drive . . . DVDs, CDs, or USB storage devices." Pineiro Decl. ¶¶ 20–21.  However, ICE states that out of the 160 custodians who searched for responsive documents, only 13 searched paper files, only one searched a USB ("thumb drive") storage device, and not a single ICE employee searched a DVD or CD. Ex. 15. ICE should have searched paper files for responsive documents, but it refused to search most paper records because they were allegedly "too voluminous." *See* Harrington Decl. ¶ 30; *Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1, 8 (D.D.C. 2003) ("While a computerized search may well be far more efficient and less costly than a manual search . . . it is apparent [under the facts of this particular case] that only the more cumbersome procedure is likely to turn up the requested information."); *Nat'l Sec. Counselors*, 549 F. Supp. 2d at 12–13. ICE has failed to describe a reasonable search of these storage systems, and therefore did not meet its burden to prove that its search was reasonably calculated.

ICE's admission that many relevant storage systems were not searched shows that its search was not reasonably calculated to uncover responsive documents. *See Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (finding search inadequate where agency searched only the record system "most likely to contain" the requested information). The Court

14

should order production of responsive email attachments not produced as listed in Ex. 21, as well as systematic searches of pertinent databases, email archives, and other records systems.

### 4. ICE Failed to Systematically Search for Several Critical Substantive Categories of Records Demonstrated to Exist and Specifically Requested by Plaintiffs.

ICE's failure to devise or conduct a systematic search caused its failure to retrieve all, or in many cases, any, of several substantive categories of the records Plaintiffs requested relating to CARI, such as: (1) particular enforcement data and individual records relating to fingerprinting, arrests and detention practices; (2) policy, planning and training records; (3) records related to collaboration with local law enforcement agencies; (4) assessment and monitoring records; and (5) fiscal impact records. *See* FOIA Req. Plaintiffs have found numerous documents that directly contradict the generalized statements in ICE's Search Declarations attempting to justify its limited scope of search and have thus provided the requisite "countervailing evidence as to the adequacy of [ICE's] search" to render summary judgment for ICE inappropriate. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313–14 (D.C. Cir. 2003); *cf. Pub. Citizen v. HHS*, 975 F. Supp. 2d 81, 94 (D.D.C. 2013) (summary judgment for agency is appropriate when there is no contradictory evidence and agency affidavits are not conclusory).

ICE has not searched systematically for at least five of the major categories of documents Plaintiffs specifically requested.  *See* Pl. SUMF ¶¶ 59–67, 76–78.  First, Plaintiffs requested certain data, and/or the individual case records needed to compile such data, regarding ICE's fingerprinting, arrest and detention practices through CARI to inform the public about ICE's law enforcement practices. To that end, Plaintiffs requested certain enforcement data and arrest-related documents related to individuals targeted by CARI: warrants, immigration detainers,

immigration arrest reports, deportation process and outcome records, prosecutorial discretion records, and records showing "arrest and encounter details, comments, case action, decision, and disposition details." FOIA Req. § 3.[7]  However, ICE completely failed to search for these and other broad categories of responsive records, because ICE claims that it "does not track this specific information as it relates to CARI" and that it cannot search comments in certain records where the requested information is located. *See* Harrington Decl. ¶¶ 20–22, 26, 29–32.

In fact, as demonstrated above in Section III.A.3, *supra*, ICE maintains records, sometimes including demographic information, for every person stopped, fingerprinted, or arrested.  *Compare* Pl. SUMF ¶¶ 66–67; Ex. 7; Ex. 10 (evidence that ICE tracks CARI-related encounters and arrests) *with* Harrington Decl. ¶¶ 20–22, 29–32. The record is replete with positive indications that ICE has the capacity to search for and produce CARI-related information within electronic and other data.  *See, e.g.*, Ex. 10 at Bates 3235-37 (ICE officials' emails about searching CARI arrest-related statistical information), at Bates 1531–32, 3380–89 (CARI weekly reports and significant arrest reports showing ICE officials' emphasis on data entry relating to CARI); Ex. 7 (showing that ICE has the capacity to search within EARM/ENFORCE and FCMS databases); Gell Decl. ¶¶ 9–10 (noting spreadsheets that ICE produced that include some CARI-related data, including numbers of targets and arrests by CARI teams). ICE produced many weekly reports detailing "CARI significant arrests" compiled with data from all ERO field offices. *See* Ex. 10. The record rebuts ICE's claims that there is no way to search records of CARI arrest records electronically.

---

[7] If any of these records sought are not stored in practically producible format such as a database, Plaintiffs believe that a representative, statistically significant random sample of individual case records necessary to approximate or compile the requested data records could be responsive to their Request in lieu of aggregated data. *See* Ex. 24.

A telling example of ICE's failure to search either electronic or paper files for data and case records related to CARI arrests is ICE's production of just one I-213 form. Arresting ICE officers complete I-213 forms for all arrests regarding a person's personal information and immigration record prior to being placed in removal proceedings; these forms include information on an individual's phenotype (e.g., "complexion"), nation of origin, as well as an arrest narrative. *See* Ex. 7 (EARM database showing I-213 form). That ICE produced exactly one I-213 form confirms that ICE can find them, but also that ICE failed to systematically search them. *See id.*; Pl. SUMF ¶¶ 64–65, 67; Ex. 15; Harrington Decl. ¶¶ 8, 10, 14, 20–23, 30–32 (no search terms relating to the data and forms requested were used, no paper files were searched, only four officers searched the EARM database, and no other databases were searched).

Second, ICE produced few of the policy, planning and training records Plaintiffs requested, including no racial profiling training or policy records at all. *See* Pl. SUMF ¶ 77. While documents ICE produced suggest that every field office was tasked with devising its own annex to the general CARI Plan, *id.* ¶ 78, ICE has produced CARI Plans for only six of the 24 ERO field offices, Ex. 16, without explanation for the missing ones. *See Kowalczyk*, 73 F.3d at 389 (an agency must pursue any leads to responsive records that are "both clear and certain").

Further, ICE has failed to produce any of its training materials for CARI. Pl. SUMF ¶ 77. As mentioned above, ICE productions reveal that the unsearched OPLA is responsible for providing mandatory Fourth Amendment trainings for all ICE agents involved in CARI. Ex. 11 at Bates 3156. Records also reveal the existence of other trainings for CARI officers, yet ICE offers no explanation for its failure to produce those materials. *See id.* at Bates 58–59; *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) (if an agency has reason to know that certain places may contain responsive documents, it is obligated to search those locations).

17

Third, Plaintiffs' Request specifically asked for documents related to local law enforcement agencies' participation in CARI and local agency immigration detainer agreements. FOIA Req. § 1. Yet ICE has produced such documents only sporadically. Pl. SUMF ¶ 77. The record includes evidence of joint operations in which New Orleans CARI officers operated from "covert locations" with mobile fingerprinting devices at the ready while officers from Jefferson Parish Sheriff's Office and the Kenner Police Department "canvassed high crime neighborhoods." Ex. 4. ICE produced these and a limited number of additional records confirming CARI officers' collaboration with local law enforcement in field enforcement, and other records reflect media attention to the issue. Pl. SUMF ¶¶ 77, 103, 108; Ex. 3; Ex. 4.

However, ICE has not shown a reasonable search for all such responsive records.  ICE's Office of State, Local and Tribal Coordination, which coordinates relationships between ICE and local law enforcement agencies, Pl. SUMF ¶ 58, was not searched at all. *Id.* ¶ 44; Ex. 15. Harrington Decl. ¶¶ 18, 27–28. Further, within ERO, the headquarters was not searched for these relevant records, and only two custodians in ERO field offices searched any terms about local law enforcement collaboration.  Pl. SUMF ¶ 44; Ex. 15; Harrington Decl. ¶¶ 8(d), 10(k). These two officers failed to tailor search terms to actually retrieve responsive records; they searched only "Local LEA-ICE operations" and "Local LEA," respectively. *Id.* These search design and execution shortcomings, combined with ICE's defiant refusal to attempt a systematic search for these records, undermine ICE's halfhearted conclusion that "[w]ith respect to communications with local officials regarding CARI, ICE has searched for such records and produced any non-exempt documents to the extent that any were collected." *See* Harrington Decl. ¶¶ 15, 24 (claiming ICE did not have to seek these records because "ICE interacts daily with local law enforcement across the country, so documents relating to such 'collaboration' would constitute

18

an extremely voluminous set of records, virtually none of which would have any connection to CARI, or be of any apparent interest to Plaintiffs.").

Fourth, ICE failed to conduct a search reasonably calculated to locate the requested assessment and monitoring records, even though records make clear that high-ranking ICE officers were tracking CARI closely. *See* Ex. 8; Ex. 15 (summarizing ICE's neglect to ensure reasonable use of tailored search terms, including about assessment and monitoring).

Fifth, ICE's Search Declarations reveal no calculated search to find information on CARI's fiscal impact, other than typing "CARI fiscal costs," or one of six slight variations of that phrase, into a few ERO and OPA employees' Outlook search bars. *See* Harrington Decl. ¶ 14. ICE's Search Declarations offer no reasoning why the OCFO was not searched, only a non-credible reason why no ICE headquarters offices were searched, and no explanation why budget and cost records would be in the custody only of the limited set of custodians who searched for some variation of the fiscal impact term used. *See* Ex. 15; Pineiro Decl.; Harrington Decl. ICE states that because CARI was "not a formal program," it did not receive additional funding and therefore would possess no responsive records. *See* Harrington Decl. ¶ 23. However, several documents produced indicate that ICE officials discussed CARI's funding. Pl. SUMF ¶47; Ex. 9. ERO Field Offices were expending additional funds to pay for overtime, as overtime pay was an incentive for CARI officers, and for Customs and Border Patrol agents to give ancillary support to ERO field offices. *Id.* at Bates 1610. ICE had an obligation to reasonably follow the lead in the numerous search results implicating increased costs as a result of this program. *See Ctr. for Nat'l Sec. Studies v. DOJ*, 215 F. Supp. 2d 94, 110 (D.D.C. 2002), *aff'd in part, rev'd in part & remanded on other grounds*, 331 F.3d 918 (D.C. Cir. 2003) (discovery of a document that

"clearly indicates the existence of [other] relevant documents" creates an "obligation" for an agency to conduct a further search for those additional documents).

Thus, because the countervailing evidence in the record not only leaves "substantial doubt" as to the sufficiency of ICE's search, but further reveals major holes in the search's construction and execution, summary judgment in favor of ICE would be inappropriate. *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). This Court should find that ICE conducted an unreasonably inadequate search and should accordingly order ICE to search again, utilizing search terms developed in response to, rather than sporadically and literally extracted from, the Request, looking in all relevant offices, and searching all applicable records storage systems.

### B. ICE Cannot Justify its Inadequate Search by Relying on an Unreasonable Interpretation of Plaintiffs' Request.

ICE asserts that Plaintiffs' Request failed to "reasonably describe" the records sought in accordance with the requirements of FOIA. *See* Def's Br. at 4–8; Harrington Decl. ¶¶ 13–32. ICE relies on this inaccurate assessment of the Request to argue that any search it then conducted would be inherently reasonable, alleging that "[ICE] properly undertook searches based on its own reasonable interpretation of the subject matter of the request." *See* Def's Br. at 9–10; Harrington Decl. ¶ 14. ICE's failure to adhere to its own regulation requiring collaboration with Plaintiffs to remedy any issues with the Request forecloses this argument, and Plaintiffs' Request reasonably described the records sought.

#### 1. ICE Is Foreclosed from Arguing that Plaintiffs' Request Was Inadequate Because ICE Violated its Own Regulation by Failing to Collaborate with Plaintiffs to Resolve any Issues with the Request.

Even if there were some basis for ICE's contention that Plaintiffs' Request did not reasonably describe the records sought, which there is not, ICE cannot now rely on this argument

where ICE neglected to offer Plaintiffs an opportunity to discuss any deficiencies with ICE and modify the Request accordingly, in violation of its own regulation.[8] *See* 6 C.F.R. § 5.3(b).  This regulation states that "[i]f . . . your request does not reasonably describe records, [the component] *shall* tell you either what additional information is needed or why your request is otherwise insufficient. The component also *shall* give you an opportunity to discuss your request so that you may modify it . . . ." *Id.* (emphasis added).

Prior to litigation, ICE never notified Plaintiffs of any concerns with their Request and never provided them with an opportunity to modify the Request.[9] After failing to adhere to its own regulation, ICE is rightfully foreclosed from arguing that any newly alleged deficiencies in the Request justify its inadequate search. *See Hall*, 83 F. Supp. 3d at 102 (admonishing EPA's failure to engage in the "collaborative process" required by its own regulation to remedy an insufficient FOIA request where the EPA belatedly advised of the requester's ability to clarify or modify the request in its final determination); *Parker v. DOJ Exec. Office for U.S. Attorneys*, 852 F. Supp. 2d 1, 13–14 (D.D.C. 2012) (concluding that where DOJ did not allow plaintiff-requester

---

[8] Further, ICE's implicit assertion that Plaintiffs' allegedly deficient request may constitute a failure to exhaust administrative remedies is inapplicable here. *See* Def's Br. at 4, n.1. Courts have clearly established that a plaintiff-requester fails to exhaust her administrative remedies only where an agency has abided by its own regulations, informed the requester of any deficiencies, and allowed the requester to remedy the request accordingly. *See, e.g.*, *DeBrew*, 792 F.3d at 123–24 (concluding that plaintiff-requester's failure to "follow up" with Bureau of Prisons after submitting an inadequate request resulted in a failure to exhaust his administrative remedies only where the BoP informed the requester of the inadequacy of the request and advised him of his options to either submit a more precise request, resubmit his request, or appeal the determination); *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (concluding that plaintiff failed to exhaust his administrative remedies where "after four letters from the IRS explaining what information it needed to conduct [Plaintiff's] FOIA search, neither [Plaintiff] nor [his counsel] ever fully supplied to the IRS the information it contends is needed to comply with FOIA and IRS regulations").

[9] In its brief, ICE claims that "attempt[s] to work with Plaintiffs to narrow and better articulate the FOIA request . . . were unavailing," referring specifically to correspondence between Plaintiffs and ICE dated June 22, 2015, July 10, 2015, and September 2, 2015. Def's Br. at 7, n.2; Harrington Decl. at ¶¶ 13–32. By so claiming, ICE mischaracterizes its conduct in this litigation and obscures the fact that it neglected to inform Plaintiffs of any perceived deficiencies in its Request until July 10, 2015, nearly two years after Plaintiffs submitted the FOIA Request to ICE in November of 2013 and four months after Plaintiffs filed their Complaint in this matter.

to modify its request, DOJ's "own FOIA regulations prevent it from denying a request simply because it is unclear").

### 2.   Plaintiffs' Request Reasonably Described the Records Sought.

FOIA requires that a request "reasonably describe" the records sought. *See* 5 U.S.C. § 552(a)(3)(A). A request is sufficient if it "enable[s] a professional agency employee familiar with the subject area to locate the record with a reasonable amount of effort." *Hall*, 83 F. Supp. 3d at 101. ICE now claims that "[t]he categories of [Plaintiffs'] requested records . . . fail to reasonably describe the records sought," focusing its criticism on Plaintiffs' request for "[a]ny and all Records . . . related to the policies, procedures or objectives of CARI." Def's Br. at 7. ICE's criticism of this request as "far too broad" is unfounded: Plaintiffs' language sufficiently specified and described records of a particular program. In *Parker*, the Department of Justice objected to a request for information "related to DOJ's policies regarding unauthorized practice of law by Assistant U.S. Attorneys, specifically any remedial policies." 852 F. Supp. 2d at 13. After reviewing the request,[10] the court concluded that it was "clear enough to constitute a valid FOIA request," insisting that DOJ locate and disclose any responsive records. *Id*. at 13–14. In this case, Plaintiffs' Request for records "related to the policies, procedures, or objectives of CARI" mirrors the language in *Parker*, refuting ICE's claims that Plaintiffs' Request failed to reasonably describe the records sought.

Further, FOIA requires ICE to construe Plaintiffs' Request reasonably and liberally. *See*

---

[10] Specifically, the plaintiff in *Parker* requested:

> [a]ll agency records that document, discuss or otherwise describe any remedial measures or additional policies implemented by the U.S. Attorney's office to prevent future circumstances wherein a U.S. Attorney could be hired or remain employed as a U.S. Attorney, notwithstanding the fact that they were suspended from the practice of law, or not authorized to practice law.

852 F. Supp. 2d at 13.

*Nation Magazine*, 71 F.3d at 890. The government should use "some semblance of common sense" when interpreting FOIA requests. *See Dale*, 238 F. Supp. 2d at 104–05. In *Dale*, the plaintiff-requester sought from the IRS "any and all documents, including but not limited to files, that refer or relate in any way to [Plaintiff]." *Id.* at 104. The court emphasized that "concluding . . . that this action should be dismissed because [Plaintiff] did not reasonably describe the records sought in his request would run the risk of elevating form over substance," particularly where the IRS was able to "determine[] the thrust of [Plaintiff's] FOIA request and what responsive records the IRS possessed." *Id.* at 105–07.

ICE failed to apply common sense in interpreting the Request. For example, ICE claims that because "one stated objective of CARI is to enforce federal immigration laws," Plaintiffs' Request "apparently seeks . . . *every record* maintained at ICE that is 'related to' the enforcement of federal immigration laws." Def's Br. at 7. Yet Plaintiffs' Request adequately described records sought and obviously focused on a particular enforcement initiative and not every record ICE possesses.  ICE has violated FOIA by failing to apply common sense to its interpretation of the Request. Thus, in view of Plaintiffs' "well defined request" and the many "positive indications" that ICE has "overlooked [responsive] materials" and failed to conduct an adequate search, summary judgment for ICE is inappropriate here. *See Iturralde*, 315 F.3d at 314.

## II.     ICE Has Failed to Meet Its Burden to Show That It Properly Withheld Information under Exemptions 5, 6, 7(C) and (7)(E).

FOIA is a "structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). Thus, courts have interpreted FOIA to contain a strong presumption in favor of disclosure. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The government has the burden to prove that it is correct in withholding documents responsive to a

FOIA request, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980), and agencies are not mandated to withhold all potentially exempt material. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979) ("Congress did not design the FOIA exemptions to be mandatory bars to disclosure.").

Here, ICE has withheld copious information without adequate justification. ICE has improperly applied exemptions under 5 U.S.C. § 552(b)(5), (6), (7)(C), and (7)(E), in an overbroad and conclusory manner, which has the effect of chilling the free flow of information that the public has a right to access. While ICE has applied thousands of withholdings, Plaintiffs only challenge those identified in Exhibits 17, 18, 19 and 25. For the ease of the Court, Plaintiffs have compiled one exhibit for each type of Exemption improperly applied, and within these charts, list each page from ICE's production containing exemptions they challenge and briefly summarize the reasons why each withholding is improper. Exs. 17–19; 25; Gell Decl.; Egal Decl.; Stanton Decl. (explaining how Exhibits 17, 18 and 19, charts cataloging the withholdings under Exemptions 5, 7(E), and 6/7(C), respectively, Plaintiffs challenge, were compiled). Plaintiffs have categorized these deficiencies that occurred across broad swaths of these withholdings and discuss these categories below, with non-exclusive examples of each to illustrate ICE's overbroad withholdings.

**A. ICE Improperly Asserts Exemption 5 based on Deliberative Process and Has Failed to Meet Its Burden to Establish that Nondisclosed Information Is Pre-Decisional and Deliberative.**

ICE claims portions and entire pages of documents are exempt from disclosure under Exemption 5, 5 U.S.C. § 552(b)(5). Exemption 5 allows the withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *Id.* To qualify for Exemption 5, a document must meet

two initial conditions: (1) the source of the document must be a government agency, and (2) the redacted material must "fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against agency that holds it." *Klamath Water Users*, 532 U.S. at 8. ICE has failed to meet its burden under (b)(5) for three reasons: 1) ICE has improperly claimed (b)(5) exemptions for some documents that are not inter/intra agency memoranda; 2) ICE cannot show that the materials withheld are pre-decisional or deliberative; and 3) ICE has improperly redacted certain non-exempt factual material. Ex. 17. ICE should thus be ordered to unredact the information withheld under Exemption 5 which Plaintiffs identify in Exhibit 17.

## 1.  ICE Has Failed to Meet Its Burden to Establish that Certain Documents It Subjected to Exemption 5 Were in Fact Inter- or Intra-Agency Memoranda.

ICE has improperly claimed Exemption 5 over pages that do not qualify as intra- or inter-government agency documents.  A document created or shared by a non-government entity to a government agency, in which the non-government entity is communicating its own interest to the government, does not qualify as an intra- or inter-government agency document and cannot be covered under Exemption 5. *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 238 (D.D.C. 2013) ("Whenever a private liaison initiates the contact and communicates with his or her 'own . . . interests in mind,' such communications cannot satisfy the threshold requirement of Exemption 5.") (quoting *Klamath Water Users*, 532 U.S. at 12). In two instances, ICE fully withheld documents regarding communications with non-governmental organizations (NGOs). *See Vaughn* Index at 17–18, 24; Ex. 17 at 370–71, 404–05. The documents contain notes from correspondence from the NGOs, in which the NGOs are advocating their own interests to ICE. ICE cannot assert Exemption 5 privilege over materials it creates to record a non-agency's opinions of and interests in ICE's actions.

## 2. ICE Has Not Met Its Burden to Establish Either Prong of the Exemption 5 Deliberative Process Privilege.

ICE has improperly applied Exemption 5 to documents that do not merit the deliberative process privilege, which is the principal basis ICE asserts for its Exemption 5 withholdings here.[11] Under *Abtew*, to qualify for the deliberative process privilege, an intra-agency memorandum must be *both* pre-decisional and deliberative. *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). The document must have been "prepared in order to assist an agency decisionmaker in arriving at his decision." *Adamowicz v. IRS*, 672 F. Supp. 2d 454, 468 (S.D.N.Y. 2009); *see also Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002) (the privilege does not apply to documents that are "merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment").

### a. ICE Claims Exemptions over Materials That Are Not Pre-Decisional.

"'A document is 'pre-decisional' if it precedes, in temporal sequence, the 'decision' to which it relates.'" *Abtew*, 808 F.3d at 898 (quoting *Senate of the Commonwealth of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). ICE redacted numerous final versions of documents under the claim that they were pre-decisional. *See* Pl. SUMF ¶ 83; Ex. 17 at Bates 3601–03, 3613–14; *Vaughn* Index at 239–41.  For example, ICE redacted entire pages of "CARI plans" which were labeled "final" in the documents' titles, visible on the attachment line of the emails with which the plans were forwarded as attachments. Ex. 17 at, *e.g.*, Bates 838–65; Ex. 16. In the body of several of these emails, the sender describes the document as "final" or "approved by HQ." *See, e.g.*, Ex. 17 at Bates 838. Yet ICE's *Vaughn* Index states the documents "contain pre-decisional information in draft form." *Vaughn* Index at 70–71. The language from

---

[11] ICE asserts attorney-client privilege under Exemption 5 over certain information, and Plaintiffs do not challenge those withholdings here.

the emails and the titles of the documents included in Plaintiffs' Exhibit 17 make clear the *Vaughn* descriptions are inaccurate and the Exemption is misapplied. *See* Pl. SUMF ¶ 83; Ex. 17 at, *e.g.*, Bates 2010–33 (email to which this CARI plan is attached states only that this is the final version of the CARI plan that was sent to HQ, and the attachment is titled "Criminal Alien Removal Initiative Plan FINAL(ATL).docx"); *Vaughn* Index at 146–47 (withholding Bates 2010–33 as "pre-decisional").

ICE offers little or no reasoning to claim that its withholdings under Exemption 5 are pre-decisional, asserting that "by their very nature, Draft documents are pre-decisional." Pineiro Decl. ¶ 47. However, "conclusory and generalized allegations of exemptions" are insufficient to justify withholding. *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973). Moreover, a "draft" or similar label in itself is not sufficient to make a document pre-decisional. *See Hansen v. U.S. Dep't of the Air Force*, 817 F. Supp. 123, 124–25 (D.D.C. 1992) (ordering disclosure of a document marked as a draft but used in effect). Here, ICE relies on the lack of a signature or on a "draft" watermark to claim documents that were used as final policy as pre-decisional, when those superficial elements do not prove actual deliberation and do not alone make a record pre-decisional. *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982) (citing *Coastal States*, 617 F.2d at 866). ICE's *Vaughn* Index recycles the same boilerplate language for each redacted CARI plan, stating, inaccurately, that each is pre-decisional because it is unsigned. *See Vaughn* Index at 70–71, 117–18, 125–26, 139, 146–47, 150–52, 156–57, 172, 175, 178. At least one redacted CARI Plan that ICE describes as lacking a signature actually contains a signature on its final page. Ex. 17 at Bates 2059–83; *see Vaughn* Index at 150–51.

Further, even those CARI plans that do not contain signatures are improperly withheld where ICE has afforded these CARI plans operational effect, thus defeating any

argument that the records withheld are "pre-decisional." *Abtew*, 808 F.3d at 899 (if a document is adopted expressly or incorporated by reference as a final decision or a document with operational effect, it is no longer covered by the exemption). Often, the unsigned CARI plan is sent by a superior to subordinates without request for comment and is titled "final." Ex. 17 at Bates 838–65, 2059–83. Under ICE's administrative process, documents sent by superior officers to subordinates are being disseminated for review rather than for revision and thus the documents are post-decisional. *See Vaughn*, 523 F.2d at 1144 ("pre-decisional materials are not exempt merely because they are pre-decisional; they must also be a part of the agency give-and-take of the deliberative process by which the decision itself is made."). For example, when ERO Taskings emailed the national CARI plan to local EROs to review, with a request that each ERO submit a local plan consistent with the national plan, the document was final and had operational effect, rendering the deliberative process privilege inapplicable. *See* Pl. SUMF ¶ 83; Ex. 16; Ex. 17 at Bates 838–65, 2010–33, 2529–44.

Even if ICE were correct that the CARI plans and other documents redacted were pre-decisional and therefore covered by Exemption 5, ICE should have produced the final version of the document unredacted in the production. The final plans are responsive to Plaintiffs' request, and each ERO was required to have a CARI plan annex. Pl. SUMF ¶ 78. Thus, either the plans produced and redacted were adopted as final, which eliminates the deliberative process privilege, or ICE's search was inadequate and ICE must produce each ERO's final CARI Plan Annex.

### b.  ICE Improperly Redacted Many Documents under Exemption 5 that Are Not Deliberative in Nature.

ICE has not met its burden of demonstrating that documents redacted under Exemption 5 are deliberative in nature. A document is deliberative "if it is a part of the agency give-and-take,

of the deliberative process, by which the decision itself is made." *Rosen*, 523 F.2d at 1144; *see also Coastal States*, 617 F.2d at 866. If adopted expressly or incorporated by reference as a final decision or a document with operational effect, it is no longer covered by the exemption. *Abtew*, 808 F.3d at 899. The agency must identify a specific decision being debated or discussed for each individual deliberative process exemption claimed. *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (agency must "pinpoint an agency decision or policy to which the document contributed, or identify a decisionmaking process to which a document contributed").

ICE only provides conclusory and general assertions that withheld information is deliberative without pinpointing any subsequent specific policies or decisions impacted. *See* Pineiro Decl. ¶¶ 48–49; *Vaughn* Index at 25; Ex. 17. Several redacted documents do not contain any identifiable issue that is being internally debated. Pl. SUMF ¶ 83; Ex. 17. For example, in one record redacted under Exemption 5, ICE discusses a protest of the CARI program at a church. *See* Ex. 17 at Bates 406-07. There is no pin-pointed policy issue under deliberation; the document is merely a memorandum on the events. Other documents reflect only conversations about how to present or publicize decisions made in the past. For example, in another redacted document, ICE describes the redacted material as "a meeting recap of an ICE meeting with an NGO . . . ." Ex. 17 at Bates 370-71. This document, which summarizes how a policy decision was already described to an outside party, cannot be covered by Exemption 5. The government is not entitled to keep secret routine agency plans to explain or implement a decision or policy that has already been made. *Fox News Network v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 272 (S.D.N.Y. 2012). As such, there is nothing deliberative about these notes and about much of the information ICE has withheld under Exemption 5. *See* Ex. 17; Pl. SUMF ¶ 83.

29

Additionally, as discussed previously, ICE improperly asserted Exemption 5 over documents that have been adopted expressly or incorporated by reference to be a final decision with operation effect. *See* Pl. SUMF ¶¶ 82–83. Once a document has operational effect, there ceases to be deliberation over its content, and it no longer meets the deliberative criterion of this privilege. *Abtew*, 808 F.3d 895. For this reason, ICE cannot claim Exemption 5 over such documents and the agency must reproduce the documents in Exhibit 17 without redactions.

### 3. ICE Fails to Meet Its Burden to Prove that It Could Not Have Segregated and Released Redacted Non-Exempt Factual Material.

Finally, ICE improperly redacted segregable factual and similar information related to the CARI program under the deliberative process privilege. *See* Pl. SUMF at ¶ 84. ICE is obligated to itemize and index exemption claims for each document, and must also show why portions of documents are or are not reasonably segregable. 5 U.S.C. § 552(b). Specifically, factual information within a policy-making document is not covered by the deliberative process privilege. *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). Here, ICE improperly redacted information on the program's statistics, costs, and arrest data under the logic that the information was pre-decisional and unconfirmed. *See Vaughn* Index at 3; Pl. SUMF ¶ 83; Ex. 17 at Bates 61. ICE's conclusory allegation that these data are subject to Exemption 5 mischaracterize their inherently factual nature. *Compare Mead Data Cent., Inc. v. Dep't of the Air Force*, 575 F.2d 932, 935 (D.C. Cir. 1978) (concluding that cost comparisons were deliberative and thus subject to Exemption 5 because they helped personnel arrive at policy opinions) *with McGrady v. Mabus*, 635 F. Supp. 2d 6, 11, 18 (D.D.C. 2009) (concluding that records containing "key personnel data and a summary of an officer's entire performance evaluation record" were not deliberative because "they reveal only the data used during the process, not the substance of the

[Navy's] deliberations"). ICE's failure to segregate data and statistics that are clearly factual in nature casts doubt upon ICE's blanket assertion that "all information not exempted from disclosure . . . was correctly segregated and non-exempt portions were released." Pineiro Decl. ¶ 65. All factual information should be unredacted and reproduced to Plaintiffs. *See* Ex. 17 (cataloging materials withheld under Exemption 5 which ICE did not meet its burden to justify withholding).

### B. ICE Improperly Asserted Exemptions 6 and 7(C) on Information Not Compiled for Law Enforcement Purposes, Whose Disclosure Posed at Most a *de Minimis* Invasion of Privacy Clearly Outweighed by the Public Interest in Disclosure.

While ICE withheld thousands of pieces of information under 5 U.S.C. § 552(b)(6) and (b)(7)(C), Plaintiffs have limited their challenge to less than ten percent of those exemptions and only seek summary judgment with respect to withholdings under Exemptions 6 and 7(C) on the limited set of pages in ICE's production listed in Exhibits 19 and 25. Pl. SUMF ¶¶ 89, 105.[12] ICE applied these exemptions to an overbroad swath of information where no more than a *de minimis* privacy interest was at stake and where that interest was heavily outweighed by the public interest in disclosure of ICE's involvement and planning of enforcement activities that may have exceeded constitutional bounds and violated civil rights. Pl. SUMF ¶¶ 20–24, 81, 84, 86, 97–98, 101–03; Ex. 19. In many instances, ICE also improperly applied 7(C) exemptions to records and information not compiled for law enforcement purposes. *See* Pl. SUMF ¶¶ 85–86, 89–96; Ex. 19.

Plaintiffs were legally entitled to a full *Vaughn* index of all exemptions that ICE claimed. However, in the spirit of cooperation and with the hopes of expeditiously resolving this matter, Plaintiffs offered to limit their challenges to exemptions claimed under b(6) and b(7)(C) to only

---

[12] In Exhibit 19, Plaintiffs have provided full page ranges of the relevant records to give the Court the full context on the subject matter of the documents in question. Plaintiffs do not challenge every withholding claimed under Exemptions 6 and 7C in these full page ranges, but rather will only challenge the withholdings under Exemptions 6 and 7C on the pages listed in their Letter to AUSA Jason Cohen, dated March 31, 2016. *See* Exhibit 25.

those claimed on approximately 235 pages, to be covered in a Supplemental *Vaughn* Index. Pl. SUMF ¶¶ 104–05; Ex. 19; Ex. 25. Of that limited universe of documents, Plaintiffs further forewent challenges to withholding of phone and fax numbers and requested a *Vaughn* Index only with respect to other withheld information, likely consisting mostly of names and email addresses.[13] Pl. SUMF ¶ 105; Ex. 19. ICE has indicated it will produce a Supplemental *Vaughn* Index by May 2, 2016. Ex. 26. Plaintiffs will raise any additional arguments in support of their challenges to ICE's assertions of Exemptions 5, 6, 7(C) and 7(E) that rely on ICE's Supplemental *Vaughn* Index as part of their Reply Memorandum in this case, and will not oppose any Motion for Leave to File a Sur-Reply filed promptly thereafter.

### 1. ICE Failed to Satisfy Its Burden to Establish the Applicability of Exemptions 6 and 7(C).

ICE appears to claim that every email address and name it did not disclose is exempt under both Exemptions 6 and 7(C). Pl. SUMF ¶ 84.  Consequently, Plaintiffs challenge the withholding of names and email addresses, and some other information, that are withheld under both Exemptions simultaneously. Exs. 19; 25. First, ICE has inappropriately invoked Exemption 6 by categorically withholding work email addresses and names where there is no substantial personal privacy interest. Pl. SUMF at ¶ 84; Ex. 19. Second, many of ICE's assertions of Exemption 7(C) do not meet the threshold "compiled for law enforcement purposes" standard. Finally, even if the Court were to find that withholdings under Exemptions 6 and 7(C) met the threshold inquiries, the exemptions are unwarranted because the *de minimis* privacy interest theoretically protected is outweighed by the public interest.

---

[13] Email addresses themselves are not what Plaintiffs seek, but Plaintiffs requested their inclusion in the limited Supplemental *Vaughn* Index because, in some records, an email address only might appear without the pertinent name, making the address the only way to discern who made a policy decision. Plaintiffs would accept that information in lieu of the actual email address itself.

### a. All Work Email Addresses and Names Were Improperly Withheld under Exemption 6.

Here, ICE has invoked Exemption 6 for almost every single name and email address in over 3500 pages of records produced to Plaintiffs. Pl. SUMF ¶ 87.  The FOIA exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  Under Exemption 6, "the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Multi AG Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1226 (2008).  The Supreme Court has found that "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982).  Exemption 6 "does not categorically exempt individuals' identities." *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 582 (D.C. Cir. 1996).  The inquiry is "whether disclosure would compromise a substantial, as opposed to a *de minimis,* privacy interest." *Consumers' Checkbook Ctr. for the Study of Servs. v. HHS,* 554 F.3d 1046, 1050 (D.C. Cir. 2009) (internal citations omitted).

ICE's categorical withholding of nearly all names and email addresses is improper. The information withheld in ICE's blanket application of Exemption 6 appears to include, *inter alia*, the names of journalists, Plaintiffs' counsel, ICE officers whose names and emails are likely to be listed in the <u>Federal Yellow Book</u>,[14] and the Consul General of Peru. Pl. SUMF ¶¶ 85, 87–90; Ex. 19 at Bates 22. Because many ICE employees' names and work email addresses are already publicly available, they do not carry a substantial privacy interest protectable by Exemption 6. Pl. SUMF ¶¶ 88–89.  *See Davis v. DOJ*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (FOIA

---

[14] *Federal Yellow Book*, Leadership Directories, https://www.leadershipdirectories.com/Products/LeadershipinPrint/ Government/FederalYellowBook (last visited Apr. 18, 2016).

exemptions may not be used to shield information already in the public domain). Furthermore, the records Plaintiffs have selected to challenge do not reveal any personal information about senders and recipients. Pl. SUMF ¶ 89; Ex 19; *see Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) ("name and work telephone number is not personal or intimate information, such as a home address or a social security number, that normally would be considered protected information under FOIA Exemption 6."). Therefore, since the disclosure of names and work email addresses would not constitute a "clearly unwarranted invasion of personal privacy," all challenged Exemption 6 withholdings must be released. 5 U.S.C. § 552(b)(6); Ex. 19; Ex. 25.

### b. ICE Improperly Invoked Exemption 7(C) for Non-Law Enforcement Records.

In evaluating withholdings under Exemption 7, including 7(C) and, as discussed in greater detail in Section IV.C, *infra*, 7(E), the threshold question is whether the withheld information was "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Records or information are compiled for law enforcement purposes where "the investigatory activity that gave rise to the documents is related to the enforcement of federal laws, and there is a rational nexus between the investigation at issue and the agency's law enforcement duties." *Cooper v. DOJ*, No. CV 99-2513, 2016 WL 1048756, at *9 (D.D.C. Mar. 14, 2016) (quoting *Jefferson v. DOJ*, 284 F.3d 172, 177 (D.C. Cir. 2002)). To satisfy the "nexus" requirement, an agency must identify a particular individual or incident as the object of its investigation, as well as the connection between that individual or incident and a potential violation of federal law or security risk. *Campbell*, 164 F.3d at 27; *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982). "If the [agency] declarations fail to supply facts in sufficient detail to apply the *Pratt* rational nexus test,

then a court may not grant summary judgment for the agency." *Campbell*, 164 F.3d at 27; *see also Quinon v. FBI*, 86 F.3d 1222, 1229 (D.C. Cir. 1996).

ICE has failed to satisfy the threshold question. ICE's blanket assertion that all of its records are related to law enforcement does not establish a "rational nexus" between ICE's law enforcement duties and any investigation at issue. *See Schoenman v. FBI*, 575 F. Supp. 2d 136, 174 (D.D.C. 2008) (finding that the mere statement that an agency document "inherently relates to a law enforcement purpose will not suffice"). The phrase "compiled for law enforcement purposes" must, like all FOIA exemptions, be construed narrowly. *See Abramson*, 456 U.S. at 630. ICE has indiscriminately applied Exemption 7(C) over many records that are not "compiled for law enforcement purposes," such as statements to the press, emails about employee overtime pay, responding to Plaintiffs' Request, and scheduling employee trainings. Pl. SUMF ¶¶ 90–96; Ex. 19. *See Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 257.  Records unrelated to an agency's law enforcement duties do not fall within Exemption 7. *See Pratt*, 673 F.2d at 420–21 (Exemption 7 is not intended to "include investigatory activities wholly unrelated to law enforcement agencies' legislated functions of preventing risks to the national security and violations of the criminal laws and of apprehending those who do violate the laws").

ICE claims that by the nature of Plaintiffs' request and of ICE's mission, the entirety of the responsive documents categorically meet the Exemption 7 threshold, with no distinction among the types of records produced. *See* Pineiro Decl. ¶ 57. While ICE's functions and the CARI program relate to the enforcement of immigration laws, not all types of records Plaintiffs requested necessarily are compiled for law enforcement purposes.  ICE applied Exemption 7 indiscriminately to documents ranging from statements to the press to overtime requests and other records not compiled for law enforcement purposes. Pl. SUMF ¶¶ 90–96. The "vague and

general" assertion that, based on ICE's operations alone, all responsive records are compiled for law enforcement purposes is legally deficient and does not meet Exemption 7's law enforcement threshold. *See Schoenman*, 575 F. Supp. 2d at 174.[15] Therefore, all withholdings under Exemption 7(C) on records not compiled for a law enforcement purpose, which Plaintiffs have indexed in Exhibit 19, must be released.

### c. Disclosure of Names and Work Email Addresses Withheld under Exemption 7(C) on Records Compiled for Law Enforcement Purposes Do Not Constitute an Unwarranted Invasion of Personal Privacy.

Plaintiffs do not dispute that some of ICE's records may rightly be understood as "compiled for law enforcement purposes." Pl. SUMF ¶ 86. Such records are rightly withheld under Exemption 7(C) when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(C) protects, "in the proper degree, the personal privacy of citizens against the uncontrolled release of information compiled through the power of the State." *Favish*, 541 U.S. at 172. The agency must prove that it is reasonably expected that disclosure would result in an unwarranted invasion of privacy. *Akin, Gump, Strauss, Hauer & Feld, LLP v. DOJ*, 503 F. Supp. 2d 373, 383 (D.D.C. 2007). As explained above, disclosure of the names and work email addresses withheld in the Exemptions that Plaintiffs challenge does not constitute an invasion of personal privacy. *See* Section IV.B.1.a, *supra*. While Exemption 7(C) protects a broader privacy interest than Exemption 6, the privacy interest in information likely accessible in the <u>Federal Yellow Book</u> is *de minimis* and outside the scope of those interests Exemption 7(C) aims to protect.

---

[15] Categorical treatment "may be used [o]nly when the range of circumstances included in the category 'characteristically support[s] an inference' that the statutory requirements for exemption are satisfied." *Citizens for Responsibility & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (internal citations omitted). Here, ICE fails to offer particularized support for any inference that every single record produced falls within Exemption 7's law enforcement ambit.

### 2. Disclosure is Warranted Because the Public Interest Overwhelmingly Outweighs the Privacy Interests.

In evaluating withholdings under Exemptions 6 and 7(C), courts use a balancing test of public and private interests. *See Favish*, 541 U.S. at 172. Where the privacy concerns covered by Exemptions 6 and 7(C) are present, the Exemptions require the requestor to establish a sufficient reason for the disclosure. *Id*. at 172.   First, the requestor must show that the public interest sought to be advanced is an interest more specific than having the information for its own sake. *Id*. Second, the requestor must show the information is likely to advance that interest. *Id*.

Exemptions may not be invoked when the government has operated outside of its statutory authority. *See Pratt*, 673 F.2d at 420–21.   Accordingly, where there has been government misconduct, the FOIA exemptions are unavailable. *Weissman v. CIA*, 565 F.2d 692, 696 (D.C. Cir. 1977) (ruling that because the CIA's actions were unauthorized, the "law-enforcement exemption is accordingly unavailable").   However, a FOIA requester's assertion of a public interest based on "government wrongdoing" requires "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174.

Here, Plaintiffs have provided evidence—much of it from ICE's own productions—sustaining a reasonable belief that government wrongdoing has occurred. *See* Pl. SUMF ¶¶ 20–24, 94, 101–03, 108; *see also* Exs. 1, 5–6.   Within the first few pages of ICE's first production to Plaintiffs are descriptions of CARI officers riding along with local law enforcement officers, "canvassing high crime neighborhoods" in search of "suspected foreign nationals." Pl. SUMF ¶ 101. These details about CARI operations contravene the public narrative about CARI woven by ICE, which, in numerous statements to local and national media, has insisted that CARI is a

"targeted enforcement operation" aimed at removing the most dangerous criminal aliens. Pl. SUMF ¶¶ 101–03.  Rather, ICE's own productions have revealed a quota-driven program that encourages ICE agents to racially profile Latino communities—at the expense of their constitutional rights—in order to bump up numbers. Pl. SUMF ¶¶ 20–24; Ex. 8. ICE claims that biometric fingerprinting devices are used to identify those high-priority targets and to exercise prosecutorial discretion in the field.  However, individuals were often arrested before the fingerprinting that allegedly would provide information with which to identify them as enforcement priorities, and some individuals detained through CARI operations have described being arrested based only on their physical appearance and then subjected to mobile fingerprinting without apparent probable cause. Pl. SUMF ¶¶ 22–24; Ex. 1; Ex. 3 (Rappleye and Seville, *Does High-Tech Dragnet to Deport Immigrants Go Too Far?*, NBC News (Feb. 24, 2014)).  The public record suggests that many such arrests may have lacked probable cause, raising serious Fourth Amendment concerns about ICE's overall practices, and especially about its operations through CARI. Pl. SUMF ¶¶ 20–24, 101–03, 108.

Press coverage continues to document public concern about ICE's use of racial profiling and illegal search and seizure methods. Pl. SUMF ¶ 108. The issues at the heart of this case— serious constitutional and dignitary harms that create community distrust of law enforcement— invoke a strong public interest in greater transparency. *See* Pl. SUMF ¶¶ 20–24, 101–103, 108. Therefore, given the *de minimis* privacy interests at stake and the weighty evidence Plaintiffs have produced showing the depth of the public interest, ICE has improperly applied Exemptions 6 and 7(C) to the withholdings catalogued in Exhibit 19.

**C. ICE Improperly Asserts Exemption 7(E) over Information not Compiled for Law Enforcement Purposes, that Is Already Generally Known to the Public, or Whose Disclosure Poses no Reasonable Risk of Circumvention of the Law.**

ICE has failed to show that information withheld under Exemption 7(E) satisfies the threshold requirement that the information was compiled for law enforcement purposes; that the information contains techniques and procedures not publicly known; or that disclosure could reasonably be expected to risk circumvention of the law.

Exemption 7 permits withholding of "records or information compiled for law enforcement purposes" if the documents fall into one of six categories. 5 U.S.C. § 552(b)(7). Exemption 7(E) allows an agency to withhold records compiled for law enforcement purposes if release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).   Documents withheld that purportedly contain law-enforcement techniques and procedures must provide "a detailed justification" for each record that permits the reviewing court to make a meaningful assessment of the redactions and to understand how disclosure would create a reasonably expected risk of circumvention of the law. *Am. Immigration Council*, 950 F. Supp. 2d at 246. "Generic portrayals of categories of documents and vaguely formulated descriptions will not suffice; accordingly, the government must provide sufficient facts and context to allow the reviewing court to 'deduce something of the nature of the techniques in question.'" *Id.* at 246 (*quoting Clemente v. FBI*, 741 F. Supp. 2d 64, 88 (D.D.C. 2010)).[16]  The government must also show that the records contain law-enforcement techniques and procedures

---

[16] For example, the Third Circuit found an FBI affidavit was insufficiently detailed to carry its burden to justify withholding all surveillance-related requests under Exemption 7(E) on the assertion that disclosure of specialized investigative techniques could diminish their usefulness as investigative aids. *Ferri v. Bell*, 645 F.2d 1213, 1224 (3d Cir. 1981), *modified on other grounds*, 671 F.2d 769 (3d Cir. 1982).

that are "generally unknown to the public." *Am. Immigration Council*, 950 F. Supp. 2d at 245. Of particular relevance to the instant case, the Senate Conference report to the 1974 FOIA amendments stated that Exemption 7(E) "investigative techniques" was not to cover "routine techniques and procedures already well-known to the public, such as ballistic tests, *fingerprinting*, and other scientific tests commonly known." Sen. Conf. Rep. No. 93-1200, 93rd Cong., 2d Sess. (1974) (emphasis added).

Here, ICE has failed to demonstrate through its affidavits and *Vaughn* Index that the documents subjected to Exemption 7(E) were compiled for law enforcement purposes and contain law-enforcement techniques and procedures that are generally unknown to the public, and that disclosure could reasonably be expected to risk circumvention of the law.

## 1. ICE Improperly Withheld Information on Records not Compiled for Law Enforcement Purposes.

Several of the documents redacted under Exemption 7(E) were compiled for purposes other than law enforcement, such as media inquiries, or in furtherance of unconstitutional enforcement practices that do not warrant protection under the FOIA exemptions. As discussed in detail in Section IV.B.2.b, *supra*, ICE's conclusory Search Declarations assert that Exemption 7 applies categorically because all responsive records are inherently compiled for law enforcement purposes. *See* Pineiro Decl. ¶ 57. ICE applies Exemption 7 without regard to the content of the particular records and offers no reason why media inquiries, responses to the media, news articles, correspondence with congressional staff, overtime requests, and many other records not related to an investigation of a person or incident connected to a potential violation of federal law, *see Campbell*, 164 F.3d at 27, are related to law enforcement. *See* Pl. SUMF ¶¶ 90–96; Ex. 18; Ex. 19.

For example, in an email from <u>The Nation</u>, ICE improperly applied Exemption 7(E) to a media inquiry from a journalist referencing a story reported in the <u>L.A. Times</u> that ICE was increasing its Fugitive Operations team personnel. *See* Pl. SUMF ¶ 92. ICE redacted the numbers of operational teams from this email that was clearly for media and not for law enforcement purposes, and the information discussed therein was generally known to the public since its publication in the <u>L.A. Times</u> on May 26, 2012. *See id*; Ex. 2 (Brian Bennett, *U.S. Steps Up Deportation Efforts for Criminal Immigrants*, L.A. Times (May 26, 2012)). ICE redacted such information in many documents. *See* Pl. SUMF ¶ 92, 100; Ex 18. This and other similar information indexed in Exhibit 18 is not exempt and should be released.

## 2. ICE Improperly Applied the (B)(7)(E) Exemption to Information Where Disclosure Posed no Risk of Circumvention of the Law.

The b(7)(E) exemption only applies to "information that could *increase the risks* that a law will be violated or that past violators will escape legal consequences." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (emphasis in original). However, ICE improperly redacted information under exemption b(7)(E) whose disclosure would not increase any reasonable risk of the circumvention of law, including staffing numbers for operations that already occurred, basic information about fingerprinting equipment, and the names of databases. ICE's *Vaughn* Index contains boilerplate language on the anticipation of risk of circumvention of the law, which is "clearly inadequate." *King v. DOJ*, 830 F.2d 210, 224 (D.C. Cir. 1987); *Vaughn* Index; *see also PHE, Inc. v. DOJ*, 983 F.2d 248, 251–52 (D.C. Cir. 1993) (agency's "affidavit does not explain why the agency could not release at least the portions . . . containing the discussion of search and seizure law and the digest of useful caselaw").

For example, ICE withheld records under Exemption 7(E) for database names and data entry codes. Pl. SUMF ¶ 98–99; Ex 18 at Bates 3040–65. ICE's Search Declarations provide conclusory reasoning why the release of database codes could risk circumvention of the law, which requires a hypothetical person planning improper use of data entry codes to already have access to ICE's databases. *See* Pineiro Decl. ¶ 61. This is highly improbable and falls short of an "increased risk of circumvention of the law." *See Mayer Brown LLP*, 562 F.3d at 1193. Further, many of the "law enforcement sensitive codes" ICE has withheld under Exemption 7(E) appear to be for use in categorizing arrests and encounters while entering information into databases; such information might aid the public in understanding statistical information about ICE's enforcement practices, but could not conceivably be used to evade enforcement. *See, e.g.*, Ex. 18 at Bates 1004; *Vaughn* Index at 84 (withholding as "law enforcement sensitive codes" information used to categorize arrests through CARI in ICE databases). Similarly, ICE claimed Exemption 7(E) on staffing numbers on operations, and provided only conclusory justification as to why releasing staffing numbers could reasonably risk circumvention of the law. Pl. SUMF ¶ 100; *compare* Exhibit 18 at Bates 3415, 3417–19, 3421, 3423; *with* Vaughn Index at 213–16.

ICE's re-release of certain information without redaction, while leaving apparently similar information redacted on other pages, casts further doubt on ICE's vague assertions of a risk of circumvention of the law. Pl. SUMF ¶ 97; Ex. 20. ICE re-released documents with references to database names, references to its Mobile IDENT biometric devices, and staffing numbers that were previously redacted without any reason why the information was initially redacted. *Id.* In its re-released pages, ICE revealed the previously-redacted name of the mobile fingerprinting device and accompanying database "Mobile IDENT." *See, e.g.*, Ex. 20 at Bates 2. However, similar references from ICE's production to database and device names remain

redacted. *See, e.g.*, Ex. 18 at Bates 449. In addition, in its re-released pages, ICE also revealed previously-redacted staffing quantities. *See* Ex. 20 at Bates 471. However, similar references from ICE's production to staffing quantities remain redacted. *See* Ex. 18 at Bates 683. ICE had even previously released the same types of information, including staffing numbers, to the media. Pl. SUMF ¶ 100; Ex. 18. ICE offers no reason why Exemption 7(E) may safely be removed from the re-released pages, but not from other similar or identical withholdings. At minimum, ICE should unredact information that is identical or similar to that it released in the re-released pages and to that released to the media.

ICE also claimed Exemption 7(E) on operations where the enforcement practices may have violated the Fourth Amendment by detaining people to take their fingerprints without probable cause. *See* Pl. SUMF ¶¶ 20–24, 101. Similarly, ICE claimed Exemption 7(E) on law enforcement or public relations discussions planning to respond to a public demonstration that may have been protected under the First Amendment. Pl. SUMF ¶ 101. ICE cannot claim 7(E) Exemptions where the information withheld is not a legally permissible law enforcement purpose.   Such activities are of significant interest to the public and should be released, especially where, as here, ICE may have withheld information relating to its own violations of the law. *See Weissman*, 565 F.2d at 696. The Court should order ICE to release all of the material withheld under Exemption 7E listed in Exhibit 18.[17]

### D. ICE's Generalized and Inadequate *Vaughn* Index of its Redactions Further Shows that ICE Has Applied Exemptions Indiscriminately and Overbroadly.

The agency has the burden to establish the applicability of all claimed exemptions with affidavits that describe the justification with specificity.  *Citizens for Responsibility & Ethics in*

---

[17] Plaintiffs note in Exhibit 18 that were ICE to sufficiently describe the nebulous "system codes" and "law enforcement codes" withheld as to permit their evaluation under Exemption 7E, Plaintiffs might not need to pursue that information.

*Washington*, 746 F.3d at 1088.  "Vague, sweeping, or conclusory materials are inadequate to support summary judgment in favor of an agency and the acceptance of such inadequate support would constitute an abandonment of the trial court's obligation under FOIA to conduct *de novo* review."  *S. All. for Clean Energy v. U.S. Dep't of Energy*, 853 F. Supp. 2d 60 (D.D.C. 2012). "Categorical description of redacted materials coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." *King*, 830 F.2d at 224.

Here, ICE's *Vaughn* Index lacks the "specificity of description" courts have "repeatedly warned is necessary to ensure meaningful review of an agency's claim to withhold information subject to a FOIA request." *King*, 830 F.2d at 216. ICE's repetition of the same categorical description of the withheld or redacted records fails to "adequately describe[ ] each withheld record or deletion and set[ ] forth the exemption claimed and why that exemption is relevant." *Id.* (citing *Paisley v. CIA*, 712 F.2d. 686, 690 n.12 (D.C. Cir. 1983)). ICE must describe each portion redacted or withheld and discuss the consequences of disclosure absent the withholding. *Id.* at 223. Yet ICE's affidavits and *Vaughn* Index fail to satisfy these requirements. ICE's insufficiently detailed declarations, coupled with its failure to meet the requirements of the exemption standards, warrant a ruling in favor of the Plaintiffs ordering ICE to produce unredacted records of the pages listed in Plaintiffs' Exhibits 17, 18 and 25.

## CONCLUSION

Plaintiffs seek to inform the public of ICE's potentially unconstitutional enforcement tactics.[18] ICE has denied the public the right afforded to it by FOIA to be fully informed about its

---

[18] There is strong public interest in public discourse regarding the subject matter central to Plaintiffs' Request, much of which ICE has failed to produce here. *See Navarro Hernandez v. U.S. Customs & Border Prot. Agency*, No. 10-4602, 2012 WL 398328, at *9 (E.D. La. Feb. 7, 2012) ("At present, there is a vigorous public debate on the topic of targeted immigration enforcement, . . . [and] on the related issue of whether and to what extent local police should be involved with federal immigration enforcement efforts. Both these questions are of substantial public interest in

government's actions by failing to conduct a search in a manner reasonably calculated to uncover all relevant documents and by withholding non-exempt information through an overbroad and improper use of Exemptions 5, 6, 7(C) and 7(E). For these reasons, Plaintiffs respectfully request that the Court deny ICE's Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment on all matters. Accordingly, the Court should order ICE to conduct a new, broadened, thorough and targeted search to uncover all requested records and to promptly reproduce properly unredacted documents, as set forth in Plaintiffs' Proposed Order.[19]

Respectfully submitted this 18th day of April, 2016,

___/s/ Jennifer Rosenbaum_____
Jennifer Rosenbaum (LA Bar #31946)
NEW ORLEANS WORKERS' CENTER FOR
RACIAL JUSTICE
217 N. Prieur St.
New Orleans, LA 70112
Tel: 504-309-5165
Email: jjrosenbaum@nowcrj.org

___/s/ Michael T. Kirkpatrick_____
Michael T. Kirkpatrick (D.C. Bar #486293)
Samantha Ondrade, Student Attorney
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Tel: 202-661-6582
Email: michael.kirkpatrick@law.georgetown.edu

___/s/ Thomas P. Fritzsche_____
Peter L. Markowitz (NY Bar #4092276)
Thomas P. Fritzsche (D.D.C. Bar #NY0203)
Farah Egal, Student Attorney
Dara Gell, Student Attorney
Sam Stanton, Student Attorney
BENJAMIN N. CARDOZO SCHOOL OF
LAW IMMIGRATION JUSTICE CLINIC
55 5th Avenue, 11th Floor
New York, New York 10003
Tel: 212-790-0895
Email: peter.markowitz@yu.edu,
thomas.fritzsche@yu.edu

*Counsel for Plaintiffs*

---

the City of New Orleans, where the plight of the large population of immigrant workers who have assisted in rebuilding efforts after Hurricane Katrina has been a matter of particular concern.") (internal citations omitted).

[19] In the alternative, the Court could review certain withholdings *in camera*. Should the Court find the record inconclusive whether ICE has met its burden to establish adequate searches or proper withholdings, the Court could grant limited discovery or order ICE to produce more detailed declarations regarding its searches and exemptions.

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NEW ORLEANS WORKERS' CENTER | ) | |
| FOR RACIAL JUSTICE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No.1:15-cv-00431-RBW |
| | ) | |
| U.S. IMMIGRATION AND CUSTOMS | ) | |
| ENFORCEMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

**PLAINTIFFS' STATEMENT OF GENUINE ISSUES AND RESPONSE TO
DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 7(h), Plaintiffs respectfully submit this Statement of Undisputed

Material Facts in opposition to Defendant ICE's Motion for Summary Judgment and in support

of Plaintiffs' Cross-Motion for Summary Judgment. Paragraph numbers 1 through 19 below

correspond to the paragraph numbering of Defendant's Statement of Material Facts, and

references to Def. Exhibits 1 through 5 are to the exhibits filed with Defendant's Statement. In

paragraphs 20 through 138, Plaintiffs set forth additional material facts that are not in dispute.

Plaintiffs' Exhibits 1 through 30 are submitted with this statement.

**I.      Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts**

1.   Undisputed, except that Plaintiffs add that these requests were the headings of sections

     describing the records requested in additional detail. *See* Pls.' Request (Ex. 1 to Pineiro

     Decl.).

2.   Plaintiffs lack the information with which to confirm or dispute this statement.

3.   Plaintiffs lack the information with which to confirm or dispute this statement as to the

     general process undertaken by ICE in responding to other FOIA requests, but dispute that

in this case, ICE identified the component offices reasonably likely to have responsive records, and dispute that these processes were followed in responding to Plaintiffs' Request. *See* Harrington Decl. ¶¶ 8-10, 29; Exhibit 15: Chart of Custodians and Search Terms; Exhibit 12: Records from ICE's Productions Showing Involvement of the Office of Congressional Relations (OCR) in CARI; Exhibit 13: Records from ICE's Productions Showing Involvement of the Office of Principal Legal Advisor (OPLA) in CARI; Exhibit 14: Records from ICE's Productions Showing Involvement of Homeland Security Investigations (HSI) in CARI.

4. Plaintiffs lack the information with which to confirm or dispute this statement, except that Plaintiffs dispute that it is reasonable for an individual employee to only search her or his email archives when she or he specifically remembers that an email responsive to a FOIA request is in the archives.

5. Undisputed, except that Plaintiffs dispute that ICE Enforcement and Removal Operations (ERO)'s detention of individuals is always necessary, that all of the individuals whom ERO removes from the United States are undocumented immigrants, and that ERO consistently follows the stated priorities.

6. Undisputed that some responsive documentation from ERO records was produced to Plaintiffs, but Plaintiffs lack the information with which to confirm or dispute other elements of this statement.

7. Disputed in that, as ICE's own Search Declarations reveal, no ICE custodians who conducted searches actually used all of the search terms listed. *See* Ex. 15; Harrington Decl. ¶¶ 8-10; Pineiro Decl. ¶ 31. Many ICE custodians only searched the acronym

"CARI," and many others searched only for phrases involving the acronym "CARI." *See Id.*

8.  Undisputed.

9.  Disputed: While Plaintiffs lack the information with which to dispute or confirm the communications between the ICE FOIA Office and the Office of the Principal Legal Advisor (OPLA) on November 26, 2013, and December 4, 2013, a number of records produced to Plaintiffs reveal that OPLA did in fact have involvement in the Criminal Alien Removal Initiative ("CARI"). *See* Ex. 13 at Bates 3118, 3138; Exhibit 19: Exemption 6 and 7(C) Withholdings Challenged by Plaintiffs at Bates 1600–02, 3106 (records showing OPLA's involvement in CARI operations).

10. Undisputed.

11. Undisputed that some responsive documentation from ICE's Office of Public Affairs was produced to Plaintiffs.  Plaintiffs lack the information with which to confirm or dispute other elements of this statement.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Undisputed, except Plaintiffs add that that on November 18, 2015, ICE made its seventh and final production and mailed to Plaintiffs 958 pages of documents and seventeen Excel spreadsheets. *See* Exhibit 3: ICE's Production Cover Letters pg. 7.

18. Undisputed.

3

19. Disputed. Plaintiffs have identified redacted information in ICE's production that expressly withholds factual material. *See* Exhibit 17: Exemption 5 Withholdings Challenged by Plaintiffs at Bates 61; *Vaughn* Index at pg. 3. Further, ICE's declarations and *Vaughn* Index provide only a blanket generalization, and no details, about whether or how ICE attempted to segregate factual material from information withheld. *See* Pineiro Decl. ¶¶ 64-66; *Vaughn* Index at pg. 3.

## II.   Plaintiffs' Statement of Undisputed Material Facts

### A.   Introduction and Background

20. In May 2012, U.S. Immigration and Customs Enforcement ("ICE") Enforcement Removal Operations ("ERO") created a new ICE enforcement program called the Criminal Alien Removal Initiative or "CARI" to increase the number of ICE and/or ERO arrests. *See* Exhibit 1: *The Criminal Alien Removal Initiative in New Orleans: The Obama Administration's Brutal New Frontier in Immigration Enforcement*. December 2013. New Orleans Workers' Center for Racial Justice; Exhibit 2: New Articles about CARI; Exhibit 8: Records from ICE's Productions Showing Evidence of a Quota System. The enforcement initiative was implemented in all twenty-four local ICE ERO field offices. *See* Ex.17 at Bates 2682. ICE Director John Morton was briefed about CARI. Ex. 8 at Bates 2852–53.  ICE Director John Morton issued directions relating to the implementation of CARI.  *Id.*

21. Under CARI, ICE has coordinated with local police departments to plan and carry out raids, dubbed "Stop and Frisk for Latinos" by <u>The Nation</u>. *See* Ex. 2 at pg. 26; Exhibit 4: New Orleans CARI Canvassing "High Crime" Neighborhoods with Local Police. For example, in New Orleans, CARI officers operated from "covert locations" as part of joint

4

operations with Jefferson Parish Sheriff's Officers, "canvassing high crime neighborhoods" in search of "suspected foreign nationals." *See* Ex. 4.

22.  A key feature of CARI is the use of cutting edge biometric technology, mobile fingerprinting devices, to remotely check the criminal and immigration records of individuals stopped by CARI officers. *See* Ex. 1 at pgs. 1-3; Ex. 2; Exhibit 5: ICE Record Discussing Use of Mobile Fingerprinting Devices. Individuals stopped as a part of CARI's efforts were often arrested based only on physical appearance, and then fingerprinted. *See* Ex. 5 (Mobile fingerprint devices are used *subsequent* to arrest); Ex. 1, pgs. 8-12 (detailing stories of arrests by CARI who were arrested after little or no interaction with the arresting officer and without making any statements or actions giving rise to probable cause, and then fingerprinted in order to determine their immigration and criminal histories).

23. Under the CARI initiative, ICE has conducted these raids and arrest procedures in public places resulting in children, spouses, and community members watching as individuals are ripped from their families and sent to rural detention centers in the midst of buying groceries, doing laundry, or going to Bible study groups. *See* Ex. 1; Ex. 2; Exhibit 6: January 31, 2014 Email Regarding the Arrest of a Pregnant Woman. As a result, the CARI program has raised national alarm among affected and potentially affected communities, press, and lawmakers for its broad use of law enforcement raids and area sweeps targeting Latino communities. *See* Ex. 2; Ex. 19 at Bates 75-76, 87-88, 91-92 (Congressional Representatives and Senators Interest in CARI Arrests).

24. For example, Plaintiff Erlin San Martin-Gomez is a reconstruction worker and father of a U.S. citizen infant who has been diagnosed with "failure to thrive," a serious

developmental condition. *See* Ex. 1 at pg. 8; Ex. 2, pg. 9 (NBC News story profiling Mr. San Martin-Gomez's arrest by ICE). A CARI team, accompanied by the Jefferson Parish Sheriff's Office, detained Mr. San Martin-Gomez in the parking lot of an apartment complex while he was in route to pick up his son. ICE agents approached Mr. San Martin-Gomez, and handcuffed and fingerprinted him using their mobile biometric device. *Id.* For several hours after detaining Mr. San Martin-Gomez, the ICE agents drove the van around arresting other Latinos in other neighborhood parking lots and in a laundromat before driving Mr. San Martin-Gomez to an ICE detention center. *Id.* ICE released Mr. San Martin-Gomez from detention after significant public concern over his case. *See* Ex. 2, pg. 15.

25. On November 13, 2013, the New Orleans Workers' Center for Racial Justice ("NOWCRJ")and New Orleans Community Civil Rights Monitors Santos Alvarado, Maria Amaya, Melvin Bardales-Deras, Jimmy Barraza-Bonilla, Alfredo Carrera, Denis Chirinos-Avila, Irma Lemus, Erlin San Martin-Gomez, Ronald Martinez-Rivera, Mario Mendoza, Ilda Sarmiento (collectively "Community Civil Rights Monitors") (collectively with NOWCRJ "Plaintiffs") submitted to ICE a FOIA request seeking records relating to CARI.  Plaintiffs sought, *inter alia*, data about ICE's practices of fingerprinting individuals in the field, and records of ICE's communications about CARI. *See* Plaintiffs' Request (Def. Ex. 1).

**B.      ICE's Response to Plaintiffs' Request**

26. On November 26, 2013 ICE denied Plaintiffs' request for expedited processing. However, on December 13, 2013, upon appeal, ICE granted expedited processing of the request. *See* Def. Exs. 2-5.

27. Between the filing of Plaintiffs' FOIA Request and their Complaint, spanning over 16 months, ICE did not assert that the FOIA Request was overly broad, burdensome, or otherwise deficient. *See* Def. Exs. 2-5 to Pineiro Decl.; Ex. 3, pg. 23 (NOLA Article 4/2/15, "ICE responded to the center's records request but refused to waive the fees associated with collecting them").

### C.     The Complaint

28. Fifteen months after ICE's grant of expedited processing, and 16 months after Plaintiffs' FOIA Request was filed, ICE still had not produced a single responsive document. *See* Pls.' Compl. As a result, on March 25, 2015, Plaintiffs filed their Complaint with this Court alleging that ICE had violated its obligations under the FOIA. *Id*.

29. Soon thereafter, on April 24, 2015, Plaintiffs contacted ICE suggesting that they discuss searches that would lead to full production of responsive records.  Exhibit 22: Email from Peter Markowitz, Counsel for Plaintiffs, to Joshua Kolsky, Counsel for ICE, April 24, 2015.

### D.     ICE's Productions and Inadequate Searches

30. ICE finally released its first production set to Plaintiffs on May 7, 2015. *See* Ex. 3 at pg. 1.

31. Soon after ICE began its productions, it was apparent to Plaintiffs that ICE was searching little more than the word "CARI" in ERO employees' Outlook email accounts. *See* Ex. 15. By correspondence to ICE, in June, 2015, Plaintiffs raised concerns regarding the scope and sufficiency of ICE's search for documents responsive to the request. *See* Exhibit 23: Appendices to Plaintiffs' Counsel's June 22, 2015 Letter to Counsel for ICE. In their June 22, 2015 letter, Plaintiffs identified the following list of offices that were

likely to hold important responsive records: Office of the Director, Principal Deputy

Secretary, Office of the Executive Secretariat, Office of the Principal Legal Advisor

(OPLA), Office of the Deputy Director, Office of the Chief of Staff, Office of Detention

Policy and Planning (ODPP), Homeland Security Investigations, Office of Professional

Responsibility, Office of State, Local and Tribal Coordination, Office of Congressional

Relations, Office of Public Affairs, Management and Administration, Offices of Chief

Counsels for records. *Id* at 7. Plaintiffs also identified a list of search terms they

believed would be helpful to ICE in locating responsive records. *Id* at 8. Plaintiffs also

clarified the scope of the most essential set of data for ICE to produce, and listed each of

the databases likely to contain that data, namely, EARM, EADM, ATD, GEMS, and

IDENT. *Id* at 7.

32. Plaintiffs sent a similar letter to ICE on September 2, 2015, also listing search terms,

offices and records custodians, and specific data sources that were likely to yield records

responsive to their Request. Exhibit 24: Appendices to September 2, 2015 Letter to

Counsel for ICE.

33. On January 7, 2016, the Parties submitted to the Court a Joint Status Report and Proposed

Briefing Schedule. ECF No. 20, Joint Status Report and Proposed Briefing Schedule.

The Court entered the accompanying order for the proposed schedule. Minute Order

February 17, 2016.

34. On February 18, 2016, ICE subsequently moved for a thirty day extension to submit its

Motion for Summary Judgment. ECF No. 22, Defendant's Motion to Reset and Extend

Deadlines. The motion was granted on February 19, 2016. (Minute Order February 19,

2016).

35. ICE released seven production sets at a rate of approximately 500-600 documents a month. In total, between May 7, 2015 and November 18, 2015, ICE produced 3,680 pages of documents, as well as certain spreadsheets of data. *See* Def. Statement of Undisputed Material Facts ¶¶ 12–17; Ex. 3.

36. On February 17, 2016, ICE rereleased 167 pages of documents with several portions of the documents that were previously redacted now unredacted. On March 10, 2016 it re-released four additional pages with fewer redactions. *See* Deft's Fact 18; Ex. 3 at pgs 19-23.

### E. What ICE Produced to Plaintiffs

37. ICE's document production consisted primarily of emails. *See* Exhibit 27: Declaration of Farah Egal, Student Attorney at ¶ 5; Exhibit 28: Declaration of Dara Gell, Student Attorney at ¶ 6; Exhibit 29: Declaration of Sam Stanton, Student Attorney at ¶ 5.

38. No ICE ERO custodian searched using more than ten search terms. *See* Ex. 15; Harrington Decl. ¶¶ 8–10; Pineiro Decl. ¶ 31.  ICE Office of Public Affairs custodians searched using twelve terms.  Pineiro Decl. ¶ 31.

39. ICE used search terms extracted verbatim from section headings in the FOIA Request, such as "Total number of individuals fingerprinted using ICE's mobile fingering units;" "What the federal government is saying about CARI;" "What ICE is saying re: CARI." Harrington Decl. ¶ 14; *See* Pls.' Request (Ex. 1 to Pineiro Decl.).

40. Forty of the 88 total search terms listed in ICE's search declarations include the word "CARI." Harrington Decl. ¶ 14.

41. No ICE custodian searched using all of 88 listed terms. *See* Ex. 15; Harrington Decl. ¶¶ 8-10; Pineiro Decl. ¶ 31.  Many custodians searched only for the acronym "CARI" or for

the initiative name "Criminal Alien Removal Initiative." Ex. 15; Harrington Decl. ¶¶ 8(a–d), 10(a, c–e, g–l, n–r, t–w).

42. ICE's own officials understood CARI to be an expansive initiative encompassing major divisions of ICE.  The Unit Chief of ICE's National Fugitive Operations Program wrote by email that "[a]nything and everything Fugitive Operations (the [redacted] + the [redacted] additional teams) is doing right now is considered CARI. This includes targeting only Level ls and 2s, but it also includes anyone arrested by Fug Ops, even a non-crim B&B. Note also that reporting for CARI is being pulled from Enforce which relates to the tasking below."  Exhibit 10: Examples of Records Reflecting the Tacking of CARI-Related Encounters and Arrests and ICE's Storage of CARI-Related Data at Bates 813–14.

43. ICE searched two offices for responsive records: the Office for Enforcement and Removal Operations (ERO) and the Office of Public Affairs (OPA). Pineiro Decl. ¶¶ 25-26, 30; Def.'s SUMF ¶ 2.

44. ICE never searched the following offices for responsive records: Office of the Director, Principal Deputy Secretary, Office of the Executive Secretariat, Office of the Principal Legal Advisor (OPLA), Office of the Deputy Director, Office of the Chief of Staff, Office of Detention Policy and Planning (ODPP), Homeland Security Investigations, Office of Professional Responsibility, Office of State and Local Coordination, Office of Congressional Relations, Office of Public Affairs, Management and Administration, Offices of Chief Counsels for records. Harrington Decl. ¶ 28. *See* Ex. 23 (Plaintiffs asked ICE to search these offices). Additionally, the following ICE offices were not searched: Office of the Chief Financial Officer, Office of State, Local and Tribal Coordination

(OSLTC), and the Office of Firearms and Tactical Programs. *See* Pineiro Decl. ¶¶ 25-26, 30-31 (ICE only searched ERO and OPA).

45. The ICE FOIA Office initially believed that responsive records might be found in OPLA, but the Chief Executive of the Communications Unit—the individual tasked with the search—indicated OPLA "did not have any involvement in Criminal Alien Removal Initiative ("CARI") matters" and no search was conducted as a result.  *See* Pineiro Decl. ¶¶ 25–26, 30–31.

46. Records produced by ICE to Plaintiffs have revealed involvement of a number of unsearched ICE offices in CARI operations, providing training, assistance in investigation or enforcement leads, as well as following up on requests for Prosecutorial Discretion. *See* Exhibit 11: Evidence of Training Materials Not Produced; Ex. 12 (OCR); Ex. 13 (OPLA); Ex.14 (HSI). These offices with involvement in CARI include the Office of the Chief Financial Officer, the Office of Firearms and Tactical Programs, the Office of Congressional Relations, the Office of the Principal Legal Advisor, and Homeland Security Investigations. *See* Ex. 11 at Bates 58-59 (trainings by the Office of Firearms and Tactical Programs for CARI teams); Ex. 12 (OCR); Ex. 13 (OPLA); Ex.14 (HSI) at, *e.g.*, Bates 774–75; Ex. 19 at Bates 3637–38 (FOIA tasking to OCFO).

47. ICE has produced email exchanges from the OCFO relating to budget and fiscal matters involving CARI. *See* Exhibit 9: Examples of Records Reflecting the Costs of CARI at Bates 3271–74. ICE has produced a June 11, 2014 email, "tasking" its CFO with responding to a FOIA request relating to CARI that ICE received from a journalism organization. Ex. 19 at Bates 3637–38.

48. The Office of the Chief Financial Officer "provides effective and efficient management of all ICE financial resources through the implementation of best business practices and by linking strategic planning, budgeting and performance reporting." Accessed from: https://www.ice.gov/management-administration/cfo.

49. The Office of Firearms and Tactical Programs provided training for CARI team members, including trainings for all CARI officers in the New Orleans CARI program. Ex. 11.

50. The Office of Firearms and Tactical Programs "ensures that ICE agency personnel have the necessary firearms, protective equipment and training to complete their jobs." Accessed from: https://www.ice.gov/management-administration/oftp.

51. The Office of Congressional Relations followed up with ERO Field Offices regarding congressional inquiries into Prosecutorial Discretion requests by individuals arrested through CARI. Ex. 12 at Bates 75.

52. "The ICE Office of Congressional Relations handles outreach to Congress, with a strong focus on promoting greater understanding of ICE operations, policies, programs and initiatives among members of Congress, Congressional committees and their staffs." Accessed from: https://www.ice.gov/leadership/ocr.

53. Homeland Security Investigations provided CARI with tips and leads on potential targets for arrests. Ex. 14 at, *e.g.*, Bates 1600, 1601, 2958. Documents produced by ICE show that HSI actively referred leads to CARI officers, assisting the CARI agents in the alleged main function of the program. *Id.*

54. Homeland Security Investigations "is a critical investigative arm of the Department of Homeland Security and is a vital U.S. asset in combating criminal organizations illegally

exploiting America's travel, trade, financial and immigration systems." Accessed from: https://www.ice.gov/hsi.

55. In order to participate in the CARI initiative and operations, ICE personnel were required to participate in Fourth Amendment trainings conducted by the Office of the Principal Legal Advisor (OPLA). Ex. 13. OPLA is further referenced in several email chains that ICE produced regarding CARI operations. *Id.*

56. In an email between ICE officials, while planning a CARI enforcement operation, an ICE official stated that "coordination with OPLA is essential . . . ." Ex. 13 at Bates 3138.

57. "OPLA is the largest legal program in the Department of Homeland Security, providing legal advice, training and services in cases related to the ICE mission." Accessed from: https://www.ice.gov/opla.

58. ICE's Office of State, Local and Tribal Coordination (OSLTC), "coordinates with state, local and tribal law enforcement as they identify community challenges and explains the partnership services ICE can provide to meet those challenges" and "is responsible for building and improving relationships and coordinating partnership activities for multiple stakeholders – including state, local and tribal governments, as well as law enforcement agencies/groups and non-governmental organizations." Accessed from: www.ice.gov/leadership/osltc.

59. ICE has produced very few records related to CARI's fiscal impact. *See* Harrington Decl. ¶ 23; Def. Ex. 1: Plaintiffs' Request at 12 (requesting records relating to the fiscal impact of CARI). Documents produced by ICE reflect that CARI affected ERO operations costs, with overtime pay requests and additional staffing from "detailers." *See* Ex. 9. Documents produced by ICE demonstrate that ERO allocates a portion of its

budget for CARI operations and staff. *See* Ex. 9 at 3271–74 (email chain discussing Congressional funding for CARI).

60. Out of the 160 ICE custodians tasked with this search, only four ICE custodians searched any databases at all. Harrington Decl. ¶¶ 8-10; Pineiro Decl. ¶ 31. *See also* Ex. 15. Only four ICE employees searched EARM at all. *Id.*

61. The four ICE custodians who searched any database searched only the EARM database and no other databases. Harrington Decl. ¶¶ 8-10; Ex. 15.

62. ICE did not systematically search for all records or data relating to persons fingerprinted, detained, or arrested through CARI. Harrington Decl. ¶¶ 8–10, 20–22, 26, 30, 32; Ex. 15; *see* Ex. 10 (records from ICE's productions showing ICE's ability to record and track CARI-related encounters and arrests in ICE's data systems).

63. ICE has not produced any records of warrants, Forms 1-247 (immigration detainer), Forms 1-286 (Notice of Custody Determination), Form 1-862 (NTA), Form 1-871 (Notice of Intent I Decision to Reinstate Prior Order), A-Files, and/or Records in EARM, EADM, ATD or any other electronic system used to store ICE enforcement information such as arrest and encounter details, comments, case action, decision, and disposition details. Harrington Decl. ¶¶ 8, 10, 14, 20–23, 30–32.

64. ICE produced one form 1-213 (record of deportable/ inadmissible Alien). *See* Exhibit 7: I-213 Form Produced by ICE, Bates numbers 747-48.

65. ICE did not systematically search for I-213 forms. *See* Harrington Decl. ¶¶ 8, 10, 14, 20-23, 30-32; Ex.15.

66. ICE has data and/or individual records of how many individuals its agents fingerprint, including by using mobile fingerprinting devices. *See* Harrington Decl. ¶ 32; Ex. 10

(Records showing ICE tracks and reports on CARI arrests and encounters). At least some

of this data is entered in relation to CARI.  Ex. 10 at Bates 590, 1601 ("drop-downs"

added into ENFORCE and FCMS to record CARI arrests); Stanton Decl. ¶¶ 9-10. At

least some of this data is searchable in relation to CARI. Ex. 10 at pages Bates 3235-37

(series of emails among ICE officials stating, *inter alia*, that "[a] spreadsheet is kept on

CARI" and discussing how to search the spreadsheet and other databases for CARI

arrest-related information); Stanton Decl. ¶¶ 11-13.

67. ICE has produced a limited number of records showing the demographics of persons

stopped by CARI teams, including one I-213 form and certain spreadsheets of arrest data

reflecting the suspected nationality of individuals. *See* Harrington Decl. ¶ 21; Def. Ex. 1

(Plaintiffs' Request) pg. 9; Gell Decl. ¶¶ 10-11.

68. ICE has not issued any search memoranda relating to Plaintiffs' FOIA Request. *See*

Pineiro Decl.; Harrington Decl.

69. ICE provided no particularized information about how ICE decided which files each

custodian would search, which search terms they would use, whether they would search

archived email records, whether they would use proximity connectors and spelling

variations of search terms, or whether any alternative approaches to these decisions were

considered. Harrington Decl. ¶¶ 8-10.; Pineiro Decl. ¶¶ 22-23, 25 ("ICE FOIA Office

instructed those specific offices to conduct a comprehensive search for records"), ¶ 31;

Ex.15: Chart of Custodians' Searches. No custodians indicated whether or not they

searched archived emails. *See* Harrington Decl. ¶¶ 8-10; Pineiro Decl. ¶ 31; *see also* Ex.

15.

70. ICE's search affidavits state that "[t]he determination of where to search, how to search, and what search terms to use in response to a particular FOIA tasking, as well as how to conduct any necessary searches, is necessarily based on the manner in which the employee maintains his/her files." Pineiro Decl. ¶ 21; Harrington Decl. ¶¶ 8-10.

71. ICE has produced no records showing assessments of CARI or an organizational chart. *See* Harrington Decl. ¶ 25. Only two ICE employees searched for any form of the phrase "organizational chart" in their records. *See* Harrington Decl ¶¶ 8(d), 10(a); Ex.15. *See also* Def. Ex. 1 (Plaintiffs' Request) pg. 9. Neither search affidavit explains why those two officers were the only ones to look for an organizational chart. *See* Harrington Decl.; Pineiro Decl.

72. Only seven ICE OPA employees and four ICE ERO field officers searched for "assessments of CARI," and ICE does not explain why only these employees in only these offices searched for records of assessment of CARI. Harrington Decl. ¶ 10(a, e, j, t); Pineiro Decl. ¶ 31.  One of these officers, in the ERO Atlanta Field Office, searched for "assessment of CARI."  Harrington Decl. ¶ 10(a).

73. ICE did not describe whether custodians who searched computer hard drives and shared servers did so using keywords, search methods designed to search the full text of documents, or other safeguards to ensure that all files were searched.  *See* Harrington Decl. ¶¶ 8-10; Pineiro ¶ 31; Ex. 15. ICE limited its searches to only exact phrases, without proximity connectors, spelling variations, or case-sensitivity. *Id.* Nineteen ICE custodians who conducted searches did not search their hard drives or shared servers.  *Id.*

74. ICE produced nearly 200 email records that indicated that they included an attachment, but without explanation, ICE did not produce the attachments. *See* Exhibit 21: Records

of Emails Whose Attachments Were Not Included in ICE's Productions; Stanton Decl. ¶¶ 4, 20-21; Egal Decl. ¶ 4; Gell Decl. ¶ 4.

75. Only thirteen ICE custodians searched paper files. *See* Harrington Decl. ¶ 10 (h, i, u); Ex. 15. Only a single ICE custodian searched a thumb drive. Harrington Decl. ¶ 10(a); Ex. 15. No other ICE custodians searched USB/thumb drive, CD, *or* DVD records. Id.

76. ICE produced very few records relating to ICE's involvement of local or state law enforcement officials in their field operations. *See* Egal Decl. ¶ 6; Gell Decl. ¶ 7; Stanton Decl. ¶ 6.

77. ICE produced no racial profiling training or policy records. *See* Egal Decl. ¶ 8; Gell Decl. ¶ 9; Stanton Decl. ¶ 8.

78. ERO headquarters disseminated a national CARI plan via email to all of the ERO Field Office Directors via email. *See* Exhibit 16: CARI Plans Produced by ICE; Ex. 17 at 2682. The CARI plan attached to that email was produced to Plaintiffs fully withheld under Exemption 5. *See* Ex.17. In the same email that distributed the national CARI plan, ERO Director Thomas Homan required each of the 24 ERO field offices to submit a field office-specific annex to a national CARI plan. Ex. 17 at 2682. At most, eight of the 24 ERO field office-specific CARI plan annexes were produced to Plaintiffs. *See* Gell Decl. ¶¶ 11–19; Ex. 16.

**F.      ICE's Withholdings**

79. Claiming deliberative process privilege, ICE withheld entire pages of several "CARI plans." *See Vaughn* Index at pg. 117, 146-147, 150, 172; Exhibit 16: Chart of CARI plans.

80. Notes taken at a meeting with a local New Orleans non-governmental organization and several email chains with media were also withheld under Exemption 5's deliberative process privilege. *See* Def. *Vaughn* Index at pg. 17–18; Ex. 17 at Bates 370–71.

81. An ICE memorandum describing a protest at a church was withheld under Exemption 5 deliberative process privilege. *See Vaughn* Index at pg. 6; Ex.17 at Bates 112–13.

82. Several responsive documents were withheld as predecisional, draft documents, but no final versions of said documents were produced. Ex.16; Ex. 17.

83. Plaintiffs have identified eighteen records with exemptions ICE has claimed under Exemption 5 that are deficient. *See* Ex. 17.  Certain exemptions ICE claimed under Exemption 5 were for information that was not pre-decisional.  *Id.*  ICE redacted information that seems from context to have been adopted as a final decision of the agency. *See* Ex. 16; Ex. 17 at Bates 398–99. ICE redacted entire pages of "CARI plans" which were labeled "final" in the documents' titles, visible on the attachment line of the emails with which the plans were sent as attachments. *Id.* Certain exemptions ICE claimed under Exemption 5 were for information that was not deliberative.  *Id.* Certain exemptions ICE claimed under Exemption 5 were for information that was factual and could have been segregated from any exempt deliberative information. *Id.* For example, ICE withheld certain data that it classified as "pre-decisional."  *Id.* at Bates 79.

84. ICE claimed that every piece of information it withheld under either Exemption 6 or Exemption 7(C) is exempt under both Exemptions 6 and 7(C).  *See* Ex. 19; Stanton Decl. ¶ 15.  ICE invoked Exemption 6 by categorically withholding what appear to be work email addresses and names without individualized analysis of the degree of privacy interest. *See* Ex. 19.

85. ICE's productions reveal that ICE has used Exemptions 6 and 7(C) to withhold what from context are likely the names of the Peruvian Consul General and of JJ Rosenbaum, Legal Director of the New Orleans Workers' Center for Racial Justice. Ex. 19 at Bates 22, 227.

86. ICE states that "all the ICE records responsive to Plaintiffs' FOIA request were compiled for law enforcement purposes and meet the threshold requirement of FOIA Exemption (b)(7)." Pineiro Decl. ¶ 57.

87. ICE applied Exemption 6 and 7(C) to the vast majority of names, email addresses and phone numbers in the production set. *See* Stanton Decl. ¶ 15.

88. The *Federal Yellow Book* is a federal government contact directory. It contains names, email addresses, phone numbers and other biographical information on employees from over 85 federal government agencies, including ICE. The *Federal Yellow Book* is available to the public for purchase. *Federal Yellow Book*, Leadership Directories, https://www.leadershipdirectories.com/Products/LeadershipinPrint/Government/FederalY ellowBook (last visited Apr. 18, 2016).

89. ICE asserted Exemptions 6 and 7(C) on thousands of pieces of information. Plaintiffs challenge that ICE over broadly uses Exemption 6 and 7(C) over the information that appears to be names, email addresses, and other information that is not telephone or fax numbers, in only a specified group of records. *See* Ex. 19. Much of the information appearing to be names withheld are likely to be the names of ICE employees available in the Federal Yellow Pages.  The names and emails redacted would likely not reveal any personal information about the senders or recipients beyond what would be available in the Federal Yellow Pages or otherwise already in the public domain.

90. ICE withheld the name of an Associated Press Reporter withheld under Exemption 7(C). ICE withheld names and work email addresses in interoffice emails regarding employee trainings, staffing, and over time requests. *See* Ex. 19 at Bates 58-60, 1599-1602, 2297–99, 2427–30, 3279–96; Ex. 9 at Bates 1610. Names and work email addresses are also withheld in email responses to media for articles which were subsequently published. Ex. 19 at Bates 3611; Ex. 2 at pg. 23.

91. ICE has withheld information under Exemption 7 in emails regarding employee overtime pay. *See* Ex. 9 at Bates 1610. ICE has withheld information under Exemption 7 in email communications with ICE agent union representatives regarding staffing. Ex. 19 at Bates 3421-3422.

92. ICE has withheld information under Exemption 7 in emails from and to the press. *See* Exhibit 18: Exemption 7(E) Withholdings Challenged by Plaintiffs; Ex. 19.

93. ICE has withheld information under Exemption 7 in emails planning responses to the press. *See* Ex. 18; Ex. 19; *Vaughn* Index.

94. ICE has withheld information under Exemption 7 in records from meetings with non-governmental groups. *See* Ex. 18 Bates 510-511; Ex. 19 at Bates 141.

95. ICE has withheld information under Exemption 7 in emails regarding this FOIA request. *See* Ex. 19 at Bates 227, 3637-3638.

96. ICE has withheld information under Exemption 7 in emails scheduling employee trainings. *See* Ex. 18 at Bates 833 and 1001; Ex.19 at Bates 58-60, 1599-1602, 2297-2299, 2427-2430, 3279-3296.

97. ICE claimed Exemption 7E for records that contain routine techniques and procedures already known to the public. ICE claimed Exemption 7(C) and (E) withholdings in

statements to the press and statements from the press to ICE, citing previously published articles. *See* Ex. 18 at Bates numbers 3340, 3443, 3446, 3460; Ex. 2, pg. 9 (NBC News article discussing ICE use of mobile IDENT fingerprinting devices). In its reproduced pages, ICE released information previously withheld under Exemption 7(E), but claims withholdings under Exemption 7(E) for the same or similar information in various other records within its productions. *See* Ex. 8 ICE's Production Cover Letters, pg. 19-23; Ex. 18 at Bates 3591; Exhibit 21: Examples from ICE's Re-Released Documents with Newly Unredacted Information.

98. ICE claims Exemption 7(E) withholdings for database names. *Vaughn* Indez. ICE claims Exemption 7(E) withholdings for codes used for categorizing information about arrests already completed in order to enter it into ICE databases. *See* Ex. 18 at Bates 3040-3065. ICE released information previously withheld under Exemption 7(E) for database names and codes. *See id.* at Bates number 543.

99. ICE describes information withheld under Exemption 7(E) with no more detail than a description as "law enforcement sensitive information regarding law enforcement techniques, systems used, and procedures." *See id.* at Bates numbers 480-483; *Vaughn* Index at pgs. 28-31.

100. ICE withheld staffing information relating to some of its raids under Exemption 7(E). *See* Ex. 18 at Bates 3415, 3417, 3418, 3419, 3421, 3423. This information has already been made public, as ICE released the same or similar information to the media for publication. *See Id.* at Bates numbers 3594, 3598, 3608, and 3618.

101. ICE claims Exemption 7 on some records relating to practices or incidents that have caused public outcry and concern over racial profiling and respect for civil rights.

*See* Ex. 4 at Bates 2 (CARI officers riding along with local law enforcement officers, "canvassing high crime neighborhoods" in search of "suspected foreign nationals."); *See also* Ex. 19 at Bates 277-278 (ICE officer makes arrest after acting as Spanish interpreter for local police). ICE claimed Exemption 7(E) on records about plans to respond to a public demonstration. *See Id.* at Bates 400, 401.

102.     ICE's press statements describe the CARI program as a "targeted enforcement operation" aimed at removing the most dangerous criminal aliens. *See* Ex. 2 at pg. 37 (ICE spokesperson stating that CARI is "designed to direct limited resources to criminal offenders").

103.     ICE presented an award to the New Orleans CARI Unit in May 2013.  Ex. 19 at Bates 53.  ICE stated to the press in December 2013 that New Orleans has modified its CARI plan "to reduce confusion in the community and to ensure that immigrants feel comfortable communicating with state and local law enforcement." *See* Ex. 19 at Bates 53 and 3640; Ex. 2 at pg. 29 ("New Orleans, administration officials said, the immigration agency halted some operations after the protest").

**G. Background on Supplemental *Vaughn* Index**

104.     In the spirit of cooperation and with the hopes of expeditiously resolving this matter, Plaintiffs reached out to ICE's counsel and offered to specify particular exemptions claimed under b(6) and b(7)(C) to be produced in a Supplemental *Vaughn* Index after submission of ICE's Motion for Summary Judgment, Search Declarations, and *Vaughn* Index for all exemptions claimed under b(5) and b(7)(E). The Parties agreed to this approach, as described in their Joint Status Update to the Court. ECF No. 20, Joint Status Report and Proposed Briefing Schedule.

105.    Out of thousands of exemptions, Plaintiffs identified approximately 235 pages of

ICE's production containing specific exemptions claimed under b(6) and b(7)(C) for

which Plaintiffs seek a Supplemental *Vaughn* Index. In order to facilitate prompt

production of the Supplemental *Vaughn* Index and to avoid unnecessary effort by ICE

agency, on the few pages in Plaintiffs' limited list, Plaintiffs chose to only request a

Supplemental *Vaughn* Index for information that is likely a name or email address or that

is indeterminate in nature foregoing any challenges to phone and fax numbers. The list of

specific exemptions was given to ICE on March 31, 2016. *See* Exhibit 25: Letter to

Counsel for ICE Jason Cohen, March 31, 2016; *see also* Ex. 19.

106.    In their March 31 letter, Plaintiffs also mentioned several pages of ICE's

production (illegible: 133; 2910-2912; 2887-2897; needed to be produced in color: 3108;

3416-3418; 3476; 3525; 3534) that were illegible or whose text reflected important text

in colored ink that were produced only in black and white and asked if ICE was amenable

to reproducing the identified pages legibly and, where requested, in color. *See* Ex. 25.

107.    On April 6, 2016, ICE responded to Plaintiffs' request by stating that it could re-

produce the referenced illegible pages, but that the agency would need at least 30 days

(until May 2, 2016) to submit a Supplemental *Vaughn* Index. *See* Exhibit 26: Email from

Counsel for ICE, Jason Cohen April 6, 2016. ICE reproduced the previously illegible

documents to Plaintiffs on April 12, 2016.

**H. Continued Public Concern Regarding CARI**

108.    Despite ICE's claim that the CARI program ended in 2012, the Press continues

to publish articles regarding public concern over the tactics employed by ICE officers

working within CARI. Specifically, the public is concerned with ICE's possible use of

racial profiling and illegal searches and seizures. *See* Ex. 2 at pgs. 1 and 4 (Joseph

Tanfani and Brian Bennett. *Homeland Security email points to ongoing racial profiling

by local police*. L.A. Times. October 15, 2015. http://www.latimes.com/nation/la-na-

border-profiling-20151015-story.html; NYTimes Editorial Board. *Wrongly Profiled and

Deported*. October 23, 2015. N.Y. Times.

http://www.nytimes.com/2015/10/24/opinion/wrongly-profiled-and-deported.html?_r=0).

**I. Exhibits**

109.      Exhibit 1 is a report titled *The Criminal Alien Removal Initiative in New Orleans:

*The Obama Administration's Brutal New Frontier in Immigration Enforcement*. New

Orleans Workers' Center for Racial Justice. December 2013. Accessible from:

http://nowcrj.org/wp-content/uploads/2008/11/CARI-report-final.pdf.

110.      Exhibit 2 consists of a series of news articles about CARI:

        a.  Joseph Tanfani and Brian Bennett. *Homeland Security email points to

            ongoing racial profiling by local police*. L.A. Times. October 15, 2015.

            http://www.latimes.com/nation/la-na-border-profiling-20151015-story.html.

        b.  NYTimes Editorial Board. *Wrongly Profiled and Deported*. October 23, 2015.

            N.Y. Times. http://www.nytimes.com/2015/10/24/opinion/wrongly-profiled-

            and-deported.html?_r=0

        c.  Hannah Rappleye & Lisa Riordan Seville, *Does High-Tech Dragnet to Deport

            Immigrants Go Too Far?*, NBC News (Feb. 24, 2014, 9:42 AM),

            http://www.nbcnews.com/news/investigations/does-high-tech-dragnet-deport-

            immigrants-go-too-far-n40306.

    d.  Paul Abowd, *Immigration Police Pilot 'Stop and Frisk'-Style Raids in New Orleans*, Al Jazeera America (Jan. 29, 2014, 6:44 PM), http://america.aljazeera.com/articles/2014/1/29/immigration-policepilotastopandfriskastyleraidsinneworleans.html.

    e.  Richard Rainey, *ICE, NOPD Roles in Immigration Enforcement Spark Renewed Debate in New Orleans*, Nola.com (Apr. 2, 2015, 4:48 PM), http://www.nola.com/politics/index.ssf/2015/04/ice_nopd_roles_in_immigration.html.

    f.  Zoë Carpenter, *How the Government Created 'Stop-and-Frisk for Latinos*, The Nation (Sept. 3, 2014),http://www.thenation.com/article/how-government-created-stop-and-frisk-latinos/.

    g.  Julia Preston, *Amid Steady Deportation, Fear and Worry Multiply Among Immigrants*, N.Y. Times, Dec. 22, 2013, at http://www.nytimes.com/2013/12/23/us/fears-multiply-amid-a-surge-in-deportation.html?_r=0.

    h.  Brian Bennett, *U.S. Steps Up Deportation Efforts for Criminal Immigrants*, L.A. Times (May 26, 2012), http://articles.latimes.com/2012/may/26/nation/la-na-immigration-20120526.

111.    Exhibit 3 consists of all the cover letters ICE submitted alongside its productions and re-releases of records to Plaintiffs.

112.    Exhibit 4 consists of pages Bates-stamped 1 through 4 and 39 through 41 from ICE's first production of records to Plaintiffs. These pages reflect a New Orleans CARI team collaborating with Jefferson Parish Sheriff's Office in "canvassing high crime

neighborhoods" looking for "suspected foreign nationals" with mobile biometrics devices.

113.     Exhibit 5 consists of an example from ICE's production of ICE's use of mobile fingerprinting units, stamped as Bates numbers 155 through 156.

114.     Exhibit 6 is an interoffice email from ICE's production dated January 31, 2014, discussing a CARI team arrest of a pregnant woman, stamped as Bates number 138.

115.     Exhibit 7 is an I-213 form produced by ICE. The Bates numbers of the form are 747 through 748.

116.     Exhibit 8 consists of records from ICE's productions that show evidence of a quota-driven program. These records show ICE has specific target numbers for arrests and that ERO was particularly concerned with increasing numbers of arrests. These records also reflect consultation and involvement by ICE Director John Morton in the development of CARI.

117.     Exhibit 9 consists of examples of records from ICE's productions relating to costs associated with CARI.

118.     Exhibit 10 consists of examples of records from ICE's productions showing ICE's ability to record and track CARI-related encounters and arrests in ICE's data systems.

119.     Exhibit 11 consists of records from ICE's production showing the existence of trainings related to CARI.

120.     Exhibit 12 is composed of examples of pages from ICE's productions showing CARI involvement by the Office of Congressional Relations (OCR), which ICE did not search.

121.     Exhibit 13 is composed of examples of pages from ICE's productions showing CARI involvement by the Office of Principal Legal Advisor (OPLA), which ICE did not search.

122.     Exhibit 14 consists of pages from ICE's productions showing CARI involvement by Homeland Security Investigations (HSI), which ICE did not search.

123.     Exhibit 15 is a chart of ICE Records Custodians' Searches. This chart details the ICE office searches, highlighting which search terms were used and which data storage systems were searched by whom. This data was pulled from Harrington's Search Declaration ¶¶ 8-10 and Pineiro's Search Declaration ¶ 31. ICE's searches were vastly different from office to office and even employee to employee. Plaintiffs' counsel is concurrently filing a declaration describing how this exhibit was compiled.

124.     Exhibit 16 is a chart of all the CARI plans produced by ICE. The chart lists all 24 ERO Field Offices, indicating whether a CARI Plan was received. Out of 24 ERO Field Offices, only 8 CARI Plans were produced by ICE. Plaintiffs' counsel is concurrently filing a declaration describing how this exhibit was compiled.

125.     Exhibit 17 consists of a chart of ICE's Exemption 5 Withholdings challenged by Plaintiffs, followed by each record from ICE's productions referenced by the chart. This exhibit contains a chart listing those Exemption 5 withholdings challenged by Plaintiffs, detailing the reasons for why each withholding is improper. Plaintiffs' counsel is concurrently filing a declaration describing how this exhibit was compiled.

126.     Exhibit 18 consists of a chart of ICE's Exemption 7(E) Withholdings challenged by Plaintiffs, followed by each record from ICE's productions referenced by the chart. This exhibit contains a chart listing those Exemption 7(E) withholdings challenged by

Plaintiffs, detailing the reasons for why each withholding is improper. Plaintiffs' counsel is concurrently filing a declaration describing how this exhibit was compiled.

127.    Exhibit 19 consists of a chart of ICE's Exemption 6 and 7(C) Withholdings challenged by Plaintiffs, followed by each record from ICE's productions referenced by the chart. This exhibit lists all the records that include Exemption 6 and 7(C) withholdings for which Plaintiffs sought a Supplemental *Vaughn* Index. The chart provides a concise summary of each record challenged and the specific withholdings that are challenged by Plaintiffs. Plaintiffs' counsel is concurrently filing a declaration describing how this exhibit was compiled.

128.    Exhibit 20 is composed of examples from ICE's *re-release* of certain documents with fewer withholdings claimed that illustrate that ICE could have re-released additional pages containing similar or identical information that is still withheld pursuant to exemptions claimed in ICE's original productions.

129.    Exhibit 21 consists of email records produced by ICE that were emails listing attached documents that were not included in ICE's production to Plaintiffs.

130.    Exhibit 22 is an email from Peter Markowitz, Counsel for Plaintiffs, to Joshua Kolsky, Counsel for ICE, on April 24, 2015.

131.    Exhibit 23 consists of the appendices to Plaintiffs' June 22, 2015, letter to Counsel for ICE.

132.    Exhibit 24 consists of the appendices to Plaintiffs' September 2, 2015, letter to Counsel for ICE.

133.    Exhibit 25 Letter to Counsel for ICE Jason Cohen, dated March 31, 2016.

134. Exhibit 26 is an Email from Counsel for ICE Jason Cohen to Plaintiffs' counsel, dated April 6, 2016.

135. Exhibit 27 is the Declaration of Farah Egal, Student Attorney.

136. Exhibit 28 is the Declaration of Dara Gell, Student Attorney.

137. Exhibit 29 is the Declaration of Sam Stanton, Student Attorney.

138. Exhibit 30 is the Declaration of Plaintiffs' counsel, Thomas Fritzsche.

Respectfully submitted this 18th day of April, 2016,

___/s/ Jennifer Rosenbaum___
Jennifer Rosenbaum (LA Bar #31946)
NEW ORLEANS WORKERS' CENTER FOR
RACIAL JUSTICE
217 N. Prieur St.
New Orleans, LA 70112
Tel: 504-309-5165
Email: jjrosenbaum@nowcrj.org

___/s/ Michael T. Kirkpatrick___
Michael T. Kirkpatrick (D.C. Bar #486293)
Samantha Ondrade, Student Attorney
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Tel: 202-661-6582
Email: michael.kirkpatrick@law.georgetown.edu

___/s/ Thomas P. Fritzsche___
Peter L. Markowitz (NY Bar #4092276)
Thomas P. Fritzsche (D.D.C. Bar
#NY0203)
Farah Egal, Student Attorney
Dara Gell, Student Attorney
Sam Stanton, Student Attorney
BENJAMIN N. CARDOZO SCHOOL OF
LAW IMMIGRATION JUSTICE CLINIC
55 5th Avenue, 11th Floor
New York, New York 10003
Tel: 212-790-0895
Email: peter.markowitz@yu.edu,
thomas.fritzsche@yu.edu

*Counsel for Plaintiffs*