# Exhibit 2
**News Articles on CARI**

Case 1:15-cv-00431-RBW   Document 27-2   Filed 04/18/16   Page 2 of 41

**The New York Times**  |  http://nyti.ms/1NXiTPd

The Opinion Pages  |  EDITORIAL

# Wrongly Profiled and Deported

By THE EDITORIAL BOARD    OCT. 23, 2015

The Obama administration likes to say it is both strict and humane in enforcing immigration laws. For years, agents of Immigration and Customs Enforcement have been instructed to focus on deporting serious criminals, not low-level offenders and others who pose no threat. President Obama and his homeland security secretary, Jeh Johnson, have eloquently defended such "prosecutorial discretion" as a wise use of law-enforcement resources.

But a deportation case from rural Louisiana makes a mockery of those policies and suggests that ICE is willing to work with corrupt police departments to further racial profiling, unjust detention and other civil-rights abuses.

The case arose in New Llano, a town of 2,500 near the Texas border, last May. Two Honduran men, Jose Adan Fugon-Cano and Gustavo Barahona-Sanchez, were picked up by New Llano police officers while waiting for work outside a motel. The officers demanded their papers. The men were charged with no crimes but were handed over to the Border Patrol and then to ICE, which detained them as unauthorized immigrants who had been deported before. As the men awaited deportation for more than 140 days, the New Orleans Workers' Center for Racial Justice, an advocacy organization, filed a civil-rights complaint on their behalf, citing the baseless arrests.

The Homeland Security Department's Office for Civil Rights and Civil Liberties investigated. It found the complaint credible. An internal email from the head of the office, Megan Mack, to the director of ICE, Sarah Saldaña, could not have been clearer: "The men appear to have been arrested, transported and detained for an extended period of time, without any local law-enforcement interest in charging them with a crime, solely for an immigration status check," Ms. Mack wrote. "It seems clear," she added, that the arrest "was based on their ethnicity and the way they were awaiting pickup for a job."

"It is imperative that the department, ICE and CBP" — Customs and Border Protection — "work to avoid becoming a conduit, or an incentive, for improper profiling by local law enforcement," Ms. Mack wrote. "We would ask that you consider both releasing them from custody and seeking closure of their removal actions."

Ms. Mack was ignored. Mr. Fugon-Cano was deported this month. Mr. Barahona-Sanchez was expected be deported imminently. Ms. Saldaña's superiors at Homeland Security are aware of the miscarriage of justice, but apparently have done nothing to undo it.

The Louisiana case points to a fundamental flaw with the Obama "prosecutorial discretion" policy. When the federal government delegates immigration enforcement to the local police, it risks outsourcing discretion to those who have no interest in using it justly. Whenever the police break the law to harass people who fit the stereotypical image of unauthorized immigrants, it is appalling. But when top officials within the Department of Homeland Security tolerate such abuses, they grossly undermine Mr. Obama's professed commitment to immigration justice.

Mr. Fugon-Cano and Mr. Barahona-Sanchez should be swiftly reunited with their families in the United States. ICE should cut all ties with law-enforcement agencies that engage in racial profiling. Ms. Saldaña should explain herself. Mr. Johnson needs to make clear to her that she cannot summarily ignore the findings of the civil rights office. If she is not willing to uphold the law and the president's policies, and ensure a just resolution of the case of Mr. Fugon-Cano and Mr. Barahona-Sanchez, she should be replaced.

Case 1:15-cv-00431-RBW   Document 27-2   Filed 04/18/16   Page 4 of 41

© 2016 The New York Times Company

Case 1:15-cv-00431-RBW   Document 27-2   Filed 04/18/16   Page 5 of 41

NATION

# Homeland Security email points to ongoing racial profiling by local police



A U.S. Immigration and Customs Enforcement agent takes part in an operation in Los Angeles. (John Moore / Getty Images)

By **Joseph Tanfani and Brian Bennett · Contact Reporters**

OCTOBER 15, 2015, 4:43 PM   |   REPORTING FROM WASHINGTON

**A**n internal email from a Department of Homeland Security lawyer is raising questions about the ongoing use of ethnic profiling by local police against immigrants, despite an Obama administration effort to stop using the justice system to round up low-level suspects for deportation.

Two Honduran men, waiting for a ride to their construction job, were detained by Louisiana police in May on loitering charges because they looked Latino, according to a Sept. 21 Homeland Security email that was released inadvertently and obtained by the Los Angeles Times.

"The only basis for the arrest seems to have been to give Border Patrol an opportunity to run an immigration investigation," wrote Megan H. Mack, head of the Homeland Security Department's civil rights office, in her report to Sarah Saldaña, Immigration and Customs Enforcement director, and other ICE officials. "This is not a practice the department wishes to endorse or facilitate."

Mack said the men posed no threat and should be released.

The case highlights the concern among some senior Homeland Security leaders that local police are making arrests based on appearance and then calling immigration agents to check on a detainee's status.

Immigration and Customs Enforcement officials chose not to follow Mack's recommendation and say they are still planning to deport the two men, Jose Adan Fugon-Cano and Gustavo Barahona-Sanchez. Because both men had been removed from the U.S. before, they are still priorities for deportation under the department's guidelines, said ICE spokesman Bryan D. Cox.

The men are being held at the Alexandria Transportation Center in Louisiana.

According to the men's lawyers, the case shows how the agency is still using arrests by local police to round up low-level offenders in the country illegally, in spite of a new plan to target only priority cases. Lawyers say the reports of these internal investigations rarely come to light.

"I think at the end of the day they do have targets to meet and they're willing to do whatever it takes to meet those quotas," said Julie Mao, a lawyer with the New Orleans Workers' Center for Racial Justice, who represents the two men. "This is a precise example of an agency with no transparency."

Fugon-Cano, 36, and Barahona-Sanchez, 29, say they were standing outside a Motel 6 waiting for a ride to a construction job when a local policeman in New Llano, La., stopped and asked them for identification. In all, the Border Patrol arrested five men but released the other three. Fugon-Cano and Barahona-Sanchez, who is the father of two U.S. citizens, ended up in a cell for immigrant detainees.

"One moment is burned in my memory," Fugon-Cano said in an affidavit. "When one of [the] police was putting us in the car, he laughed at us, laughed at our identification, and threw the documents on the top of his car. I would use the word racism to describe how they treated us."

Lt. Josh Foster of the New Llano Police Department denied the men were singled out because they were Latino. He said the city had a problem with people loitering and using drugs in hotel parking lots. Foster said the officer, who is no longer with the department, checked their identification and found they were in the U.S. illegally. The city is obliged to contact immigration officials in such cases, Foster said.

"It wouldn't matter if they were Latino, white, black, whatever," Foster said in a telephone interview.

Mack, who reviewed the case after the pair's lawyers filed a civil rights complaint, noted in her email that the two men had never been convicted of a crime. She recommended that the department "strongly consider" releasing them.

"Detention based on ethnic appearance ... is not an appropriate form of police custody for Border Patrol or ICE to use as a foundation for an enforcement action," Mack wrote.

"We believe it is imperative that the department, ICE and CBP work to avoid becoming a conduit, or an incentive, for improper profiling by local law enforcement," she wrote, adding that she did not think ICE or the Border Patrol had done anything improper in detaining the two men. She did not respond to requests for comment.

The total number of people deported from the U.S. has declined steadily over the last three years, since the Obama administration told immigration agents to focus more on deporting convicted criminals, repeat immigration violators and recent border crossers. Critics have said the limits put more pressure on immigration agents to find creative ways to locate immigrants in the country illegally.

President Obama in November scrapped a program called Secure Communities, in which the department enlisted local jails to hold people suspected of being in the country illegally. That effort drew a tide of protests because of cases in which people were deported after traffic stops or minor arrests.

Because the two men have been removed before, Cox said, they still meet the second priority for deportation under the revised guidelines, called the Priority Enforcement Program, which went into effect earlier this year.

Barahona-Sanchez originally came to the U.S. illegally in 2004 to find work and escape escalating violence in Tegucigalpa, the Honduran capital, where he grew up, his sister, Heidy Barahona, said in a telephone interview Thursday from her home in Louisiana.

His earlier deportation came after he was driving from Houston to a construction site in Louisiana and his vehicle broke down. A police car pulled up to the vehicle on the roadside, he said in an affidavit.

"I told him that I needed help getting to a mechanic or a gas station," Barahona-Sanchez wrote. "The police officer laughed and said he would go get some help for me and went to make a call." An immigration van pulled up, he wrote. He was sent back to Honduras in 2010 by order of an immigration judge, according to ICE.

Not long after, Barahona-Sanchez's brother, Rolando, was gunned down while working on his car in front of the family's house in Tegucigalpa. Barahona-Sanchez decided to sneak back into the U.S. two months later, his sister said.

"Leaving Honduras saved his life," Heidy Barahona said. "He came back because he loves his children."

Barahona-Sanchez's 8-year-old son, Gustavo Jr., and 6-year-old daughter, Romelia, have been living in Houston with their mother while Barahona-Sanchez follows construction jobs around neighboring Louisiana.

"I don't want to lose another brother," Heidy Barahona said between sobs.

Fugon-Cano was removed from the United States on Nov. 21, 2005, after he was caught by the Border Patrol, Cox said.

"After conducting a comprehensive review of Mr. Barahona and Mr. Fugon's cases, at this time ICE has chosen not to exercise prosecutorial discretion," Cox said — meaning that they are still due for removal.

Cox added that Mack's conclusions were speculative and "not a formal finding" of the department.

**Twitter:** **@JTanfani** and **@ByBrianBennett**

**ALSO:**

**Use of force by border agents declines, but shootings remain steady**

**Hillary Clinton just backed healthcare for immigrants in the U.S. illegally**

**Brown nixes bill protecting some immigrants with drug charges from deportation**

Copyright © 2016, Los Angeles Times

---

**UPDATES**

**4:43 p.m.:** The story was updated throughout with new details.

**3:28 p.m.:** Updated with additional information and to make clear that the arresting officer is no longer with the police department.

**1:44 p.m.**: Additional background and details were added throughout.

**9:24 a.m.:** This story was updated with reaction from ICE.

The story was originally published at 9:13 a.m.

**This article is related to:** Central America, Honduras, Crime, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security

NEWS FEB 28 2014, 9:42 AM ET

# Does High-Tech Dragnet to Deport Immigrants Go Too Far?

by HANNAH RAPPLEYE and LISA RIORDAN SEVILLE

When Erlin Gomez saw police officers in front of his apartment complex on the afternoon of Sept. 11, 2013, he parked his car and considered his options.

Gomez suspected the cluster of cops and unmarked cars blocking the gate to the heavily Latino complex was a checkpoint, designed to catch undocumented immigrants. In Jefferson Parish, a county just outside New Orleans, such encounters with local police and federal immigration agents had become common, according to Gomez and many in the growing immigrant community.

But Gomez, a 28-year-old undocumented immigrant from Honduras who arrived in Louisiana in 2006, had to take his chances.

Gomez got out of his car and walked toward the gate. A police officer intercepted him and asked for his ID and apartment number. "I said I didn't want to tell him," recalled Gomez, who'd already been deported once.

The officer responded by slipping handcuffs around Gomez's wrists. Then another man, who Gomez learned was a federal Immigration and Customs Enforcement (ICE) agent, brought him to a vehicle. Inside sat a small fingerprinting device that would instantly check his fingerprints against multiple biometric databases.

A single scan of his finger landed Gomez in a federal detention center, and he's now awaiting word on whether he'll be deported. But his encounter inside the vehicle would otherwise leave no traces -- no record of his arrest, or of why officers stopped him, and no proof, other than his memories, that officers from two agencies had set up a checkpoint in a suburban parking lot.

Deportations, which doubled under President Bush, have risen again under the Obama administration to historic highs, with 409,849 removals nationwide in 2012. Gomez is one of thousands of immigrants across the country who've been snared in a surge fed by partnerships between local and federal officials who use biometric tools to find deportable aliens.

But critics say that Jefferson Parish is a prime example of how such partnerships and tools have led to widespread abuses. Civil libertarians and advocates for immigrants charge that Latinos, including legal residents, are being stopped for dubious reasons and their biometric

data collected, and that the drive to catch criminal aliens is leading to the deportation of long-term residents without criminal records and with deep ties to the U.S.



Jimmy Barraza (center) led a chant during the rally across the street from City Hall, in New Orleans in Nov. 2013. The protest targeted a new program of community raids that ICE has piloted in New Orleans over the past year called the Criminal Alien Removal Initiative (CARI).   William Widmer / Redux file

Since 2008, Jefferson Parish has led the nation in deportations of immigrants without significant criminal records. From 2008 to 2011, 87 percent of those deported after an arrest in Jefferson Parish had no prior criminal convictions, or were convicted of crimes resulting in sentences of less than a year, the highest percentage in the U.S.

"This law enforcement technology is rolled out in communities where people can't push back," said Jennifer Lynch, staff attorney for the Electronic Frontier Foundation, a civil liberties advocacy group, and author of a report on the use of biometric data in immigration enforcement.

But while critics say too little attention has been paid to the potential for abuse, others argue that biometric devices aid both police agencies and the suspects they detain.

Follow NBC News Investigations on Twitter and Facebook

"Rather than fostering discrimination it makes sure that people are going to be identified properly," said Jessica Vaughan, director of policy studies at the Center for Immigration Studies, a policy research group that advocates limiting immigration. "After all, it doesn't come into play unless an officer has made a legitimate stop to begin with."

100 million records

Erlin Gomez was stopped and identified as a "criminal alien" because of the confluence of two trends: a broader definition of which immigrants are considered "criminal aliens," and the spread of technology that makes it easy for law enforcement to identify those aliens.

ICE's use of biometric tools is not new. The agency and its predecessor, the Immigration and Naturalization Service (INS), have used fingerprint checks and gathered biometric data since the 1990s.

But today, ICE agents equipped with handheld devices, some as small as an iPhone, can check an individual's fingerprints against federal databases and have results in minutes. The Department of Homeland Security's IDENT database, for example, contains 100 million records.

ICE's targeting of "criminal aliens" for deportation is also not new. But the definition of that term has widened significantly in the past two decades, as have criminal prosecutions for immigration violations. Immigrants who are deported but then return, like Gomez, are now increasingly charged with "illegal re-entry," a federal felony.

In 2011 the agency announced it would focus on deporting violent or convicted criminals, and immigrants who posed a threat to national security. The new targets included returned deportees, as well as "immigrant fugitives," meaning immigrants who failed to appear for a court date. In 2012, ICE launched a program called the Criminal Alien Removal Initiative, or CARI, to capture those targets.

ICE found willing partners for its deportation strategy in local law enforcement agencies, many of which had their own handheld biometric devices with instant access to databases. Across the country, federal agents have joined with local police departments to find and deport "criminal aliens."

Some partnerships with ICE are unofficial, like the cooperation between the agency and the Jefferson Parish Sheriff's Office, and revealed via court documents and FOIA requests. Others, including task forces in various border communities, are official and public. Police departments in the San Diego area, for example, share facial recognition data with ICE as part of a county-

wide program. And under ICE's "Secure Communities" program, every locality in the U.S. is required to ship arrest data on criminal defendants to the feds to check for immigration offenses.

But even the officials who oversee ICE have expressed worries that the local police will misuse their access to biometric data. According to a 2010 memo obtained by immigration activists via the Freedom of Information Act, officials from the Privacy office of the Department of Homeland Security, the parent agency of ICE, had "concerns" that if access to the federal IDENT database was expanded, local police could "misuse" the information and engage in "profiling."

"They believe that LE (law enforcement] Officers would be able to phish for information contained within IDENT," said the memo.

Raul Pinto, staff attorney for the North Carolina chapter of the American Civil Liberties Union, charges that those predictions of racial profiling came true in his state, where he says both undocumented immigrants and legal residents were detained at traffic checkpoints.

"We saw local law enforcement agencies stopping people who look Latino because they think they may be undocumented and fit the profile that the ICE fugitive ops are looking for," Pinto said. "That runs afoul of constitutional protections. A violation of the Fourth Amendment is a violation of your civil rights, whether you're undocumented or not."

Immigrants and advocates say the same pattern of high-tech profiling appeared in Southern Louisiana. Jacinta Gonzalez of the New Orleans Workers' Center for Racial Justice, an immigrant rights group, said that both non-citizens and citizens have complained to her office about stops and arrests.

She said immigrants have described being asked for ID, then handcuffed and fingerprinted, while walking on the street, standing in their front yard, or driving through checkpoints. Hispanic U.S. citizens, she said, have also reported being fingerprinted by ICE agents, then let go, after the scans of their prints show their legal status.

"They really are just casting a wide net, stopping and handcuffing and fingerprinting any people they come into contact with," she said.

nbcnews.com



Erlin Gomez flips through paperwork from his deportation case.   William Widmer / Getty Images for NBC News

'I told them I wasn't a criminal'

In 2006, at age 21, Erlin Gomez made his first attempt to cross the U.S. border. But Border Protection officers caught him in Texas and he was deported back to Honduras.

Within days, he headed north again, and on his second try he made it to New Orleans.

The city's effort to rebuild after Hurricane Katrina was drawing migrant workers from Mexico and Central America. Gomez quickly found construction work. He and his wife had a son, now two years old and a U.S. citizen.

"People focus on the fact that we don't have papers," Gomez said. "But we came to serve the country."

Gomez and his wife settled in Jefferson Parish, just west of New Orleans, part of a wave of Hispanic immigrants moving into the county. According to census data, even as the county's population decreased between 2000 and 2010 because of Katrina, its Latino population

doubled. There are now at least 65,000 Latinos in Jefferson Parish, or 15 percent of the county's population of 435,000.

According to the Jefferson Parish Sheriff's Office, that growing Hispanic population led to the need for a partnership between ICE agents and local officers.

While no official agreement exists between the two agencies, according to Col. John Fortunato, public information officer for the Jefferson Parish Sheriff's Office, ICE agents assisted police officers with "investigatory stops," conducted "based on reasonable suspicion and/or probable cause."

Fortunato said that the sheriff's office asked ICE to patrol with police officers because of a rising crime rate involving Hispanic perpetrators and victims. Fortunato could not provide statistics indicating an increased crime rate among Latino residents, but statistics available on the county website show that overall crime has largely decreased in recent years.

On the afternoon of Sept. 11, 2013, the cooperation between the Jefferson Parish Sheriff's Office and ICE meant that there were officers from both agencies and a mobile fingerprinting lab outside Erlin Gomez's apartment complex.

Fortunato denied that the presence constituted a checkpoint, or that the sheriff's department ever set up checkpoints with ICE. "We don't do checkpoints," he said.

But internal ICE emails uncovered via FOIA by the North Carolina ACLU show that ICE has used the word "checkpoint" to describe its work with local law enforcement agencies in searching for deportable immigrants. A memo describing operations in the Southeast talks about local police being deployed at the "checkpoint," looking for DWI and traffic offenses, with ICE set up at a "secondary location" ready to run fingerprints.

When Gomez placed his finger against the small screen of the fingerprint machine, it told the ICE agent manning the device that while Gomez had no criminal history except a previous arrest for driving without a license, he had an outstanding deportation order. That classified him as an "absconder," one of ICE's high-priority enforcement categories.

"They told me I was arrested because they were looking for criminals," Gomez said. "I told them I wasn't a criminal."

In Jefferson Parish, the ad hoc collaboration between the locals and the feds has made it difficult to determine why some Latinos have been stopped and questioned by police. The ICE agents who scanned Gomez's fingerprints were members of a CARI program "fugitive team."

Federal indictments from stops in the county describe the CARI team members "assisting" sheriff's officers on "routine patrols."

An ICE spokesperson told NBC News that nationwide, CARI teams target individuals using intelligence gleaned from local and federal sources, and do not fingerprint individuals without reasonable suspicion or probable cause. "ICE does not conduct sweeps or raids to target undocumented immigrants indiscriminately," said Bryan Cox. He also said that to his knowledge the unofficial partnership between the CARI fugitive teams and the Jefferson Parish Sheriff's Office was the only such partnership in the nation.

According to ICE, Gomez was first arrested by Jefferson Parish officers, and then fingerprinted by ICE after officers asked the agency to check his immigration status. Cox said that immigrants must first be arrested before they are fingerprinted.

But agency documents obtained via FOIA indicate that ICE has for years tried to facilitate the sharing of biometric data with local law enforcement in "pre-arrest" scenarios, much like what happened to Gomez.The Jefferson Parish Sheriff's Office told NBC News that it had no record of Gomez ever being arrested, and could not confirm what police officers were doing in front of his apartment.

What is known is that after ICE ran Gomez's fingerprints, Gomez was taken into federal custody and shipped to a detention center in Basile, La.

According to ICE, most people fingerprinted by its mobile labs don't wind up in detention centers. Agents from the New Orleans field office work in five states, Arkansas, Louisiana, Mississippi, Alabama and Tennessee, and release 75 percent of the people they fingerprint, said Cox. The agency couldn't provide the total number of individuals fingerprinted, however, or a time frame for the 75 percent figure.

Biometric tools, said Cox, help agents make on-the-spot decisions about whether an individual should be processed for deportation. "The strategy," he said, "is working." In 2013, according to recently released numbers, 48 percent of those removed had been convicted of aggravated felonies, and 60 percent were either "immigrant fugitives" or had previously been deported.

Critics argue that while many perpetrators of serious crimes have been deported, the pool of priority cases is shrinking, which explains why the total number of removals fell from 2012 to 2013. The majority of those targeted now -- people with re-entry convictions or outstanding deportation orders – have typically spent many years in the U.S. without incident, working and raising families.

"A lot of their priorities have to do with people who have prior deportation orders, who ironically are people who have the strongest ties to this country," said Jessica Karp, an attorney with the National Day Laborer Organizing Network. "The people that come back often have family here."

Following protests by immigrants and advocates in New Orleans, and inquiries by NBC News, ICE said CARI teams have stopped going into the field alongside local law enforcement.

Gomez, meanwhile, was released after a month. The deportation order still stands, but because he has no underlying criminal conviction, he is a candidate for prosecutorial discretion. His case is pending, and he is hopeful.

"I want the opportunity to stay here with my son," he said.

---

Visit Al Jazeera English

(/)

**U.S. (/TOPICS/TOPIC/CATEGORIES/US.HTML)**

# Immigration police pilot 'stop and frisk'-style raids in New Orleans

*In the fight to keep an immigrant family together, workers' center uncovers a little-known deportation initiative*

January 29, 2014 6:44PM ET

by **Paul Abowd (/profiles/a/paul-abowd.html)** -    @PaulAbowd (http://www.twitter.com/PaulAbo



A protest after New Orleans police arrested 22 people in November. Michael Democker/Times-Picayune/Landov

Share                    Tweet

Federal agents have quietly launched a program aimed at deporting undocumented immigrants who have violent criminal records.

The Criminal Alien Removal Initiative, or CARI, has sparked immigration raids at grocery stores, Bible study groups and parks where immigration agents handcuff and fingerprint suspects on the spot.

The raids have created "a terrifying effect," said Jacinta Gonzalez, an organizer with the New Orleans Workers' Center for Racial Justice, which authored a December report exposing the program (http://nowcrj.org/press-releases/report-alarming-rise-of-race-based-immigration-raids-in-new-orleans-121913/). "We haven't seen raids with this magnitude, this intensity and this technology in other parts of the country."

---

> **CARI is a nationwide effort that began in May 2012 when ICE boosted the number of immigration 'fugitive operations teams' in field offices like New Orleans by 25 percent.**

---

Immigration and Customs Enforcement, or ICE, says the CARI program is narrowly focused on apprehending violent criminals who are a risk to public safety. ICE touted these efforts in 2013, saying that 82 percent (http://www.ice.gov/removal-statistics/) of the people it deported from inside the country last year had a criminal record.

The Workers' Center report, however, called CARI a "stop and frisk" program for the immigrant community that is actively separating families.

## Picked up at day care

Erlin San Martin was leaving his house to pick up his 2-year-old son at day care when two plainclothes immigration agents approached him last September.

The agents had one question for the 27-year-old Honduran immigrant.

"They wanted to know if I had ID, which made me very nervous," said San Martin.

The agents handcuffed him, led him to an ICE vehicle and scanned his fingerprints with a mobile biometrics unit that searches immigration and criminal databases.

ICE spokesman Bryan Cox said that San Martin was targeted because he had been deported once before, in 2006.

He added that CARI determines its targets "based on the totality of an individual's public safety threat, beyond their status as an immigration fugitive."

But San Martin did not have a history of violent crime.

---

> **" I heard one of the agents say to another,**
> **'This is like going hunting.' And the other responded,**
> **'Yeah, I like this s---.' "**

> **— Erlin San Martin**
> Former ICE detainee

---

Nonetheless, he was put in the back of an ICE vehicle, where he would stay for several hours.

"My feet were shackled, and I was handcuffed from 5 in the afternoon to 10 at night," said San Martin.

During that time, he said, the agents stopped for a meal, met with other ICE officers and then drove around New Orleans arresting people until the vehicle was full.

"I heard one of the agents say to another, 'This is like going hunting,'" said San Martin. "And the other responded, 'Yeah, I like this s---.'"

San Martin was taken to ICE headquarters in downtown New Orleans. Agents removed his leg shackles but not his handcuffs. He was finally allowed to call his wife.

He said he asked the immigration agents if they had kids. They said yes, but that their kids were from the United States.

It turns out that San Martin and the agents had something in common: Christopher San Martin was born in the U.S. two years ago, after Erlin arrived to take a construction job in New Orleans.

## CARI program revealed

While San Martin was locked in a detention facility for a month, the Workers' Center requested that ICE use discretion to keep him in the country with his family.

ICE denied the request in October, but its response (https://docs.google.com/file/d/0B_nw3oV2SYs0WVZQT1pxODdPa0E/edit) also revealed that San Martin had been arrested under the Criminal Alien Removal Initiative. It was the first public acknowledgment of the CARI program.

CARI is a nationwide effort that began in May 2012 when ICE boosted the number of immigration "fugitive operations teams" in field offices like New Orleans by 25 percent.

ICE officials told Al Jazeera in an email that CARI "focuses ICE's limited enforcement resources on identifying, arresting and removing at-large criminal aliens who pose a risk to community safety."

But agents are also arresting people like San Martin for violating prior deportation orders — even if those people have U.S. citizen children and no violent criminal record.

San Martin has won an "order of supervision," which allows him to live with his family until immigration officials make a final ruling on his deportation case.

## Taking prints

ICE agents in New Orleans use mobile fingerprinting devices (http://www.youtube.com/watch?v=7-f_aBKxeRQ) similar to those used by the U.S. military during its "counterinsurgency" campaigns in Iraq and Afghanistan (http://www.boston.com/news/nation/washington/articles/2010/08/31/questions_arise_about_u

"These machines were intended for war situations," said the Workers' Center's Gonzalez. "And now they're being used in the streets of New Orleans."

ICE has used the mobile "IDENT" units for nearly 10 years. In an email, ICE officials called them an "invaluable resource" that "allowed ICE to exercise discretion for 75 percent of individuals scanned" in New Orleans.

The Workers' Center wants to know why so many innocent individuals are handcuffed and fingerprinted in the first place.

"This is exactly what the Constitution prohibits," said J.J. Rosenbaum, a lawyer for the center.

> **They will raid a house looking for one person, but subject everyone in the house to fingerprints.**

— **Jacinta Gonzalez**
New Orleans Workers' Center for Racial Justice

An ICE official spoke to Al Jazeera on the condition of anonymity about allegations of racial profiling. The official maintained that CARI raids go after specific criminal suspects, but that immigration agents also handcuff and fingerprint people in the area around that suspect.

"We may scan people in the immediate vicinity because that makes sense to do," the official said. "We want to make sure that there's nobody else there that might be a violent criminal."

## Internal emails

The CARI program was established the same month that ICE officials were pushing for an increase in deportations of criminals, according to emails obtained by the American Civil Liberties Union of North Carolina (https://docs.google.com/file/d/0B_nw3oV2SYs0ZzlKMVBJNjN6Njg/edit). The internal documents from April and May 2012 show ICE officials in Washington, D.C., pushing the agency's field offices to increase removals of "criminal aliens."

In an email, David Venturella, the assistant director of ICE field operations in D.C., informed agents in Atlanta that they were "1,200 criminal removals under when compared to last year." He added, "The only performance measure that will count this fiscal year is the criminal alien removal target."

Venturella later left his post to become an executive at GEO Group (https://www.opensecrets.org/revolving/rev_summary.php?id=78082), one of the largest owners of immigration detention facilities in the country.

In New Orleans, CARI raids slowed after a November protest that saw immigrants' rights activists block rush-hour traffic outside ICE's headquarters (http://www.notonemoredeportation.com/2013/11/14/new-orleans-congress-of-day-laborers-sitting-in-at-ice-right-now/) for three hours. Several undocumented immigrants were arrested in the civil-disobedience action demanding an end to the CARI program.

But the raids have picked up again, according to Gonzalez.

"They will raid a house looking for one person, but subject everyone in the house to fingerprints," she said.

ICE's home raids have been the subject of legal challenges. In a class-action suit (http://www.nytimes.com/2013/04/05/nyregion/us-agrees-to-set-new-rules-for-immigration-raids.html?_r=0) that was settled last April, immigrant families in New York alleged that ICE agents had entered their homes unlawfully. The suit culminated in a $1 million settlement that also required ICE to change its practice of entering private residences without consent.

ICE recently raided a home in New Orleans, arrested a pregnant woman and placed her in deportation proceedings, said Gonzalez. The woman has no criminal history. Instead, she came under ICE scrutiny after calling the police to report that her car had been broken into.

"How pregnant women are a priority for removal at this moment is beyond me," said Gonzalez.



**Tune in to "Fault Lines (http://america.aljazeera.com/watch/shows/fault-lines.html)," Friday, Jan. 31, at 9:30 p.m. ET** for the premiere of "The Deported: America's Immigration Battle" for more on immigration reform and the debate over deportation practices in the United States. And join the live tweet during the epsiode premiere by following the hashtag **#TheDeported** on Twitter.

Greater New Orlear

# ICE, NOPD roles in immigration enforcement spark renewed debate in New Orleans



New Orleans supporters of immigration enforcement reform file into the City Council chambers on March 25.
*(Richard Rainey, NOLA.com | The Times-Picayune)*

 By **Richard Rainey, NOLA.com | The Times-Picayune**
**Email the author** | **Follow on Twitter**
on April 02, 2015 at 4:48 PM, updated April 02, 2015 at 4:56 PM

Debate over how best to enforce federal immigration laws in New Orleans has **heated up again** as immigrant advocates who suspect the U.S. Bureau of Immigration & Customs Enforcement of targeting Latinos through racial profiling have sued the federal agency.

The lawsuit, filed March 25 in a Washington, D.C., federal court, accuses ICE of refusing to respond to a public records request that the New Orleans Workers' Center for Racial Justice submitted more than a year ago. That request asked for documents related to the Criminal Alien Removal Act, a recent policy change that ICE uses to search for convicted criminals it suspects have immigrated to the U.S. illegally.

## LATEST IMMIGRATION NEWS

An ICE official, speaking on the condition of anonymity because of the agency's policy against commenting on pending lawsuits, said ICE responded to the center's records request but refused to waive the fees associated with collecting them.

The center filed its lawsuit the same day it met with the New Orleans City Council to pressure the police department to end any form of cooperation with ICE.

It's a two-prong effort that the center and its partner, the Congress of Day Laborers, say they launched to protect Latin-American immigrants who helped rebuild New Orleans after the devastation of Hurricane Katrina.

The discussions that have followed illustrate just how nuanced and cloudy views of immigration enforcement can be in a city such as New Orleans.

Jolene Elberth, and organizer for the Congress of Day Laborers, accused the NOPD of helping ICE during raids on Latino communities across New Orleans that round up people suspected of entering the country illegally.

"You can't imagine the day-to-day uncertainty, grief that these people are facing, that this community is facing," Elberth told the council.

NOPD Superintendent Michael Harrison countered that city police assistance for ICE goes no further than helping to coordinate traffic during a federal operation. He said he considers immigration status a matter outside the purview of local police.

"We're not participating in any civil issues, and we're only enforcing criminal law," Harrison said.

But ambiguity arose when Elberth and her colleagues questioned the NOPD's written policies toward ICE. Police officers cannot ask the immigration status of witnesses or victims, but department policy says nothing about how to approach people stopped for other reasons.

Harrison said NOPD officers are instructed not to ask about the immigration status of anyone, including suspects.

He said the department has submitted a new policy on its relationship with ICE to the U.S. Department of Justice for review under the federal consent decree. But when Councilwoman Susan Guidry asked for a copy of that draft, Harrison said he didn't have that information. NOPD spokesman Tyler Gamble also didn't produce that policy when a reporter requested it, but later said Harrison had met often with immigration reform advocates to hear their concerns.

"I think that it continues to be very problematic because we continue to not get any clear answers as to what the new policy is," Elberth said in a later interview.

Hispanic community advocates are worried that ICE has planned sweeps in New Orleans under the Criminal Alien Removal Initiative to scoop up people based mostly on their appearances.

ICE spokesman Bryan Cox said that is not the case. Instead, agents target specific individuals who have already been identified by the criminal justice system, he said.

"ICE's criminal alien enforcement actions are designed to be narrowly focused and limited to identified individuals known to fit within the agency's enforcement priorities," he said. "ICE does not conduct sweeps or raids to target undocumented immigrants indiscriminately."

Elberth and immigration attorney Julie Mao said ICE often detains and questions people who are in the area of a target.

Sentenced to English classes: Jefferson Parish court discriminates, group says

Do immigrants have an economic impact in New Orleans? Grant will support local research

Seafood company to pay back wages to migrant workers

Louisiana dead last in U.S. social justice, report says

New Orleans Mayor Landrieu: Vitter is 'race-baiting' on immigration

"We can't assume that Latinos are automatically undocumented people and at the same time, I think that everybody's rights should be protected equally," Mao said. "We are slowly beginning to realize that everyone has there civil rights and deserves to be respected. We recognized that as a community we want to be inclusive."

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2016 NOLA Media Group. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of NOLA Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site. **Contact interactivity management.**

 **Ad Choices**

# How the Government Created 'Stop-and-Frisk for Latinos'



Y

estel Velazquez went to pick up his truck from an auto shop on a Tuesday evening three months ago. He had left it in Kenner, Louisiana, with a mechanic named Wilmer Palma, a fellow Honduran immigrant he'd met doing construction work after Hurricane Katrina. Velazquez was inside his truck, ready to drive away, when several unmarked cars pulled up and blocked the exits. He recalls men in plainclothes and bulletproof vests that said Police, along with an officer in a Kenner Police Department uniform, getting out of the cars.

Minutes later, Velazquez and Palma were lined up behind a Ford Expedition, along with more than a dozen other employees and customers of the auto shop and people from a neighboring business. They were all Latinos. One by one, the men were ordered to press their fingertips to a machine in the back of the Expedition. Palma's hands were coated in auto grease, which briefly delayed what he and Yestel knew was inevitable.

"I always thought this would happen," said Velazquez on the phone from an Immigration and Customs Enforcement detention center in Basile, Louisiana. He spoke in a low, precise voice, as if he was too tired for bitterness. Before his arrest, Velazquez had grown accustomed to peering out the window before leaving his apartment; to keeping an eye out for the immigration agents he sometimes saw crouched behind their unmarked cars in the morning as people left for work; and to avoiding public places—even grocery stores—where other Latinos hung out, because they drew ICE like flies to honey.

4/15/2016
Case 1:15-cv-00431-RBW   Document 27-2   Filed 04/19/16   Page 28 of 41
How the Government Created Stop-and-Frisk for Latinos

New Orleans is bearing perhaps the heaviest burden of an immigration-enforcement strategy launched by the Obama administration amid the pandemonium of a presidential election. President Obama said in 2011 that he wanted to focus the government's resources on undocumented immigrants with criminal convictions, rather than (as he put it at the time) "folks who are here just because they're trying to figure out how to feed their families."

The Criminal Alien Removal Initiative, which began in the spring of 2012, was one of the formal programs inside ICE designed to carry out this goal. But in New Orleans, CARI morphed into an aggressive initiative characterized by coordination between ICE and local police, and the use of mobile fingerprinting devices wielded against seemingly random groups of Latino residents. Critics in Louisiana have dubbed ICE's practices "stop-and-frisk for Latinos." Immigrants report being detained at checkpoint-style operations at apartment complexes, grocery stores, soccer fields and laundromats.

Of all the people ICE rounded up at the auto shop, only Velazquez and Palma had records that resulted in their being loaded into the Expedition and taken to Basile. Even so, their sole crime was having been deported once before; otherwise, their records were clean. This makes it hard to see them as criminals, but their situation is not unusual: the deportation of people convicted of entering the country illegally has tripled during Obama's tenure. As *The New York Times* reported in April, two-thirds of the record 2 million people who have been deported since Obama took office committed only minor infractions or had no criminal history at all.

For Velazquez and Palma, it made no sense. "We have contributed to lift the city up," Palma said. "Now we're being hunted down like animals."

* * *

## Many immigrants in New Orleans have come to think of themselves as prey.

Many of the immigrants I spoke with in New Orleans have come to think of themselves as prey. Some 33,000 Latinos came after Katrina to help rebuild the city. A large number stuck around, nurturing families and starting small businesses. Most settled on the city's fringes, in the parishes of St. Bernard and Jefferson, a slab of two-story apartment buildings and strip malls just west of the Big Easy. Today, this area is deporting undocumented immigrants without serious criminal records at a higher rate than any other jurisdiction in the country.

The city was never entirely welcoming. Ray Nagin, the now-disgraced mayor of New Orleans, infamously asked a business group in 2005 for advice on how to "stop New Orleans from being overrun by Mexican workers." (Most of the newcomers were from Honduras or El Salvador.) Other civic leaders also complained loudly about foreigners taking jobs from the city's natives. In 2007, Jefferson Parish went so far as to outlaw taco trucks.



**Aggressive wide-net tactics were rooted in a political desire to increase deportations.**

As the pace of construction slowed, undocumented workers became even less welcome. "After a lot of the work was done, there seemed to be this effort to remove people," New Orleans Sheriff Marlin Gusman told me at his office in June. I asked if the influx of undocumented workers had corresponded with any increase in gang activity or other crime, and he replied: "Certainly not, from my perspective."

Gusman is an unlikely critic of ICE. A little over a year ago, he was the target of a federal lawsuit and a multiyear advocacy campaign in protest of his compliance with ICE detainer requests, in which the agency asked local law enforcement to hold arrestees beyond the time they would normally be released to allow officials to investigate their immigration status. When Gusman reversed his position last August, effectively kicking ICE out of the parish prison, he was the first sheriff in the Deep South to do so.

Now, Gusman criticizes ICE for prioritizing expediency over civil rights. "As a nation, as a community, we respect the rights of individuals—and the respect for an individual really doesn't [depend on whether] they're here legally or illegally. And that's where I think ICE policy may have gone astray," he said.

The relationship between New Orleans's immigrant workers and law enforcement was so fraught that when organizers at the New Orleans Workers' Center for Racial Justice began hearing complaints in the summer of 2012 about raids in Latino neighborhoods, vehicle checkpoints facilitated by local police and the mobile fingerprinting devices, they assumed it was simply the local ICE office "acting like the rogue agency that they are," said Jacinta Gonzalez, the lead organizer for a Workers' Center project called the Congress of Day Laborers, known by its members as *el Congreso*.

But what was happening in New Orleans was more than that. The aggressive wide-net tactics were rooted in a political desire to increase deportations—and they appear to be formal agency policy.

* * *

In May 2012, the *Los Angeles Times* reported that in "an aggressive effort to boost deportations," ICE was upping the number of agents tasked with finding and detaining undocumented immigrants by 25 percent. The move was not publicly disclosed. This was the birth of CARI.

According to documents obtained by the *Times*, the strategy was intended to correct "a shortfall in criminal removals for the fiscal year." According to the president of ICE's employee union, senior-level managers told field agents that the initiative was "politically motivated to bump up the numbers during an election year for the Obama administration." The problem is that criminal immigrants have been targeted for years, and the only way to keep the numbers up was "to go after the low-hanging fruit," said César Hernandez, a professor at the University of Denver's Sturm College of Law. That means going after people like Yestel and Wilmer, who are a far cry from the "gang-bangers" the president claimed to be targeting. So the administration did two things to increase its harvest. The first was to grow more fruit: the administration effectively created more criminals by choosing to file formal charges against immigration violators who previously would have been deported without them. The second was the deployment of novel enforcement tactics, like the ones seen in New Orleans.

Speaking on background, an ICE spokesperson insisted that CARI was merely a national strategy designed to direct limited resources to criminal offenders. "If we're going to remove 400,000 people, we can all agree convicted rapists should be removed," the spokesperson said, while also denying the agency uses quotas for detentions or removals.

But e-mails between the ICE field office in Atlanta and agency headquarters in May 2012, obtained by the ACLU of North Carolina, reveal an agency scrambling to find more people to deport. "HQ has directed us to implement this plan to REALLOCATE ALL AVAILABLE RESOURCES…to attaining this year's criminal-alien removal target," wrote one employee in Atlanta. ICE's assistant director of field operations, David Venturella, warned the field office that "the only performance measure that will count this fiscal year is the criminal alien removal target."

The Congress of Day Laborers wasn't aware of the orders from Washington. But in the months after CARI was launched, its staff started to notice what they described as systematic cooperation between ICE and local police. Organizers heard an increasing number of reports about New Orleans cops pulling over Latino drivers for minor offenses like failing to use a turn signal and then calling ICE agents to the scene. Immigrants reported that agents were entering their homes without permission, in a few instances after unlocking doors with confiscated keys. Agents rounded up whole groups of people at Bible study groups, soccer fields and other public spaces in Latino neighborhoods—and used the fingerprinting machines to figure out who had a criminal record.



In fact, 75 percent of the people fingerprinted by ICE were found *not* to qualify for deportation.

By the winter of 2012, authorities in Louisiana were arresting more people for immigration violations per capita than any other state except for three that border Mexico. Still, no one had proof that what was happening in New Orleans was connected to official policy until October 2013, when a Honduran immigrant named Erlin San Martin Gomez was arrested outside his apartment in Jefferson Parish. In his release paperwork, his attorneys found a startling internal ICE memo.

"On September 11, 2013, Immigration and Customs Enforcement (ICE) officials with the New Orleans Criminal Alien Removal Initiative Team (CARI) working in conjunction with the deputies from the Jefferson Parish Sheriff's Office encountered San Martin at his residence," the memo stated, in part. "ICE agents identified San Martin as a prior deport." For the first time, advocates had a name (CARI) and an official summary of the patterns they'd noted in the recent raids, including collaboration with local law enforcement and the fact that San Martin had been "encountered," not targeted, only to be identified by the biometric device afterward.

ICE objects to accusations that the raids are indiscriminate or based on race. Officially, all operations are pre-approved by field office leadership, and agents go into the field with a list of specified targets. But the spokesperson acknowledged that agents may go to locations where they have intelligence suggesting a target might be—and that they might then detain people who are "hanging around" if the agents "discover" that they have criminal records or have a reasonable suspicion that they do.

But even ICE acknowledges that agents have no way of knowing if bystanders have criminal records until after they've been detained and fingerprinted. "Fingerprints allow us to know who we're dealing with. That's why fingerprints are done," the spokesperson explained.

In fact, 75 percent of the people fingerprinted by ICE are found *not* to qualify as priorities for deportation

and are immediately released, the agency says. To ICE, that statistic suggests efficiency; to civil-rights advocates, it emphasizes the indiscriminate nature of the stops.

"If you're going after a target, you go after that target. Every other police force does not need a biometric machine to go after somebody that they're looking for," said Julie Mao, an attorney at the Workers' Center. "What is the definition of a bad police office? Quotas, stop-and-frisks, racial profiling, tons of money and technology, and very little oversight. You have this national enforcement system that is precisely that, but far more egregious."

Justin Cox, a staff attorney with the ACLU's Immigrants' Rights Project, said that the way CARI has been carried out in New Orleans exemplifies the problems of an immigration policy driven by an insatiable hunger for removals. "ICE is a results-oriented agency, and they've shown themselves willing to use a variety of tactics and to evolve in order to reach ever-increasing numbers," he said. "So long as they're arresting and deporting large numbers of people, there's not a lot of scrutiny of the means. It helps that the folks whose constitutional rights you're violating are going to be in a detention facility in remote areas far from support networks, families, lawyers, or will be out of the country soon. They can't vote, so they aren't a constituency. It's a perfect storm of factors."

The storm came to a head in November 2013, when workers blocked a major intersection outside the ICE office in New Orleans during a protest against the raids. In December, Cedric Richmond, the Democratic congressman whose district includes New Orleans, sent a scorching letter to ICE's acting director. "I have reason to believe that the aggressive tactics employed by ICE officials in my district are inconsistent with the national policy of the Obama administration, and are based on troubling criteria, such as the ethnic makeup of targeted persons," he wrote.

Earlier this year, things began to change. The director of the New Orleans field office, Trey Lund, was transferred to Washington, DC, and ICE told a reporter that CARI teams have stopped going into the field alongside local law enforcement.

\* \* \*

Many undocumented immigrants hope the executive order that Obama is expected to issue this fall will prevent other families from being dismantled. Extending the Deferred Action for Childhood Arrivals program to a larger group of people—parents of US citizens, for example—would give families temporary protection from deportation, along with the ability to work.

But the aggressive enforcement patterns in New Orleans and elsewhere are a warning that what happens on the ground doesn't always correspond to the sound-bite explanations of official policy.

Groups ranging from the ACLU to the National Day Laborer Organizing Network are pushing to end collaboration between ICE and local law enforcement, which is institutionalized through programs like Secure Communities. Advocates also want the administration to de-prioritize deportation of

undocumented immigrants whose criminal records consist only of minor crimes or immigration infractions. The Workers' Center wants a moratorium on the use of biometric devices in the field, and it also wants the federal government to hold agents who engage in racial profiling accountable.

* * *

Without question, any action that Obama takes—no matter how modest—will provoke a furious backlash from Republicans. But the last thing that advocates want is even more immigration enforcement based on thresholds and political considerations. As long as ICE agents have few meaningful checks on their actions in the field and believe it's their job to find as many deportable immigrants as possible, it's hard to see how Obama's orders will preclude localized abuses like those seen in Louisiana.

Through a combination of legal work and community mobilization, the Workers' Center has had some success delaying deportations and even securing the exercise of prosecutorial discretion for people picked up by ICE. Several hundred members of the Congress of Day Laborers pack the assembly hall of a school in New Orleans's Seventh Ward on Wednesday nights to speak about loved ones who have been detained or released, to tell their stories to local politicians and to share a meal. Together, they chant a rallying cry: *Sin papeles, sin miedo*. No papers, no fear.

But the fear lingers. After their arrest, Yestel Velazquez and Wilmer Palma filed complaints with the Department of Homeland Security's Office for Civil Rights and Civil Liberties, alleging that they were racially profiled. They were granted three-month stays of deportation pending an investigation of ICE's practices, although they had to remain in detention in the meantime.

In early August, shortly after talking with me, their wives traveled to Washington, DC, to speak to national immigrant and civil-rights groups about ICE's conduct in Louisiana. Velazquez participated in the discussion via telephone. The very next day, ICE revoked both stays and expedited their removal. After initially directing inquiries about the allegations against ICE directly to an ICE press handler, the Department of Homeland Security declined to respond to questions about the status of Velazquez's and Palma's complaints; it also declined to answer questions about what kind of policy, if any, the department has to protect civil-rights complainants from retaliation. ICE deported Palma to Honduras on August 8. Velazquez was eventually granted a one-year stay.

I asked Velazquez what the impact of his deportation would be, should it come. "They would be tearing us apart and frustrating the lives of our children," he replied. "We came to work, and we don't ask for handouts. We've done the work that nobody wants to do. There may be people out there who are against us, but they don't know who we are. They should know we are hardworking people—and families."

Amid Steady Deportation, Fear and Worry Multiply Among Immigrants - The New York Times

**The New York Times** | http://nyti.ms/1d27ol9

U.S.

# Amid Steady Deportation, Fear and Worry Multiply Among Immigrants

By JULIA PRESTON    DEC. 22, 2013

NEW ORLEANS — Karen Sandoval's promising life in this city fell apart in one day last summer when she went to buy school supplies for her two daughters.

Ms. Sandoval, a Honduran immigrant here illegally, was riding with the man her girls have always called their father. Immigration agents, seeing a dilapidated car, pulled them over. They released Ms. Sandoval but detained her partner, a Nicaraguan also here illegally, and he was soon deported.

Now Ms. Sandoval, 28, is grieving her loss and scrambling to support her children without her partner, Enrique Morales, and the income from his thriving flooring business. She sees no future for the girls, who are both American citizens, in her home country or his. So Ms. Sandoval is facing the possibility that she may never see Mr. Morales again.

"It is very difficult to explain to two little girls that Daddy will not be with us anymore," Ms. Sandoval said.

Since taking office, President Obama has deported more than 1.9 million foreigners, immigration officials announced last week, a record for an American president. The officials said they focused on removing criminals, serious immigration offenders and recent border crossers, with 98 percent of

deportees in 2013 in those groups, while sparing workers and their families. Mr. Obama is also pressing for an overhaul of immigration laws with a path to citizenship for those here illegally.

But immigrant leaders say the enforcement has a broad impact on their communities, with deportations still separating bread-winning parents from children and unauthorized immigrants from family members here legally, including American citizens.

Administration officials say the deportation numbers — more than 368,000 this fiscal year — are driven by a congressional requirement that more than 30,000 immigrants be detained daily. They acknowledge that the lines are becoming harder to draw between high-priority violators and those with strong family ties.

For immigrants, the steady deportations have compounded their frustration with Congress, where the House took no action this year after the Senate passed a bipartisan overhaul bill in June. Increasingly advocates are turning their pressure on the president, saying he should use his executive powers to halt removals.

A 24-year-old South Korean, Ju Hong, brought attention to those demands when he repeatedly interrupted Mr. Obama during a speech in San Francisco last month, calling on him to stop deportations of all unauthorized immigrants in the country. In recent days, anti-deportation protesters blocked entrances to immigration detention centers in southwestern Ohio, Northern Virginia and downtown Los Angeles, with more than two dozen people arrested.

In New Orleans, street sweeps by Immigration and Customs Enforcement agents this year also led to a protest. On Nov. 14, nearly two dozen demonstrators, including 14 immigrants without legal status, tied up midday traffic at one of the city's busiest intersections for nearly three hours until the local police arrested them.

"Our people feel they can't go to the store to buy food or walk their children to school," said Santos Alvarado, 51, a Honduran construction worker who joined the protest here even though he has legal papers. "We couldn't be quiet any longer."

Many immigrants here have been stunned by the arrests, in which some people seemed to be stopped based solely on their Latino appearance, because they had been living here uneventfully since they came in the chaotic days after Hurricane Katrina in 2005 to work on reconstruction.

One of those workers, Jimmy Barraza, was unloading a carful of groceries on Aug. 16 when agents pulled up with pistols drawn, handcuffing him as well as his teenage son, a United States citizen. A mobile fingerprint check of Mr. Barraza, who is also Honduran, revealed an old court order for his deportation.

Mr. Barraza, 28, won release from detention but is still fighting to remain. His wife is a longtime legal immigrant, and he has two other younger children who are American citizens.

"If they deport me," he said, "who will keep my son in line? Who will support my family?"

Another Honduran, Irma Lemus, was packing fishing rods for a day on the bayou when cruising immigration agents spotted her family and stopped. A fingerprint check revealed that Ms. Lemus, too, had a deportation order.

"They handcuffed me in front of my children," she recalled, speaking of a son who is 2 and a daughter who is 4.

After she spent 18 days in jail, lawyers won her release with an ankle monitor while immigration prosecutors weigh their options.

Ms. Lemus, 35, had steady work here cleaning hotels and a stable family, including a Honduran son, Joseph, who is 9 and in treatment for an eye

disease, and her younger children who are American-born citizens. So she
might be eligible for prosecutorial discretion, a policy the Obama
administration has applied extensively to suspend deportations.

But although Ms. Lemus — like Mr. Morales, Mr. Barraza and many other
illegal immigrants — had no criminal history, she did have a civil immigration
record because of an earlier brush with enforcement authorities. She had
failed to appear at a court hearing after she was stopped in 2006 crossing the
southwest border. The judge's order gave agents the authorization to deport
her speedily.

Taking her children to Honduras, with its rampant gang violence and poor
medical care, is not an option Ms. Lemus wishes to consider. So they live in
anxiety that she could leave them any day.

"I think it would be so sad for all of my family," her son Joseph said.

Many Republicans say Mr. Obama is deporting too few illegal immigrants.
Robert Goodlatte, the chairman of the House Judiciary Committee, said the
figures published last week, showing a 10 percent decrease from 2012, were
"just more evidence that the Obama administration refuses to enforce our
immigration laws."

Administration officials said removal numbers were determined by a
requirement, included by Congress in the immigration agency's
appropriations, to fill a daily average of about 34,000 beds in detention
facilities. The mandate, which is closely monitored by oversight committees,
amounts to about 400,000 removals a year.

"We are fulfilling the mandate," John Sandweg, the acting director of
Immigration and Customs Enforcement, said in an interview. "We want to fill
the beds with the right people, that is, public safety and national security
threats and individuals we are required by law to detain."

But he noted that agents were encountering many immigrants who fit those priorities but also had family connections that could make them eligible to stay by prosecutorial discretion.

"Many of these cases are very complex and not cut-and-dry," Mr. Sandweg said.

In New Orleans, administration officials said, the immigration agency halted some operations after the protest. They had been part of an anti-gang campaign with the local police. But random stops of Latinos were not consistent with the agency's guidelines, the officials said.

Saket Soni, the executive director of the New Orleans Workers' Center for Racial Justice, said deportations had picked up again in recent days.

"If Congress doesn't act, another 400,000 people will be deported," said Mr. Soni, whose group helped organize the protest. "This suffering has to stop."

Advocates argue that Mr. Obama could expand reprieves he gave to young undocumented immigrants last year. But White House officials say the only solution is for Congress to pass a path to citizenship. Cecilia Muñoz, the director of the Domestic Policy Council, said in an interview that Mr. Obama did not have the legal authority for a wholesale curb on deportations.

"There are not sufficient tools in his toolbox to address the heart of this problem," she said.

### *Correction: December 23, 2013*

An earlier version of a headline with this article referred inaccurately to the rate of deportations by the Obama administration. While there has been a total of more than 1.9 million deportations under President Obama and there was a recent increase of removal operations in New Orleans, overall deportations decreased by 10 percent in fiscal 2013 from the previous year. There has not been a "surge." A version of this article appears in print on December 23, 2013, on page A1 of the New York edition

with the headline: Fears Multiply Amid a Surge in Deportation.

---

© 2016 The New York Times Company

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

# U.S. steps up deportation efforts for criminal immigrants

*Immigration and Customs Enforcement increases the number of agents responsible for finding and deporting illegal immigrants with criminal records. Critics, including some within the agency, denounce the push as a political stunt.*

May 26, 2012 | By Brian Bennett, Washington Bureau

WASHINGTON — In an aggressive effort to boost deportations, U.S. Immigration and Customs Enforcement has begun to increase by nearly 25% the number of agents tasked with finding and deporting illegal immigrants with criminal records, pulling 150 officers from desks and backroom jobs to add extra fugitive search teams around the country.

The plan was launched when the number of deportations slumped after several years of growth, partly due to the drop in illegal immigration along the Southwest border. But critics, including some inside ICE, denounced the effort as politically inspired to help President Obama's reelection campaign.

The move, which began without public notice on May 14, calls for increasing the number of fugitive operations teams to 129 from 104. Each team has been given a goal of arresting 50 suspects per month, according to documents obtained by The Times, although ICE officials insisted Friday that no quotas were set for the teams.

An early draft of the plan says ICE is "experiencing a shortfall in criminal removals for the fiscal year," and called for using 300 Border Patrol agents, dressed in ICE uniforms, to close the gap. The plan was scaled back to 150 ICE officers after objections were raised by union organizers for the Border Patrol.

The fugitive teams were instructed for the first time this month to focus chiefly on finding and deporting illegal immigrants convicted of a felony or more than two misdemeanors, multiple immigration violations, or having used fraudulent documents, and not on broader categories of illegal immigrants.

ICE officials are also reviewing pending deportation proceedings to look for those who do not fall into those categories and pose no security risks. So far, about 10% of the cases reviewed have been placed under an administrative hold.

The stepped-up effort may prove politically sensitive in an election year with both parties scrambling for voters in states where immigration issues are important, including Arizona, Colorado and New Mexico.

Obama, who has drawn strong support from Latino voters, is under pressure from Latino activists to find more humane ways to enforce federal immigration laws and protect families with deep roots in America. Focusing on criminal immigrants tends to avoid that issue.

Republican leaders, including likely GOP nominee Mitt Romney, have demanded greater efforts to identify and deport anyone who is in the U.S. illegally, including those who have lived and worked here for years, not just those found guilty of committing crimes.

ICE Director John Morton defended the program Friday as "the best way to use our limited resources" against those who pose the greatest threat to public safety.

"We changed agency policy to focus fugitive operations more on criminal offenders," Morton said in a telephone interview. "This is part of a permanent restructuring of agency resources to meet the highest priority of removing serious offenders. ... We think that is the right call because at the end of the day public safety is our goal."

In a memo last year, Morton wrote that ICE prosecutors could use their discretion as to whether or not to seek deportation of people with strong family ties in the U.S., including college students and members of the military.

After Morton gave the memo to a congressional committee, Republicans criticized the Obama administration for trying to use back channels to enact the Dream Act. In 2010, Congress narrowly defeated the measure, which would have created a path to citizenship for some illegal immigrants who were brought to the U.S. as minors.

Some ICE agents condemned the latest plan as politically inspired, rather than a more efficient use of resources.

"Our officers in the field are being told by senior-level managers that this is politically motivated to bump up the numbers during an election year for the Obama administration," said Chris Crane, president of the National ICE Council, a union that represents approximately 7,300 ICE employees.

"During this administration, every year we are restricted from doing our jobs during the year and then at the end of the fiscal year we have to pull some kind of stunt to pull our numbers back up," said Crane.

Obama administration officials say they forcibly removed a record number of people last year, some 396,906 in all, including 216,698 criminal immigrants, or about 55% of the total.

ICE has removed 127,044 criminal illegal immigrants this fiscal year, officials said. That is behind last year's rate by approximately 12,000, or 9%.

Immigrant advocates worry that the extra ICE teams will sweep up people who do not pose a danger and should not be a priority for deportation.

Case 1:15-cv-00431-RBW Document 27-2 Filed 04/18/16 Page 41 of 41

"I applaud the agency for continuing to try and focus its resources, but they ought to also come up with better definitions with what is a criminal and what is a fugitive, and Congress has to do its part to pass immigration laws that fit with our reality today," said Ben Johnson, executive director at the American Immigration Council, an immigration advocacy group based inWashington, D.C.

"We are talking about a labeling game ICE has been playing," said Gregory Chen, director of advocacy for the American Immigration Lawyers Assn. "ICE's definition of who counts as a criminal includes people who have driven without a license or driven without insurance. Those certainly are not dangerous people."

ICE created eight fugitive operations teams in 2004 to help track down a backlog of an estimated 470,000 illegal immigrants who had ignored a final deportation notice from an immigration judge. The program has expanded dramatically.

The ICE teams find their targets using tips from law enforcement agencies as well as reports generated by investigators searching databases at a little-known support center in the town of Williston, Vt.

Doris Meissner, who was head of the U.S. Immigration and Naturalization Service from 1993 to 2000, said ICE was designed to enforce the law, not make immigration policy decisions.

"They are, at the end of the day, an enforcement agency," Meissner said. "But they are being asked to deal with the whole immigration problem and they are not equipped to do that."

*brian.bennett@latimes.com*

---

**Los Angeles Times**   Copyright 2016 Los Angeles Times      Index by Keyword | Index by Date | Privacy Policy | Terms of Service