# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NEW ORLEANS WORKERS' CENTER FOR RACIAL JUSTICE, <u>et al.</u>, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 15-431 (RBW) |
| UNITED STATES IMMIGRATION & CUSTOMS ENFORCEMENT, | ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

The New Orleans Workers' Center for Racial Justice and eleven individual plaintiffs

bring this civil action against the defendant, the United States Immigration & Customs

Enforcement ("ICE"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012),

seeking, <u>inter alia</u>, records related to ICE's Criminal Alien Removal Initiative ("CARI").  <u>See</u>

Complaint ("Compl.") ¶ 1.  Currently pending before the Court are the parties' cross-motions for

summary judgment.  <u>See generally</u> Defendant's Motion for Summary Judgment ("Def.'s Mot.");

Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Cross-Mot.").  Upon careful

consideration of the parties' submissions,[1] the Court concludes that it must deny the defendant's

motion and grant in part and deny in part the plaintiffs' cross-motion.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendant's Statement of Undisputed Material Facts ("Def.'s Facts"); (2) the Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); (3) the Declaration of Fernando Pineiro in Support of the United States Immigration and Customs Enforcement Agency's Motion for Summary Judgment ("Pineiro Decl."); (4) the Declaration of Paula Harrington in Support of the United States Immigration and Enforcement Agency's Motion for Summary Judgment ("Harrington Decl."); (5) the Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Opp'n"); (6) the Plaintiffs' Statement of Issues and Response to Defendant's Statement of Material
(continued . . . )

# I.  BACKGROUND

The following facts are undisputed by the parties, unless otherwise indicated.  "On November 13, 2013, [the p]laintiffs submitted to [the d]efendant . . . [the] FOIA request" that is the subject of this civil action (the "Request").  Def.'s Facts ¶ 1; see Pls.' Facts ¶ 1.  "The [stated] purpose of the [R]equest [wa]s to obtain information for the public about . . . []CARI[] and other ICE programs related to community enforcement[,] . . . includ[ing] information on mobile fingerprint units and other technological tools at ICE's disposal, and the collaboration between ICE and local law enforcement in the planning and carrying out of immigration enforcement actions."  Pineiro Decl., Ex. 1 (FOIA Request Re[:] CARI and New Orleans Community Raids and Request for Expedited Review ("Request")) at 1.[2]  Specifically, the Request sought records related to the following seven categories: (1) "the policies, procedures[,] or objectives of CARI," id., Ex. 1 (Request) at 8; (2) the "[s]cope of CARI," id., Ex. 1 (Request) at 9; (3) "[i]nformation on CARI [a]rrests," id., Ex. 1 (Request) at 10; (4) "CARI's [c]ost and [f]iscal [i]mpact," id., Ex. 1 (Request) at 12; (5) "communications related to CARI by, to, or between" various government officials, id., Ex. 1 (Request) at 12; (6) "[a]ssessments of CARI," id., Ex. 1 (Request) at 13; and (7) "requests for prosecutorial discretion file[d] by individuals arrested by CARI officers," id., Ex. 1 (Request) at 13.  Each of these seven categories sought

---

( . . . continued)
Facts ("Pls.' Facts"); (7) the Defendant's Reply in Support of Its Motion for Summary Judgment and Opposition to Plaintiffs' Cross-Motion for Summary Judgment ("Def.'s Reply"); (8) the Defendant's Response to Plaintiffs' Statement of Material Facts ("Def.'s Reply Facts"); (9) the Supplemental Declaration of Fernando Pineiro in Support of the United States Immigration and Customs Enforcement Agency's Motion for Summary Judgment ("Supp. Pineiro Decl."); (10) the Plaintiffs' Reply Memorandum in Further Support of Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Reply"); and (11) the Defendant's Surreply to Plaintiffs' Reply Memorandum ("Def.'s Surreply").

[2] According to the plaintiffs, "CARI appear[ed] to be a new or expanded ICE enforcement program operated with new mobile fingerprint technology and formal collaboration with local law enforcement officials," Pineiro Decl., Ex. 1 (Request) at 6, which was "created . . . to increase the number of ICE . . . arrests," Pls.' Facts ¶ 20.

several subcategories of records.  For example, under the third category regarding "[i]nformation on CARI [a]rrests," the Request sought, <u>inter alia</u>, "[a]ny and all records pertaining to the factual basis for the initial stop, interrogation[,] and/or arrest of the" individual plaintiffs in this case, "[a]ny and all records containing information related to any stops, interrogations, fingerprinting, and/or arrests by ICE agents who work in whole or in part o[n] CARI teams," and "[a]ll records containing information related to [certain] arrest data for the past two years," including the "[t]otal number of ICE arrests per week in [ ] designated jurisdiction[s]" in New Orleans, the "[t]otal number of ICE arrests per week related to CARI," and the "[t]otal number of individuals fingerprinted using ICE's mobile fingerprinting units and/or other technological tools per week." <u>Id.</u>, Ex. 1 (Request) at 10–11.

On November 26, 2013, the defendant sent a letter to the plaintiffs acknowledging receipt of the plaintiffs' Request.  <u>See id.</u>, Ex. 2 (Letter from Catrina M. Pavlik-Keenan, FOIA Officer, to Jennifer Rosenbaum, New Orleans Workers' Center for Racial Justice (Nov. 26, 2013)) at 1; <u>see also</u> Pls.' Facts ¶ 26; Def.'s Reply Facts ¶ 26.[3]  According to the defendant, "upon receipt and review of the Request, [it] determined that . . . there were two [ ] offices likely to have records responsive to [the R]equest: [(1)] the [defendant's] Office of Enforcement and Removal Operations ('ERO')[] and [(2)] the [defendant's] Office of the Principal Legal Advisor ('OPLA')."  Pineiro Decl. ¶ 25.  Accordingly, the defendant "instructed those specific offices to conduct a [ ] search for [responsive] records."  <u>Id.</u>  In response, the ERO conducted searches of its headquarters, its Secure Communities and Enforcement office, its Field Operations office, and

---

[3] The plaintiffs sought expedited processing of their Request, <u>see</u> Pineiro Decl., Ex. 1 (Request) at 5, which the defendant initially denied, <u>see id.</u>, Ex. 2 (Letter from Catrina M. Pavlik-Keenan, FOIA Officer, to Jennifer Rosenbaum, New Orleans Workers' Center for Racial Justice (Nov. 26, 2013)) at 1.  However, "on December 13, 2013, upon [the plaintiffs'] appeal, [the defendant] granted expedited processing of the [R]equest."  Pls.' Facts ¶ 26; Def.'s Reply Facts ¶ 26.

its New Orleans Field Office, see Harrington Decl. ¶ 8, which is one of its "[twenty-four] Field

Offices," id. ¶ 6.   However, "the Chief of [OPLA's] Executive Communications Unit . . .

indicat[ed] that OPLA did not possess any [responsive] records, as OPLA did not have any

involvement in . . . []CARI[] matters."  Pineiro Decl. ¶ 30.

Approximately "[sixteen] months after [the p]laintiffs [ ] [filed their] Request . . . , [the

defendant] had not produced a[ny] . . . responsive document[s]."  Pls.' Facts ¶ 28; see Def.'s

Reply Facts ¶ 28.  "As a result, on March 25, 2015, [the p]laintiffs filed their Complaint" in this

case.  Pls.' Facts ¶ 28; see Def.'s Reply Facts ¶ 28.  According to the defendant, "[i]n response to

the filing of the [C]omplaint . . . , and upon [the defendant's] litigation review, [the] ERO . . .

tasked [its twenty-three] remaining [ ] Field Offices to search for responsive document[s],"

Harrington Decl. ¶ 9, and the defendant also tasked its Office of Public Affairs, see Pineiro Decl.

¶ 31.

On May 7, 2015, the defendant "released its first production set to [the p]laintiffs."  Pls.'

Facts ¶ 30; see Def.'s Reply Facts ¶ 30.  Thereafter, in June 2015, the plaintiffs sent a letter to

the defendant, see Pls.' Facts ¶ 31; Def.'s Reply Facts ¶ 31, to which they attached various

appendices identifying, inter alia, "[d]atabases, [o]ffices[,] and [i]ndividuals' [f]iles [that the

defendant should] [s]earch[]," Pls.' Cross-Mot., Ex. 23 (Appendices to Counsel for Plaintiffs'

Correspondence with Counsel for ICE, June 22, 2015 ("June 2015 Appendices")) at 6, as well as

"[s]earch [t]erms" that the defendant should use, id., Ex. 23 (June 2015 Appendices) at 8.  In

September 2015, the plaintiffs "sent a similar letter to [the defendant] . . . , [again identifying]

search terms, offices and records custodians, and specific data sources" that they believed the

defendant should search.  Pls.' Facts ¶ 32; see Def.'s Reply Facts ¶ 32 (not disputing that the

"[p]laintiffs sent correspondence to ICE in September 2015" and stating that the correspondence

"speaks for itself"); Pls.' Cross-Mot., Ex. 24 (Appendices to Counsel for Plaintiffs' Correspondence with Counsel for ICE, September 2, 2015 ("September 2015 Appendices")) at 2, 4.

"On June 18, 2015, the [defendant] made its second production of responsive material," Def.'s Facts ¶ 13; Pls.' Facts ¶ 13, followed by five additional productions on July 16, August 18, September 17, October 15, and November 18, 2015, see Def.'s Facts ¶¶ 14–17; Pls.' Facts ¶¶ 14–17. "In total, between May 7, 2015[,] and November 18, 2015, [the defendant] produced 3,680 pages of documents, as well as certain spreadsheets of data." Pls.' Facts ¶ 35; Def.'s Reply Facts ¶ 35. Then, "[i]n February [ ] 2016, [the defendant] re[-]released 167 pages of documents with several portions of the documents that were previously redacted now unredacted," and "[o]n March 10, 2016[,] it re[-]released four additional pages with fewer redactions." Pls.' Facts ¶ 36; Def.'s Reply Facts ¶ 36. Following the defendant's final production, the parties filed their cross-motions for summary judgment, see Def.'s Mot. at 1; Pls.' Cross-Mot. at 1, which are the subject of this Memorandum Opinion.

## II.    STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere

allegations or denials." Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248). Thus, "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (Garland, J., concurring) (alteration in original) (quoting Exxon Corp. v. FTC, 663 F.2d 120, 126–27 (D.C. Cir. 1980)). If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thus, when "ruling on cross-motions for summary judgment, the [C]ourt shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Shays v. FEC, 424 F. Supp. 2d 100, 109 (D.D.C. 2006).

"FOIA cases typically are resolved on a motion for summary judgment." Ortiz v. U.S. Dep't of Justice, 67 F. Supp. 3d 109, 116 (D.D.C. 2014). "FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." Students Against Genocide v. U.S. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001). In a FOIA action, the defendant agency has "[the] burden of demonstrating that the withheld documents are exempt from disclosure." Boyd v. U.S. Dep't of Justice, 475 F.3d 381, 385 (D.C. Cir. 2007) (citation omitted). The Court will grant summary judgment to the government in a FOIA case only if the agency can prove "that it has fully discharged its obligations under [ ] FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Friends of Blackwater v. U.S. Dep't of Interior, 391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). Thus, in a lawsuit brought to compel the

production of documents under FOIA, "an agency is entitled to summary judgment if no material

facts are in dispute and if it demonstrates 'that each document that falls within the class

requested either has been produced . . . or is wholly[, or partially,] exempt [from disclosure].'"

Students Against Genocide, 257 F.3d at 833 (omission in original) (quoting Goland v. CIA, 607

F.2d 339, 352 (D.C. Cir. 1978)).  However, "[t]he burden upon the requester is merely 'to

establish the absence of material factual issues before a summary disposition of the case could

permissibly occur.'"  Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 904–05 (D.C.

Cir. 1999) (quoting Nat'l Ass'n of Gov't Emps. v. Campbell, 593 F.2d 1023, 1027 (D.C. Cir.

1978)).

### III.    ANALYSIS

The plaintiffs challenge the defendant's response to their Request for two main reasons.

First, they argue that the defendant's searches for responsive records were inadequate because

the defendant failed to (1) "search its headquarters and at least five essential component[]

[offices]," Pls.' Opp'n at 9; (2) "search critical types of record storage systems where responsive

information is stored," id. at 5; (3) "generate reasonable and obvious search terms related to [the

p]laintiffs' Request," id.; and (4) "search adequately for several categories of clearly responsive

records," id.  Second, the plaintiffs argue that the defendant "improperly applied exemptions

under 5 U.S.C. § 552(b)(5), (6), 7(C), and 7(E)" as the basis for withholding responsive records.

Id. at 24.  The Court will address each of the plaintiffs' challenges in turn.

### A.    The Adequacy of the Defendant's Searches

"The adequacy of an agency's search is measured by a standard of reasonableness[] and

is dependent upon the circumstances of the case."  Truitt v. U.S. Dep't of State, 897 F.2d 540,

542 (D.C. Cir. 1990) (internal quotation marks omitted).  To satisfy its burden to show that no

genuine issue of material fact exists as to the adequacy of its search, the agency must show that each agency component "has conducted a search reasonably calculated to uncover all relevant documents." Elliott v. U.S. Dep't of Agric., 596 F.3d 842, 851 (D.C. Cir. 2010) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). "[T]he agency may meet its burden by providing 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" Iturralde v. Comptroller of Currency, 315 F.3d 311, 313–14 (D.C. Cir. 2003). "The plaintiff may then provide 'countervailing evidence' as to the adequacy of the agency's search." Id. at 314 (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)). The question a court must answer in considering the adequacy of an agency's search is "not whether other responsive documents may exist, but whether the search itself was adequate." Moore v. Bush, 601 F. Supp. 2d 6, 13 (D.D.C. 2009) (citing Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994)). However, "if the 'record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper.'" Beltranena v. Clinton, 770 F. Supp. 2d 175, 183 (D.D.C. 2011) (quoting Truitt, 897 F.2d at 542).

The Court must first address the defendant's argument that its searches were adequate as a general matter because the "[p]laintiffs' [R]equest failed to 'reasonably describe' the records sought." Def.'s Mem. at 6. Specifically, the defendant argues that the Request was "overly broad" and could be construed to seek "an extremely voluminous set of records, virtually none of which would have any connection to CARI," id. at 6–7, and, "[i]n the context of such a broad request, it is within an agency's discretion to structure a search that is likely to uncover responsive documents without resulting in an unduly burdensome search," Def.'s Reply at 4.

Accordingly, the defendant argues that it "properly undertook searches based on its own reasonable interpretation of the scope of the . . . [R]equest." Def.'s Mem. at 7. The plaintiffs respond that the defendant's "failure to adhere to its own regulation requiring collaboration with [the p]laintiffs to remedy any issues with the Request forecloses th[e defendant's] argument," and, in any event, the "[p]laintiffs' Request reasonably described the records sought." Pls.' Opp'n at 20.

As an initial matter, the defendant is correct that a FOIA request must "reasonably describe[]" the records sought by a requester, 5 U.S.C. § 552(a)(3)(A), and the Court agrees with the defendant that the plaintiffs' Request, at least in some respects, falls short of this standard. "The linchpin inquiry" when evaluating whether a request reasonably describes the records sought is "whether the agency is able to determine precisely what records (are) being requested." Yeager v. DEA, 678 F.2d 315, 326 (D.C. Cir. 1982) (internal quotation marks omitted). Here, as the defendant notes, see Def.'s Mem. at 7, the Request broadly defines the term "CARI," a term used throughout its Request, to include not only its Criminal Alien Removal Initiative, but also "ICE programs related to community enforcement which use[] mobile fingerprint units and other technological tools, and/or the collaboration between ICE and local law enforcement in the planning and carrying out of the enforcement actions," Pineiro Decl., Ex. 1 (Request) at 7. However, the Request fails to identify the non-CARI-specific "ICE programs" that it targets or define key terms such as "community enforcement," "technological tools," or "the enforcement actions," see generally id., Ex. 1 (Request), thus "leaving unanswered how broadly [the plaintiffs thought] an objective agency professional should construe th[ose] terms," Freedom Watch, Inc. v. U.S. Dep't of State, 925 F. Supp. 2d 55, 62 (D.D.C. 2013).[4] Moreover, numerous

_____

[4] Although another portion of the Request suggests that "community enforcement" encompasses "homes, driveways,
(continued . . . )

subcategories of requested records seek "[a]ny and all" records "related to" or "pertaining to" broad subjects, including "the policies, procedures[,] or objectives of CARI," "CARI teams," and CARI "enforcement actions," Pineiro Decl, Ex. 1 (Request) at 8, 10–11; <u>see, e.g.</u>, <u>id.</u>, Ex. 1 (Request) at 8 (seeking "[<u>a]ny and all</u> Records, received, maintained, or created by <u>any</u> government agency or subdivision, <u>related to</u> the policies, procedures[,] or objectives of CARI" (emphases added)), which is a formulation that other members of this Court have consistently found to be "insufficiently precise," <u>Freedom Watch, Inc.</u>, 925 F. Supp. 2d at 61 (observing that requests seeking "all" documents "related to" a particular topic are "subject to criticism as overbroad since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote fashion" (citation omitted)); <u>see</u> <u>Sack v. CIA</u>, 53 F. Supp. 3d 154, 164 (D.D.C. 2014) (observing that requests seeking all documents "pertaining to" a particular topic "lack [ ] clarity [and] leave[] the agency to guess at the plaintiff's intent" because "a record may pertain to something without specifically mentioning it").

However, the Court cannot conclude for several reasons that the Request's shortcomings justify the scope of the search conducted by the defendant in this case. First, as the plaintiffs correctly note, <u>see</u> Pls.' Opp'n at 20, the defendant failed to timely notify them of any perceived deficiencies in their Request in violation of the defendant's own FOIA regulations in effect at the time. Those regulations required the defendant, upon

> determin[ing] that [a] request does not reasonably describe records, . . . [to] tell [the requester] either what additional information is needed or why [the] request is otherwise insufficient[, and] . . . also [ ] give [the requester] an opportunity to discuss [the] request so that [the requester] may modify it to meet [such] requirements.

---

(. . . continued)
supermarkets, laundromats, and other spaces of day-to-day life," Pineiro Decl., Ex. 1 (Request) at 2, this list of locations is not exhaustive and it is not clear "how broadly [the plaintiffs thought] an objective agency professional should construe the term[]" "other spaces of day-to-day life," <u>Freedom Watch, Inc.</u>, 925 F. Supp. 2d at 62.

6 C.F.R. § 5.3(b) (2015).[5] Here, it is undisputed that the defendant did not notify the plaintiffs at any point prior to the filing of this action that it believed the Request failed to reasonably describe the records sought or give the plaintiffs an opportunity to address such perceived failures, see Pls.' Facts ¶ 27 ("Between the filing of . . . [the] Request and their Complaint, . . . ICE did not assert that the [ ] Request was overly broad, burdensome, or otherwise deficient."); Def.'s Reply Facts ¶ 27,[6] and the Court has been unable to locate any evidence in the record demonstrating that the defendant provided such notice and opportunity at any point prior to filing its motion for summary judgment. Thus, given the defendant's failure to follow its own administrative process, the Court cannot conclude that any failure by the plaintiffs to reasonably describe the records sought supports the defendant's position that it is entitled to summary judgment as to the adequacy of its search. See Ruotolo v. U.S. Dep't of Justice, Tax Div., 53 F.3d 4, 10–11 (2d Cir. 1995) (denying summary judgment to an agency on the basis that the plaintiffs' request failed to "reasonably describe" the records sought in part because the agency's

---

[5] The Court notes that 6 C.F.R. § 5.3(b) has since been amended to state that if the defendant "determines that [a request] does not reasonably describe the records sought, . . . [it] should inform the requester what additional information is needed or why the request is otherwise insufficient." 6 C.F.R. § 5.3(b) (2017) (emphasis added). However, even if the amended version of the regulation applied here, it appears that the defendant failed to comply with it as well, as the amended regulation only permits the defendant, upon determining that "a request does not adequately describe the records sought," to "administratively close the request or seek additional information from the requester," id. § 5.3(c), but does not authorize the defendant to proceed based on its own interpretation of a request as it did here.

[6] The defendant represents that it "attempted to work with [the p]laintiffs to narrow and better articulate the FOIA request, but such attempts were unavailing." Def.'s Mem. at 7 n.2 (citing Harrington Decl. ¶ 13–32). However, the portions of its affidavit that it cites for this proposition only refer to the plaintiffs' post-litigation correspondence to the defendant regarding locations it believed should be searched and search terms it believed should be used, see Harrington Decl. ¶ 13–32, which appears to have gone unanswered by the defendant, see id. (responding to the claims raised in the plaintiffs' correspondence, but not asserting that it ever previously answered the plaintiffs' correspondence). The defendant also notes that "[o]n November 26, 2013, [it] notified [the p]laintiffs that their request 'seeks numerous documents that will necessitate a thorough and wide-ranging search,' and asked them to please contact ICE if they 'care to narrow the scope of [their] request.'" Def.'s Reply Facts ¶ 27. However, as the defendant appears to concede, see id., this boilerplate language does not amount to "inform[ing] the requester what additional information is needed or why the request is otherwise insufficient," 6 C.F.R. § 5.3(b) (2015). Thus, the defendant has failed to demonstrate that it complied with its obligations under § 5.3(b).

FOIA regulations imposed on the agency a "duty . . . to assist the [requesters] in reformulating their request if it [ ] thought that the request needed to be narrowed," but it "made no effort" to do so).

Even assuming that it was proper for the defendant to structure its search based on its "own reasonable interpretation of the . . . [R]equest," Def.'s Mem. at 7, rather than notifying the plaintiffs of the Request's deficiencies and giving the plaintiffs an opportunity to modify it, the Court cannot conclude that the defendant's interpretation of the Request was reasonable. As this Circuit has instructed, even when a request is "not a model of clarity," an agency must "'construe [the] request liberally,'" particularly when a "request is reasonably susceptible to a broader reading." LaCedra v. Exec. Office for U.S. Att'ys, 317 F.3d 345, 348 (D.C. Cir. 2003) (quoting Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995)). The defendant appears to have ignored this instruction, as it has narrowly interpreted the Request as seeking only records related to CARI, see Harrington Decl. ¶ 13 (asserting that the search terms "'CARI' and 'Criminal Alien Removal Initiative' were reasonably likely to uncover all relevant records responsive to a reasonable interpretation of [the p]laintiffs' . . . [R]equest[] . . . because every topic [in the Request] is connected to CARI"), even though various subcategories of requested records plainly seek records that reach beyond the objectives of CARI, see, e.g., Pineiro Decl., Ex. 1 (Request) at 11 (requesting the "[t]otal number of ICE arrests per week in [ ] designated jurisdiction[s]" in New Orleans, the "[t]otal number of individuals fingerprinted using ICE's mobile fingerprinting units and/or other technological tools per week," and the "[r]ace or ethnicity of each individual arrested and/or fingerprinted" in those categories); id., Ex. 1 (Request) at 8 (seeking "records . . . related to training, briefing, guidance, procedures, rules, or other informational materials developed for local [law enforcement agencies] or other state or

local entities"). Thus, the defendant's interpretation of the Request as excluding the non-CARI-specific information requested is plainly inconsistent with its obligation to "construe a FOIA request liberally." LaCedra, 317 F.3d at 348 (quoting Nation Magazine, 71 F.3d at 890); see Leopold v. U.S. Dep't of Justice, 130 F. Supp. 3d 32, 43–44 (D.D.C. 2015) (rejecting an agency's "limited" interpretation of a term used in the plaintiff's Request because "[t]he natural meaning of the term . . . encompasse[d] more"). And, in any event, for the reasons explained in Part III.A.1–5 of this Memorandum Opinion, infra, the defendant failed to conduct an adequate search based on even its narrow interpretation of the Request.

Moreover, the defendant appears to have resolved any issues presented by the specific deficiencies it identifies in the plaintiffs' Request. For example, despite the defendant's position that the Request's definition of the term "CARI" could be construed to seek "voluminous . . . records, virtually none of which would have any connection to CARI," Def.'s Mem. at 7, the defendant appears to have determined that the term "CARI" should be interpreted to only refer to the Criminal Alien Removal Initiative itself, and not any other programs or topics, see, e.g., Def.'s Mem. at 13 (arguing that the search terms "'CARI' and 'Criminal Alien Removal Initiative[']' were reasonably likely to uncover all relevant records responsive to a reasonable interpretation of . . . [the R]equest"), which is an interpretation that the plaintiffs do not appear to dispute, see Pls.' Opp'n at 22 (arguing that the defendant's "criticism of th[e R]equest as 'far too broad' is unfounded[] [because the p]laintffs' language sufficiently specified and described records of a particular program" (emphasis added)); see also id. at 23 (arguing that the "Request adequately described records sought and obviously focused on a particular enforcement initiative" (emphasis added)). Additionally, although the defendant argues that the plaintiffs' request for "[a]ny and all Records . . . related to the . . . objectives of CARI," Pineiro Decl., Ex. 1

(Request) at 8, could be construed to "seek[] . . . every record maintained at ICE that is 'related to' the enforcement of federal immigration laws," Def.'s Mem. at 7 (emphasis omitted), the defendant appears to have wisely concluded that the Request does not sweep so broadly, as it does not represent that it searched for "every record . . . 'related to' the enforcement of federal immigration laws," see id. (emphasis omitted).

Finally, to the extent that the defendant asserts that supplementing its search as requested by the plaintiffs would be "unduly burdensome," Def.'s Reply at 4, it has failed to adequately support such a claim. Although the defendant is correct that "an agency need not honor a FOIA request that requires it to conduct an unduly burdensome search," id. at 5 (internal quotation marks and citation omitted), "the burden falls on the agency to 'provide sufficient explanation as to why [ ] a search would be unreasonably burdensome,'" Hainey v. U.S. Dep't of the Interior, 925 F. Supp. 2d 34, 45 (D.D.C. 2013) (quoting Nation Magazine, 71 F.3d at 892), and "[c]ourts typically demand 'a detailed explanation by the agency regarding the time and expense of a proposed search in order to assess its reasonableness,'" Shapiro v. CIA, 170 F. Supp. 3d 147, 156 (D.D.C. 2016) (citation omitted). Here, the defendant's generic claims that the plaintiffs' Request is "overly broad," Def.'s Mem. at 6, and "vague," id. at 13, are plainly insufficient to satisfy this burden, see Hall v. CIA, 881 F. Supp. 2d 38, 53 (D.D.C. 2012) ("This Court will not find a search unduly burdensome on conclusory statements alone."). And, although the defendant has provided more detail regarding the alleged burden of searching for the CARI-related arrest data requested by the plaintiffs, see Harrington Decl. ¶ 32 (asserting that "[i]n order to determine the universe of arrests related to CARI, . . . ICE would have to manually review

over 230,000 A-files, for FY2013 alone"), for the reasons explained in Part III.A.2.a of this Memorandum Opinion, infra, those claims fail to satisfy its burden, as well.[7]

Thus, the Court concludes that summary judgment for the defendant is not warranted due to the deficiencies in the plaintiffs' Request. Having rejected the defendant's arguments on this issue, the Court next turns to the plaintiffs' specific challenges to the adequacy of the defendant's search.

### 1. Offices Searched

The plaintiffs argue that the defendant "[u]nreasonably [l]imited its [s]earch to [t]wo [c]omponent [o]ffices." Pls.' Opp'n at 8. Specifically, they argue that the defendant should have "search[ed] its headquarters and . . . essential [agency] components whose involvement in CARI has been confirmed by records [the defendant] produced and whose missions are closely related to the clear themes in [the] Request," id. at 9, namely, the offices of the defendant's Director, Deputy Director, Chief of Staff and Executive Secretariat, Assistant Deputy Director, and Management and Administration (the "headquarters offices"), the OPLA, the Homeland Security Investigations ("HSI") department, the Office of Firearms and Tactical Programs/National Firearms and Tactical Training Unit, the Office of Congressional Relations (the "OCR"), the Office of the Chief Financial Officer (the "OCFO"), id. at 9–10, and the Office of State, Local,

---

[7] The defendant implies in a footnote that the plaintiffs' "failure to reasonably describe the records sought [i]s a failure to exhaust administrative remedies." Def.'s Mem. at 4 n.1. However, assuming for the sake of argument that the defendant is correct, the Court declines to find that any failure to exhaust administrative remedies in this regard would bar judicial review of the plaintiffs' claims. As this Circuit has held, "[b]ecause a FOIA requester's failure to exhaust administrative remedies 'is not [a] jurisdictional' bar to review, it is within [a court's] discretion to entertain [a requester's] arguments[] . . . [where,] in the specific circumstances of [a] case, the purposes of the exhaustion doctrine would not be served by declining to hear [the requester's] claim." Nat'l Sec. Counselors v. U.S. Dep't of Justice, 848 F.3d 467, 470 (D.C. Cir. 2017) (quoting Hidalgo v. FBI, 344 F.3d 1256, 1258 (D.C. Cir. 2003)). Here, given that the defendant processed the plaintiffs' Request based on its own interpretation of the Request, and at no time objected to the Request as inadequate, the Court finds that "the purposes of the exhaustion doctrine would not be served by declining to hear [the plaintiffs'] claim[s]." Id.; see id. at 470–71 (identifying the purposes of administrative exhaustion as "enabling the agency to 'function efficiently' and to 'have an opportunity to correct its own errors,' 'afford[ing] the parties and the courts the benefit of its experience and expertise,' and 'compil[ing] a record which is adequate for judicial review'" (quoting Weinberger v. Salfi, 422 U.S. 749, 765 (1975))).

and Tribal Coordination, id. at 18.  The defendant responds that it was not "obligated to search" these offices because they "had nothing to do with CARI, so [they] would be unlikely to have responsive records."  Def.'s Mem. at 10; see Def.'s Reply at 10–11 ("[T]he offices listed by [the p]laintiffs did not implement [CARI] or have any association with it[.]").

Although there is "no requirement that an agency search every division or field office . . . in response to a FOIA Request," Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (citing Marks v. U.S. Dep't of Justice, 578 F.2d 261, 263 (9th Cir. 1978)), "[i]t is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search [those places] barring an undue burden," Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 327 (D.C. Cir. 1999).  And, even if an agency "start[s] with [a] reasonable assumption that only . . . [certain search locations] would be necessary," "it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry."  Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 28 (D.C. Cir. 1998).

Here, the Court cannot conclude that the offices searched by the defendant were adequate for at least two reasons.  First, the defendant has failed to "aver[] that all locations likely to contain responsive records were searched."  Powell v. IRS, 280 F. Supp. 3d 155, 162 (D.D.C. 2017); see Iturralde, 315 F.3d at 313–14.  Rather, the defendant asserts only that it identified "[three] offices likely to have [responsive] records" and "instructed those [ ] offices to conduct a comprehensive search for [responsive] records."  Pineiro Decl. ¶ 25; see id. ¶ 26.  However, these statements "fail[] to invoke 'the magic words' concerning the adequacy of the search— namely, the assertion that [the agency] searched all locations likely to contain responsive

documents," Huntington v. U.S. Dep't of Commerce, 234 F. Supp. 3d 94, 103 (D.D.C. 2017), and, thus, preclude summary judgment for the defendant, see id. at 104.

Additionally, the plaintiffs have identified countervailing evidence undermining the defendant's claim that the offices it chose not to search were "not likely to have responsive records," Harrington Decl. ¶ 28, because "these offices had nothing to with CARI," Def.'s Reply Facts ¶ 44. Specifically, the plaintiffs have identified evidence demonstrating that the defendant "ha[d] reason to know" that at least six other offices may possess responsive documents. Valencia-Lucena, 180 F.3d at 327. As to OPLA, the defendant itself initially identified OPLA as one of "two [ ] offices likely to have records responsive to [the p]laintiffs' Request." Pineiro Decl. ¶ 25. Although it later determined that a "search [of OPLA] would not be reasonably calculated to uncover any relevant documents" because "the Chief of [OPLA's] Executive Communications Unit [ ] . . . indicat[ed] that OPLA did not possess any [responsive] records, as OPLA did not have any involvement in . . . []CARI[] matters," id. ¶ 30, the Chief's "bare assertion that . . . [OPLA] had no responsive documents is inadequate because it does not indicate that he performed any search at all," Defs. of Wildlife v. U.S. Dep't of Agric., 311 F. Supp. 2d 44, 55 (D.D.C. 2004) (concluding that "the Deputy Under Secretary's conclusory denial that he did not possess any responsive documents d[id] not 'demonstrate beyond material doubt that [the agency's] search was reasonably calculated to uncover all relevant documents'" (quoting Nation Magazine, 71 F.3d at 890)); see Valencia-Lucena, 180 F.3d at 327 (the agency's "failure to search [a location] where the requested documents might be located clearly raises a genuine issue of material fact as to the adequacy of the search"). Moreover, documents produced by the defendant contradict the Chief's representation that "OPLA did not have any involvement in . . . []CARI[] matters." Pineiro Decl. ¶ 30; see, e.g., Pls.' Cross-Mot., Ex. 13

(Examples of Records Indicating ICE's Office of the Principal Legal Advisor's Involvement in CARI) at Bates No. 3138 (email stating that "[c]oordination with OPLA [wa]s essential" to an operation requiring "[f]ield [o]ffices . . . to identify [fifty] targets for each Fugitive Operation/CARI Team" (emphasis added)).

As to the defendant's headquarters offices, records produced by the defendant demonstrate that at least one headquarters component, then-Director John Morton's office, oversaw and managed the development of an operational plan for CARI. See Pls.' Cross-Mot., Ex. 8 (Examples of Records ICE Produced Evidencing a Quota System and Close Attention to Numbers of CARI Arrests ("Quota Documents")) at Bates No. 2853 (email with subject line referring to the "Criminal Removals Enforcement Initiative" and stating that "the criminal enforcement operations plan [ ] was briefed to Director Morton," who requested that the plan be "updated to include [additional] information"). Moreover, given other evidence demonstrating that CARI is a nationwide initiative involving the ERO's twenty-four field offices, see, e.g., Harrington Decl. ¶ 6 (representing that the "ERO's mission is carried out nationwide by [twenty-four] ERO Field Offices"); Pls.' Cross-Mot, Am. Ex. 17 (Exemption 5 Withholdings Challenged by Plaintiffs ("Exemption 5 Withholdings")) at Bates No. 2682 (email instructing Field Office Directors to "complete [their] annex to the [CARI] Operational Plan"), the Court agrees with the plaintiffs that "[i]t strains credulity for [the defendant] to assert that [the] ERO could implement . . . [CARI] without any involvement whatsoever of any ICE [h]eadquarters office," Pls.' Opp'n at 10; see Defs. of Wildlife v. U.S. Dep't of Interior, 314 F. Supp. 2d 1, 13 (D.D.C. 2004) (concluding that "it would strain credulity to find that the [agency] did not know that [its] Office of the Inspector General . . . would be [a] likely repositor[y] of responsive records" in

light of "the high-profile nature of the[] ethics concerns" targeted by the request and "the fact that the [office's] mission is to investigate such alleged ethics violations").

The plaintiffs have also identified evidence demonstrating that responsive records are likely to be possessed by the OCFO,[8] the HSI,[9] the Office of Firearms and Tactical Programs/National Firearms and Tactical Training Unit,[10] and the OCR.[11] However, as to the remaining office identified by the plaintiffs in their summary judgment briefing, the Office of State, Local, and Tribal Coordination, the plaintiffs' belief that this office is likely to possess responsive records appears to be merely speculative. See Pls.' Opp'n at 18 (relying only on that office's general mission statement to argue that the defendant should have searched that office

---

[8] As to the OCFO, the plaintiffs have identified evidence demonstrating, for example, that the defendant's FOIA office believed in 2014 that the OCFO was likely to possess "financial records related in whole or in part to . . . []CARI," Pls.' Cross-Mot., Am. Ex. 19 (Withholdings Under Exemptions 6 and 7(C) Challenged by the Plaintiffs) at Bates No. 3638 (email from the defendant's FOIA office "task[ing]" the "CFO" to search for, inter alia, "financial records related in whole or in part to . . . []CARI[]"), which are records likely to be responsive to the plaintiffs' request for records related to "CARI's [c]ost and [f]iscal [i]mpact," including "[r]ecords related to actual, estimated, or projected costs of the CARI program to the federal government," Pineiro Decl., Ex. 1 (Request) at 12.

[9] As to the HSI, the plaintiffs have identified evidence suggesting that CARI officers coordinated with HSI personnel on CARI operations, see Pls.' Cross-Mot., Ex. 14 (Examples of Records Indicating Homeland Security Investigations' Involvement in CARI) at Bates No. 2958 (email from the Deputy Field Office Director of the Boston Field Office inquiring about "the topic of sharing leads with [the] HSI with regard to CARI" and stating that "HQ would like us to share leads with HSI with the goal of arresting and removing more criminal aliens"), which suggests that the HSI is likely to possess documents responsive to the plaintiffs' request for, inter alia, "[r]ecords containing information related to . . . arrests by ICE agents who work in whole or in part o[n] CARI teams," Pineiro Decl., Ex. 1 (Request) at 11.

[10] As to the Office of Firearms and Tactical Programs/National Firearms and Tactical Training Unit, the plaintiffs have identified documents demonstrating that this component provided training for CARI officers, see Pls.' Cross-Mot., Ex. 11 (Examples of Training Materials in ICE's Possession but Not Produced) at Bates Nos. 58–59 (emails reflecting plans for persons on the "CARI roster" to participate in training "taught by the National Firearms and Tactical Training Unit"), which suggests that this office would likely possess documents responsive to the plaintiffs' Request for "information related to training administered or received by ICE agents . . . related to CARI," Pineiro Decl., Ex. 1 (Request) at 10.

[11] As to the OCR, the plaintiffs have identified documents demonstrating the OCR's involvement in requests for prosecutorial discretion submitted on behalf of detained individuals, see, e.g., Pls.' Cross-Mot., Ex. 12 (Examples of Records Indicating the Office of Congressional Relations' Involvement in CARI) at Bates No. 99 (email from the "ERO Liaison/Office of Congressional Relations" regarding the status of the defendant's review of the denial of a request for prosecutorial discretion for an individual detained in connection with the New Orleans Field Office), which implicates the plaintiffs' request for "information on ICE's review and decision on requests for prosecutorial discretion file[d] by individuals arrested by CARI officers participating in a CARI team enforcement action in a designated CARI jurisdiction," Pineiro Decl., Ex. 1 (Request) at 13.

for responsive records).  Thus, the Court cannot conclude that the defendant's failure to search this office was unreasonable.  See Nolen v. U.S. Dep't of Justice, 146 F. Supp. 3d 89, 98–99 (D.D.C. 2015) (rejecting the plaintiffs' argument that the FBI should have searched its field offices because the "[p]laintiff [ ] offered no evidence, only speculation, that the . . . field offices would possess [responsive] records").[12]

In sum, the plaintiffs have identified evidence demonstrating that the defendant failed to search at least six of its offices likely to possess responsive records.  The defendant makes no meaningful response to the plaintiffs' evidence, other than inexplicably asserting that the evidence is "not relevant to the question of whether [it] . . . conduct[ed] adequate searches."  See, e.g., Def.'s Reply Facts ¶ 49.  Moreover, "the record[] [ ] contains no evidence that [the defendant] limited its search [to exclude these offices] based on ascertained facts about" the offices' involvement in CARI.  Leopold, 130 F. Supp. 3d at 44; see Def.'s Reply Facts ¶¶ 43–44 (asserting only that "ICE FOIA tasked" offices with searches based on its "knowledge of ICE operations"); id. ¶ 53 (suggesting that it did not search the HSI because "CARI was [not] created and implemented within" it).  Thus, the Court must conclude based on the record before it that the defendant's exclusion of these six offices from its search was unreasonable.  See Valencia-Lucena, 180 F.3d at 327 (concluding that "summary judgment for the [agency] was inappropriate" because the agency "provid[ed] no explanation for why it did not search . . . [a] facility" likely to possess responsive records).

---

[12] The Court also cannot conclude that genuine issues of material fact exist regarding the defendant's failure to search the additional offices and custodians identified in the plaintiffs' June and September 2015 correspondence to the defendant, see, e.g., Pls.' Cross-Mot., Ex. 24 (September 2015 Appendices) at 6–7, as the plaintiffs have not identified any evidence to demonstrate that these offices and custodians are likely to possess responsive records, see generally Pls.' Facts (identifying evidence only for the offices already addressed); Pls.' Opp'n (same); see Nolen, 146 F. Supp. 3d at 98–99.

## 2. Record Storage Systems Searched

The plaintiffs argue that the defendant's search of its record storage systems was inadequate because (1) it "failed to search databases that the record confirms exist and are searchable for CARI-related records," (2) its "searches of most other types of record[] storage systems, including [email accounts], hard drives and servers, paper files, USBs, and DVDs were either inadequate or nonexistent," and (3) it "omitt[ed] attachments to many emails from its production to [the p]laintiffs." Pls.' Opp'n at 11. The Court will address each of the plaintiffs' arguments in turn.

### a. Databases

The plaintiffs argue that the defendant failed to search a number of "databases likely to contain [requested data], namely, EARM, EADM, ATD, GEMS, and IDENT," Pls.' Facts ¶ 31, and that it notified the defendant of this fact in its June and September correspondence, id. ¶¶ 31–32. The plaintiffs further argue that the defendant "has produced records showing . . . [that these] databases contain[] information on CARI arrests[] . . . [and] that a search of the database[s for that information] was possible," Pls.' Opp'n at 12 (internal citations omitted); however, "[o]ut of the 160 ICE custodians tasked with [a] search, only four ICE custodians searched any databases at all," Pls.' Facts ¶ 60, and those four "searched only the EARM database and no other databases," id. ¶ 61. The defendant responds that it instructed "specific individuals and component offices to conduct searches of their file systems, . . . which in their judgment, based on their knowledge of the manner in which they routinely keep records, would be reasonably likely to have responsive records." Def.'s Reply at 11. With respect to data on CARI arrests, it asserts that it "did not track electronically whether an arrest related to the CARI program, but if noted at all, it would have been a manual note in [a] physical file or a note in [an]

electronic file in a comments or notes section (which is not searchable for reporting purposes)," and thus, "[i]n order to determine the universe of arrests related to CARI, every individual arrest record would need to be manually reviewed to determine if that arrest was part of the CARI program." Harrington Decl. ¶ 32. It further responds that "[a]ny statistics regarding CARI arrests that the agency kept and produced were aggregate numbers kept and reported contemporaneously with the CARI program only and not linked to any individual cases electronically for historical purposes." Id. ¶ 30.

Notably, the defendant does not dispute that its databases or electronic systems contain responsive data on CARI arrests, but instead argues that it would be unreasonably burdensome to search them for such data. Specifically, it argues that it "did not track electronically whether an arrest related to the CARI program," and, thus, "[i]n order to determine the universe of arrests related to CARI, . . . [it] would have to manually review over 230,000 A-files, for FY2013 alone." Harrington Decl. ¶ 32. However, these assertions fail to satisfy the defendant's burden to "provide sufficient explanation as to why [ ] a search would be unreasonably burdensome," Hainey, 925 F. Supp. 2d at 45 (quoting Nation Magazine, 71 F.3d at 892), which typically requires "a detailed explanation by the agency regarding the time and expense of a proposed search," Wolf v. CIA, 569 F. Supp. 2d 1, 9 (D.D.C. 2008). First, the defendant has failed to identify the specific electronic files or systems to which it is referring or describe in any detail what information they contain and how that information is stored and retrieved. Thus, the Court lacks sufficient information to assess the defendant's claim that a search for these records would require an unreasonably burdensome manual search. See Church of Scientology of Calif. v. IRS, 792 F.2d 146, 151 (D.C. Cir. 1986) (instructing that agencies must provide "an affidavit reciting facts which enable the [ ] Court to satisfy itself that all appropriate files have been searched, i.e.,

that further searches would be unreasonably burdensome[,] [and s]uch an affidavit would presumably identify the searched files and describe at least generally the structure of the agency's file system which makes further search difficult").  Additionally, the defendant has failed to provide the Court with an estimate of the time or cost required for a manual search or the total number of files that would need to be searched.  See Harrington Decl. ¶ 32 (providing only the number of files that would need to be reviewed for "FY2013"); see also Pinson v. U.S. Dep't of Justice, 80 F. Supp. 3d 211, 217 (D.D.C. 2015) (Pinson I) (rejecting as insufficient the agency's "state[ment] that all Civil Division files would need to be searched" without any "estimate of the time required to conduct [the] requested search, the cost of such a search, or the number of files that would have to be manually searched").  Such omissions by the defendant fail to demonstrate that the search would be unduly burdensome.  See Shapiro, 170 F. Supp. 3d at 156 ("Courts typically demand 'a detailed explanation by the agency regarding the time and expense of a proposed search in order to assess its reasonableness.'" (quoting Wolf, 569 F. Supp. 2d at 9)).

On the other hand, the plaintiffs have identified countervailing evidence undermining the defendant's blanket claim that it "did not track electronically whether an arrest related to the CARI program."  Harrington Decl. ¶ 32.  For example, emails produced by the defendant demonstrate that at least two of the defendant's electronic systems contained "CARI drop downs" used to track certain CARI activities, which would be utilized by certain teams.  See Pls.' Cross-Mot., Ex. 10 (CARI Tracking Documents) at Bates No. 1601 ("There have been drop downs added in ENFORCE and FCMS to accommodate CARI activity[,] . . . [which] will [ ] be utilized when a detailed CARI officer assists in the lead cultivation and arrest of a detainee."); id., Ex. 10 (CARI Tracking Documents) at Bates No. 590 (explaining that certain "teams" would

track CARI arrests using a "drop down for CARI in FCMS"). Additionally, other emails produced by the defendant suggest that other codes, not necessarily specific to CARI, could be used to identify CARI-related data. See id., Ex. 10 (CARI Tracking Documents) at Bates No. 813 (June 26, 2012 email stating that "[a]nything and everything Fugitive Operations . . . is doing right now is considered CARI"); id., Ex. 10 (CARI Tracking Documents) at Bates No. 590 (providing "fields" specific to "Fugitive Operations" used in "EABM"). And, at least one document demonstrates that the defendant kept "[a] spreadsheet . . . on CARI" that permitted it to calculate "total . . . [CARI] arrests." Id., Ex. 10 (CARI Tracking Documents) at Bates No. 3236. Finally, other documents suggest that the defendant was able to generate CARI-related reports using databases or other electronic systems. See, e.g., id., Ex. 10 (CARI Tracking Documents) at Bates No. 590 ("During the Criminal Alien Removal Initiative (May 14, 2012 thru September 28, 2012), HQ will be tracking our work through various reports generated from information within EABM."); id., Ex. 10 (CARI Tracking Documents) at Bates No. 813 (stating "that reporting for CARI is being pulled from Enforce"); id., Ex. 10 (CARI Tracking Documents) at Bates Nos. 763–70 (copy of a "GENERATED" "ACTIVITY REPORT" containing data associated with a "CARI team 2" data field); id., Ex. 10 (CARI Tracking Documents) at Bates No. 2643 (purporting to attach "two worksheets with graphs, one for [a]ll [a]rrests and one for CARI [a]rrests only"). Notably, the defendant does not specifically respond to this evidence that it did in fact track electronically whether an arrest related to CARI. See, e.g., Def.'s Reply Facts ¶ 66 (asserting only that it "does not track individuals subjected to stops, interrogations, fingerprints, and/or arrests as it relates specifically to the CARI program").

Thus, "[a]lthough the [defendant's] claim of infeasibility as to [CARI-specific data] may well be correct, the Court cannot credit this bare assertion" in light of the plaintiffs' specific

24

countervailing evidence and the lack of detail provided by the defendant. <u>Int'l Counsel Bureau v. U.S. Dep't of Def.</u>, 657 F. Supp. 2d 33, 41 (D.D.C. 2009); <u>see</u> <u>Pinson I</u>, 80 F. Supp. 3d at 217 ("Because the DOJ has not met its burden to 'provide a sufficient explanation as to why [the requester's] search would be unreasonably burdensome,' a grant of summary judgment would be inappropriate." (quoting <u>Nation Magazine</u>, 71 F.3d at 892)); <u>cf.</u> <u>Nation Magazine</u>, 71 F.3d at 893 (reversing the district court's determination that searching for a "1981 [ ] memo would be too laborious, given that the [relevant] files [we]re indexed chronologically"). Accordingly, the defendant "must either search [for] these records or demonstrate why it would be impractical to do so." <u>Int'l Counsel Bureau</u>, 657 F. Supp. 2d at 41.

### b.      Other Record Systems

The plaintiffs further argue that the defendant's "searches of . . . [custodians' email accounts,] hard drives and servers, paper files, USBs, and DVDs were either inadequate or nonexistent." Pls.' Opp'n at 11. Specifically, the plaintiffs argue that the defendant's declarations "reveal inadequate efforts to search custodians' email accounts" because "[t]hey fail to describe with any detail [the defendant's] methodologies for searching with the limited terms it devised," "do not state which, if any, custodians searched their email archives, and show no systematic effort to ensure that archived emails were searched." Id. at 13. Additionally, the plaintiffs argue that the defendant's declarations "did not describe whether custodians who searched computer hard drives and shared servers did so using keywords, search methods designed to search the full text of documents, or other safeguards to ensure that all files were searched." Pls.' Facts ¶ 73. They further argue that the defendant "should have searched paper files for responsive documents, but it refused to search most paper records because they were allegedly 'too voluminous.'" Pls.' Opp'n at 14. And finally, they object to the fact that

"[n]ineteen [ ] custodians who conducted searches did not search their hard drives or shared servers," Pls.' Facts ¶ 73, "[o]nly thirteen ICE custodians searched paper files," "[o]nly a single [ ] custodian searched a thumb drive," and "[n]o other [ ] custodians searched USB/thumb drive[s], CD[s], or DVDs," id. ¶ 75.

As to the defendant's searches of custodians' email accounts, hard drives, and shared servers, the Court agrees with the plaintiffs that the defendant's declarations fail to demonstrate that these searches were adequate. To satisfy its burden, the defendant must "describe in detail how [it] conducted its search[es]." Aguirre v. SEC, 551 F. Supp. 2d 33, 61 (D.D.C. 2008); see Oglesby, 920 F.2d at 68 ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched, is necessary . . . to allow the district court to determine if the search was adequate in order to grant summary judgment." (emphasis added)). Here, the defendant asserts that, under its standard search procedures, its "determination of . . . how to conduct any necessary searches[] [of hard drives or shared drives] is necessarily based on the manner in which the employee maintains his/her files," Pineiro Decl. ¶ 21, and that "[i]ndividual archives of emails are searched by the individual employees where those employees have identified individual archives containing potentially responsive documents," id. ¶ 23. The defendant further represents that, in this case, various employees "searched their government computer[s], including their hard drives, shared network drives, and their Microsoft Outlook e[]mail account, using [specific] search terms." See, e.g., Harrington Decl. ¶ 10a. Such assertions fail to provide the Court with any detail regarding how the defendant's employees conducted these searches, and, thus, they are insufficient. See Aguirre, 551 F. Supp. 2d at 61 (rejecting as insufficient the agency's assertions that it "sent memoranda to FOIA liaisons in the . . . Offices . . . who could have responsive

documents[, t]hose liaisons contacted the relevant staff and instructed them to review their work files . . . to determine if they had responsive documents[, and that] [t]he FOIA Office staff followed standard [search] procedures"); see also Oglesby, 920 F.2d at 68 (concluding that the agency's "affidavit did not adequately describe [its] search" where it "merely state[d] that ' . . . consistent with customary practice and established procedure, a search was initiated of the . . . [agency's] Central Records'"). Additionally, the defendant's failure to indicate whether any of its custodians searched their archived emails also precludes the Court from assessing whether the custodians' searches of their email accounts were reasonable. See Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514–15 (D.C. Cir. 2011) (concluding that the agency "failed to show the adequacy of its search[] because it didn't address its employees' archived emails and backup tapes," which was "raised . . . before the district court"). Absent additional information regarding the manner in which the defendant conducted these searches, the Court cannot determine whether these searches were adequate.

As to custodians' apparent failures to search their hard drives, shared servers, paper files, USB/thumb drives, CDs, or DVDs, the Court also lacks sufficient information to determine whether these failures render the defendant's search inadequate. "While an agency need not search every one of its record systems, a 'reasonably detailed affidavit . . . averring that all files likely to contain responsive materials . . . were searched, is necessary to . . . allow the district court to determine if the search was adequate in order to grant summary judgment.'" Am. Immigration Council v. U.S. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 231 (D.D.C. 2013) (emphasis added) (quoting Oglesby, 920 F.2d at 68). However, the defendant has failed to assert that it searched all files likely to contain responsive records. And, its assertion that its standard procedure is to direct "individuals and component offices . . . to conduct searches of their file

systems (including both paper files and electronic files) which in their judgment, based on their knowledge of the manner in which they routinely keep records, would be reasonably likely to have responsive records," Harrington Decl. ¶ 7, is inadequate, see Am. Immigration Council, 950 F. Supp. 2d at 231 (rejecting as insufficient ICE's assertion that it searched filing systems that "were determined by the person familiar with the records within [an ICE department] to be relevant to the request and reasonably calculated to uncover relevant documents"); see also Huntington, 234 F. Supp. 3d at 104 (denying summary judgment to the defendant because the agency's assertion that it "conducted a search of the offices reasonably likely to have the records sought" "ultimately d[id] not pass muster").

Without the additional information described above, the Court cannot determine whether the defendant's searches of, or apparent failures to search, these record systems were unreasonable. Thus, the Court concludes that issues of material fact exist regarding this issue, and thus, summary judgment is inappropriate. See Am. Immigration Council, 950 F. Supp. 2d at 233 ("Without a more detailed description of the systems that the agency searched, a question of material fact exists as to whether the search was adequate.").

### c. Email Attachments

Finally, the plaintiffs argue that the defendant's searches of its email records "were inadequately conducted," Pls.' Opp'n at 13, because the defendant "produced nearly 200 email records that indicated that they included an attachment, but without explanation, [ ] did not produce the attachments," Pls.' Facts ¶ 74. The defendant responds that "FOIA does not require production of an email and attachment if the attachment is not responsive." Def.'s Reply Facts ¶ 74. However, as other members of this Court have explained, "attachments should reasonably be considered part and parcel of the email by which they were sent" if "the emails . . . make

explicit reference to, or include discussion of, the [ ] attachments." Coffey v. Bureau of Land Mgmt., 277 F. Supp. 3d 1, 8 (D.D.C. 2017) (Coffey II); see Parker v. U.S. Dep't of Justice, 278 F. Supp. 3d 446, 451–52 (D.D.C. 2017) (treating a letter and its attachment as a single record because the letter "itself touche[d] on the subject matter of the attachment and refer[red] the recipient to examine its contents"). Here, the plaintiffs identify numerous emails provided to them by the defendant that do not contain attachments, even though the emails "make explicit reference to . . . missing attachments." Coffey II, 277 F. Supp. 3d at 8; see, e.g., Pls.' Cross-Mot., Am. Ex. 21 (Records of Emails Whose Attachments Were Not Included in ICE's Production ("Emails Missing Attachments")) at Bates No. 53 ("Please see attached."); id., Am. Ex. 21 (Emails Missing Attachments) at Bates No. 179 ("Please note attached NGO report[.]"); id., Am. Ex. 21 (Emails Missing Attachments) at Bates No. 66 ("Attached you will find our request for prosecutorial discretion[.]"). Thus, the Court concludes that such missing attachments are "part and parcel of the email by which they were sent," Coffey II, 277 F. Supp. 3d at 8, and the defendant "must search for [these] attachments to emails already deemed responsive and either produce them or explain why they are exempt from disclosure," id. at 9–10.

### 3. Search Terms Used

The plaintiffs argue that the defendant "failed to generate reasonable and obvious search terms related to [their] Request." Pls.' Opp'n at 5. Specifically, they argue that the defendant improperly "relied on a narrow range of search terms extracted verbatim from section headings in the [ ] Request," and ultimately, "searched for little more than the term 'CARI,'" which is insufficient in light of documents produced demonstrating that "ICE officials understood CARI to be an expansive initiative that subsumed the entirety of ICE's National Fugitive Operations

Program," id. at 6, and because "not all records about the initiative contain its name," Pls.' Reply at 7. Additionally, the plaintiffs argue that the defendant's "poorly constructed and unreasonably limited set of search terms was exacerbated by [the defendant's] haphazard use of search terms," including its "fail[ure] to issue search memoranda" to its custodians and "improperly allow[ing] its custodians to apply different search terms without coordination." Id. As a remedy for these alleged FOIA violations, the plaintiffs "ask the Court to . . . order[] [the defendant] to search using, at [a] minimum, the terms listed in Appendix B of [the p]laintiffs' September 2, 2015 letter, along with any other terms [that the defendant] identifies [as] . . . necessary to capture the records described in [the] Request." Id. at 8.

The defendant responds that "[t]he various ERO program offices and field offices searched with and used the search terms that they determined, based on their experience and knowledge of their office's practices and activities, would be reasonably likely to locate responsive records." Def.'s Facts ¶ 7. Additionally, the defendant argues that it "used over eighty terms," Def.'s Mem. at 7, and that "[t]hese search terms, in particular 'CARI' and 'Criminal Alien Removal Initiative,' were reasonably likely to uncover all relevant records responsive to a reasonable interpretation of [the p]laintiffs' vague [ ] [R]equest," id. at 13, "because every topic [of requested records] is connected to CARI," Harrington Decl. ¶ 14. It further argues that the plaintiffs' arguments regarding the variations in search terms used by each custodian are unavailing because "FOIA does not require an agency to search for responsive documents in a centralized fashion using consistent search terms and techniques across various departments." Def.'s Reply at 7.

"Agencies enjoy discretion in crafting search terms designed to identify responsive records, but that discretion 'is not boundless.'" Am. Ctr. for Equitable Treatment, Inc. v. Office

of Mgmt. & Budget, 281 F. Supp. 3d 144, 151 (D.D.C. 2017) (quoting Coffey v. Bureau of Land Mgmt., 249 F. Supp. 3d 488, 498 (D.D.C. 2017) (Coffey I)).  The search terms selected must be "reasonably tailored to uncover documents responsive to the FOIA request."  Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 140 (D.D.C. 2015).  However, "[w]here the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior."  Liberation Newspaper v. U.S. Dep't of State, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015).

Here, the Court lacks sufficient information to determine whether the search terms used by the defendant were adequate.  As an initial matter, although the defendant asserts that it "used over eighty terms," Def.'s Mem. at 7, the defendant's declarations reflect that approximately two-thirds of the defendant's custodians searched using only the terms "CARI" or "Criminal Alien Removal Initiative," Pls.' Cross-Mot., Ex. 15 (Chart of ICE's Searches by Custodian, Storage System, and Search Terms Summarizing Declarations of Paula Harrington and Fernando Pineiro ("Custodian Chart")) (demonstrating that, of the 153 custodians who searched for responsive records, 59 searched using only "CARI" and an additional 43 searched using only "CARI" and "Criminal Alien Removal Initiative").  Additionally, many of the remaining custodians effectively searched using only these terms, as they used terms containing, and thus, duplicative of, the term "CARI," see Harrington Decl. ¶ 13 (representing that thirty-eight of the eighty search terms used contained the term "CARI"), or terms that quoted language in the Request verbatim and, thus, were likely too narrow to yield any meaningful results, see Harrington Decl. ¶ 13 (representing that the custodians' search terms included the following: "Total number of individuals fingerprinted using ICE's mobile fingerprinting units," "What the federal government is saying about CARI," "What ICE is saying re: CARI," and "Race or

ethnicity of each individual arrested and/or fingerprinted"); see Coffey I, 249 F. Supp. 3d at 499 (rejecting as unreasonable search terms "tailor[ed] . . . to the request in [a] literal manner" absent explanation as to "why the [ ] format [ ] used would be likely to turn up responsive records").

However, the defendant fails to adequately explain why these two terms alone were adequate to uncover all responsive documents. Its assertion that these terms are sufficient because "every topic [of requested records] is connected to CARI," Harrington Decl. ¶ 14, falls short for several reasons. First, the plaintiffs' Request seeks records not necessarily linked to CARI, see, e.g., Pineiro Decl., Ex. 1 (Request) at 11 (seeking "[t]otal number of ICE arrests per week in [ ] designated jurisdiction[s]" in New Orleans, the "[t]otal number of individuals fingerprinted using ICE's mobile fingerprinting units and/or other technological tools per week," and the "[r]ace or ethnicity of each individual arrested and/or fingerprinted" in those categories), and, thus, the Court finds it difficult to conclude that such terms are reasonably tailored to uncover such records. Additionally, evidence in the record suggests that the terms "CARI" and "Criminal Alien Removal Initiative" may not be sufficient to uncover responsive records specific to CARI either. For example, documents produced by the defendant suggest that CARI activities may be referred to using other terms, such as "Fugitive Operations," Pls.' Cross-Mot., Ex. 10 (CARI Tracking Documents) at Bates No. 813 (email stating that "[a]nything and everything Fugitive Operations . . . is doing right now is considered CARI"), or "Criminal Removals Enforcement Initiative," id., Ex. 8 (Quota Documents) at Bates No. 2853, and that subjects of CARI investigations may be referred to as simply "criminal alien[s]" or "criminal fugitive[s]," see, e.g., id., Ex. 12 (Examples of Records Indicating the Office of Congressional Relations' Involvement in CARI) at Bates Nos. 308–09 (in a responsive document, referring to a detained individual seeking prosecutorial discretion as a "criminal alien" and a "criminal fugitive").

Indeed, a handful of custodians, including the Executive Associate Director of the ERO's headquarters, found it necessary to search using variations on the terms "CARI" or "Criminal Alien Removal Initiative," by using for example the terms "criminal alien," "removal," "initiative," or "removal initiative," see Pls.' Cross-Mot., Ex. 15 (Custodian Chart) at 1, 2, 4, 10–11, 13, 18, 22, 24, or terms related to "Fugitive Operations," see id., Ex. 15 (Custodian Chart) at 3 ("Fugitive Op Report"); id., Ex. 15 (Custodian Chart) at 23 ("Fugitive Operations").

Although the majority of custodians "very well may have made a reasonable decision not to use the[se additional] terms[,] . . . that reason is not at all apparent from [the defendant's] declarations." Am. Ctr. for Equitable Treatment, Inc., 281 F. Supp. 3d at 152. Thus, absent further explanation from the defendant as to why the terms "CARI" and "Criminal Alien Removal Initiative" are sufficient to locate all responsive records, the Court cannot conclude that the use of these terms alone is adequate. See id. (where the defendant "elected not to use" terms that the agency "appear[ed] to commonly use," rejecting as insufficient the agency's "entirely conclusory" statements regarding the reasonableness of its search, which "fail[ed] . . . to [adequately] explain its [search term] choices"); see also Bagwell v. U.S. Dep't of Justice, 311 F. Supp. 3d 223, 230 (D.D.C. 2018) ("Because it is likely that emails concerning the investigation would use "PSU" or "Penn State" rather than the full name of the University, the Department's search was not reasonably calculated to find all responsive emails.").

Moreover, the defendant's declarations are also insufficient because the defendant failed to explain the wide variance in the search terms used by custodians and offices with "seemingly similar law enforcement responsibilities." Tushnet v. United States Immigration & Customs Enf't, 246 F. Supp. 3d 422, 435 (D.D.C. 2017); see, e.g., Pls.' Cross-Mot., Ex. 15 (Custodian Chart) at 1 (reflecting that the Executive Associate Director searched using "Removal" and

"Initiative"); id., Ex. 15 (Custodian Chart) at 3 (in the New Orleans Field Office, two custodians searched only "CARI," one searched "CARI" and "Fugitive Op Report," and one searched seven terms, including "Org CHART" and "Prosecutorial Discretion," as well as the A-numbers provided by the requester); id., Ex. 15 (Custodian Chart) at 19–20 (two custodians in the San Francisco field office searched using "mobile" and "fingerprints"); id., Ex. 15 (Custodian Chart) at 23–24 (one custodian in the Seattle field office searched using "Fugitive Operations" and another searched using "Initiative," "Criminal," "Alien," and "New Orleans"). The defendant fails to offer any explanation for these inconsistencies, aside from asserting that "differences in . . . the specific terms used to search are a result of various factors such as staffing allocations, subject matter expertise, resource allocation, geographic priorities, and how involved/active with [CARI] an ERO Field Office may or may not have been," Harrington Decl. ¶ 11, "as well as . . . the manner in which the employee maintains his/her files," id. ¶ 12. However, such vague and conclusory statements are insufficient to demonstrate that its search was adequate. See SafeCard Serv., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (instructing that an agency's affidavits in support of the adequacy of its search must be "relatively detailed and non-conclusory"). "While FOIA might not require complete uniformity, it does require reasonable explanations for the scope of agency-wide searches[, and t]he . . . unexplained variances in the [defendant's] search [terms] fall short of this standard." Tushnet, 246 F. Supp. 3d at 435; see Roseberry-Andrews v. U.S. Dep't of Homeland Sec., 299 F. Supp. 3d 9, 24–25 (D.D.C. 2018) (concluding that it could not find the "[d]efendant's search . . . sufficient to warrant summary judgment" in part because the defendant failed to "explain why different program offices used varying search terms").

In sum, "the failure of the [defendant] to explain its [search term] choices prevents the [C]ourt from evaluating the reasonableness of the [defendant's] search method." <u>Am. Ctr. for Equitable Treatment, Inc.</u>, 281 F. Supp. 3d at 152. Ultimately, the defendant "must either run [additional] search terms or explain to the [C]ourt why its search terms 'are reasonably calculated to uncover all relevant documents.'" <u>Id.</u> (quoting <u>Oglesby</u>, 920 F.2d at 68).[13]

### 4.   Documents Allegedly Omitted

The plaintiffs also argue that the record contains "positive indications of serious oversights in [the defendant's] searches." Pls.' Reply at 13. Specifically, they argue that the defendant's production of "very few" or "no" records in "several [ ] categories of clearly responsive records" demonstrates that the defendant "failed to search adequately" for responsive records within these categories. <u>Id.</u> at 6–7; Pls.' Facts ¶ 59 ("ICE has produced very few records related to CARI's fiscal impact."); <u>id.</u> ¶ 71 ("ICE has produced no records showing assessments of CARI or an organizational chart."); <u>id.</u> ¶ 76 ("ICE produced very few records relating to ICE's involvement of local or state law enforcement officials in their field operations."); <u>id.</u> ¶ 77 ("ICE produced no racial profiling training or policy records."). They further argue that records produced by the defendant demonstrate that the defendant "omitted clearly responsive documents from its production," Pls.' Reply at 6; <u>see, e.g.</u>, <u>id.</u> at 13–14 (asserting that, although records produced by the defendant demonstrate that "every ERO field office was tasked with

---

[13] The Court declines to order the defendant to search the specific terms identified in the plaintiffs' September 2015 correspondence at this time. <u>See</u> Pls.' Opp'n at 8. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request," <u>Bigwood</u>, 132 F. Supp. 3d at 140, and this Court must not "micro manage" how agencies conduct searches in response to a FOIA request, <u>Johnson v. Exec. Office for U.S. Att'ys</u>, 310 F.3d 771, 776 (D.C. Cir. 2002). Moreover, in their September 2015 correspondence, the plaintiffs represented that they "would agree to limit the searches for some of the [proposed] terms . . . to only certain databases, offices, and files," Pls.' Cross-Mot., Ex. 24 (September 2015 Appendices) at 8, and, given the apparent breadth of some of these terms, <u>see, e.g.</u>, <u>id.</u>, Ex. 24 (September 2015 Appendices) at 8 (proposing that the defendant search "[m]obile and IDENT"); Harrington Decl. ¶ 20 (representing that the defendant has used "[m]obile fingerprinting devices . . . for at least ten years"), the Court is not prepared to say that such limitations are inappropriate.

implementing its own CARI Plan version, ICE has produced CARI plans for at most eight of the 24 ERO field offices, without explanation for the sixteen omissions" (internal citations omitted)). The defendant disputes the plaintiffs' position on several different grounds, including that the missing records identified by the plaintiffs are "irrelevant to the question of whether [it] has . . . conduct[ed] adequate searches," Def.'s Reply Facts ¶ 78, and that its "search need not produce every document in existence," id. ¶ 47.

An agency may not ignore "positive indications of overlooked materials." Valencia-Lucena, 180 F.3d at 326. Specifically, discovery of a document that "clearly indicates the existence of [other] relevant documents" creates an "obligation" for an agency to conduct a further search for those additional documents. Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 215 F. Supp. 2d 94, 110 (D.D.C. 2002), aff'd in part, rev'd in part & remanded on other grounds, 331 F.3d 918 (D.C. Cir. 2003); see Kowalczyk v. U.S. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996) (instructing that an agency must pursue "clear and certain" leads regarding potentially responsive records); Carter, Fullerton & Hayes, LLC v. Fed. Trade Comm'n, 637 F. Supp. 2d 1, 7 (D.D.C. 2009) (additional searches are required when an agency is apprised of "additional potentially responsive materials"). However, "the fact that a particular document was not found does not demonstrate the inadequacy of a search." Boyd, 475 F.3d 381, 291 (D.C. Cir. 2007). And, "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." SafeCard Servs., Inc., 926 F.2d at 1201.

First, the Court cannot agree with the plaintiffs' position that the defendant's production of only few or no documents in certain categories of records demonstrates that the defendant's searches for those records were inadequate. "[T]he adequacy of a FOIA search is generally

determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde, 315 F.3d at 315 (citations omitted). The fact "[t]hat [the defendant's] search turned up only a few [documents in these categories] . . . is not enough to render its search inadequate, even supposing that any reasonable observer would find this result unexpected." Ancient Coin, 641 F.3d at 514; see Huntington, 234 F. Supp. 3d at 106 ("In general, identifying a handful of documents that an agency fails to uncover does not, in itself, demonstrate that a search was inadequate.").

Additionally, the Court generally cannot conclude that a defendant's failure to produce the specific documents identified by the plaintiffs demonstrates that the defendant's search was inadequate either. For example, as to the sixteen CARI plans that the plaintiffs assert were improperly omitted from the defendant's production, although the plaintiffs have identified evidence that the ERO's field offices were instructed to create them, Pls.' Cross-Mot., Am. Ex. 17 (Exemption 5 Withholdings) at Bates No. 2682 (email from the Assistant Director for Field Operations to Field Office Directors and Deputy Field Office Directors instructing them to "complete and submit your annex to the [CARI] Operational Plan to Unit Chiefs . . . by . . . May 10, 2012"), the plaintiffs have not identified any evidence establishing that they were in fact created, see, e.g., Pls.' Facts ¶ 78. And, in any event, the absence of specific documents from the defendant's production does not necessarily establish that the defendant's search was inadequate because "particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." Itturalde, 315 F.3d at 315.

The Court notes that the defendant's failure to produce certain documents or categories of documents very well may be due to deficiencies in its search that the Court has already addressed, such as its failure to search certain offices, databases, or other locations. However,

the Court simply cannot conclude that the absence of such records alone renders the defendant's search inadequate.

For all the foregoing reasons, the Court finds that the defendant has in many respects failed to "demonstrate beyond material doubt that its search[es] w[ere] 'reasonably calculated to uncover all relevant documents.'" Ancient Coin, 641 F.3d at 514 (quoting Valencia-Lucena, 180 F.3d at 325). Specifically, the Court finds that the defendant's search was inadequate because the defendant failed to search six offices identified by the plaintiffs, failed to search its databases for CARI-related data, and failed to produce responsive email attachments. However, the Court finds that it lacks sufficient information to evaluate the reasonableness of the defendant's search of its non-database record systems and the adequacy of the terms used to conduct the search. Accordingly, the Court must deny the defendant's motion for summary judgment and grant in part and deny in part the plaintiffs' cross-motion for summary judgment with respect to the adequacy of the defendant's search. Additionally, the Court will order the defendant to "conduct an adequate search of its records" that addresses the deficiencies identified in this Memorandum Opinion, or, where appropriate, "submit a supplemental affidavit demonstrating that its initial search was adequate." Aguirre, 551 F. Supp. 2d at 62.

## B.     The FOIA Exemptions Applied by the Defendant

The plaintiffs argue that the defendant "has improperly applied exemptions under 5 U.S.C. § 552(b)(5), (6), (7)(C), and (7)(E)" to "withh[o]ld copious information without adequate justification." Pls.' Opp'n at 24. The defendant responds that its "[w]ithholdings [w]ere [a]ppropriate" and that it "has provided adequate descriptions of the information withheld and the reasons why they were justified in doing so." Def.'s Reply at 11. The Court will address each claimed exemption in turn.

1.      **Exemption 5**

The plaintiffs challenge the defendant's withholding of documents, or portions of

documents, under the deliberative process privilege of Exemption 5.  See Pls.' Opp'n at 24–30;

Pls.' Cross-Mot., Am. Ex. 17 (Exemption 5 Withholdings) at 1–8.  The documents withheld

include documents described by the defendant as an "NGO Meeting Memorandum," Pineiro

Decl., Ex. 7 (Vaughn Index) at 17 (entry for Bates Nos. 370–71); "draft" operational plans, see,

e.g., id., Ex. 7 (Vaughn Index) at 70–71 (entry for Bates Nos. 840–53); emails regarding media

inquiries, see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 225 (entry for Bates No. 3492), a

"draft . . . talking point memo about the fugitive operations program," id., Ex. 7 (Vaughn Index)

at 199–200 (entry for Bates Nos. 3226–27), and documents containing "draft [ ] statistics," see,

e.g., id., Ex. 7 (Vaughn Index) at 3 (entry for Bates No. 61).  Upon consideration of the

defendant's descriptions of these documents, the Court agrees with the plaintiffs that the

defendant has failed to satisfy its burden to demonstrate that the withheld material is protected by

the deliberative process privilege.

The deliberative process privilege protects "documents 'reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated.'"  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150

(1975) (quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena, 40 F.R.D. 318, 324 (D.D.C.

1966)).  "To be exempt from disclosure under the deliberative process privilege, the agency must

show that the information is both (1) 'predecisional' and (2) 'deliberative.'"  Cleveland v. U.S.

Dep't of State, 128 F. Supp. 3d 284, 298 (D.D.C. 2015) (Walton, J.) (quoting Nat'l Ass'n of

Home Builders v. Norton, 309 F.3d 26, 39 (D.C. Cir. 2002)).  "A document is predecisional if it

was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than

to support a decision already made." Petrol. Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975)); see Senate of P.R. v. U.S. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987) ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates."). "And a document is deliberative if it is 'a part of the agency give-and-take—of the deliberative process—by which the decision itself is made." Abtew v. U.S. Dep't of Homeland Sec., 808 F.3d 895, 899 (D.C. Cir. 2015) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)). "The 'key question' in determining whether the material is deliberative in nature 'is whether disclosure of the information would discourage candid discussion within the agency.'" Pub. Emps. for Envtl. Responsibility v. EPA, 213 F. Supp. 3d 1, 11 (D.D.C. 2016) (quoting Access Reports v. U.S. Dep't of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991)).

"To justify its application of the deliberative process privilege, an agency must address the following areas: '(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.'" Hunton & Williams LLP v. EPA, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting Nat'l Sec. Counselors v. CIA, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)); see Senate of P.R., 823 F.2d at 585–86 ("The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" (quoting Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980)); Arthur Andersen & Co. v. IRS, 679 F.2d 254, 258 (D.C. Cir. 1982) (explaining that an agency must describe "the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents" (internal quotation marks and citation omitted)). "The need to

describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" <u>Pub. Emps. for Envtl. Responsibility</u>, 213 F. Supp. 3d at 11 (quoting <u>Animal Legal Def. Fund, Inc. v. U.S. Dep't of Air Force</u>, 44 F. Supp. 2d 295, 299 (D.D.C. 1999)). Accordingly, "to sustain its burden of showing that records were properly withheld under Exemption 5, an agency must provide in its declaration . . . precisely tailored explanations for each withheld record at issue." <u>Nat'l Sec. Counselors</u>, 960 F. Supp. 2d at 188. "If the agency does not provide 'the minimal information necessary to make a determination concerning applicability of the deliberative process privilege[,]' then the court should deny the agency summary judgment." <u>Hunton & Williams LLP</u>, 248 F. Supp. 3d at 241 (quoting <u>Elec. Frontier Found. v. U.S. Dep't of Justice</u>, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (Walton, J.)).

First, for many of the documents at issue in this case, the defendant has failed to adequately describe "the nature of the specific deliberative process involved," <u>Hunton & Williams LLP</u>, 248 F. Supp. 3d at 241, as it fails to "pinpoint an agency decision or policy . . . or identify a decisionmaking process to which a document contributed," <u>Judicial Watch, Inc. v. U.S. Postal Serv.</u>, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (internal citation and quotation marks omitted). Instead, it provides only vague descriptions of the documents' content and repeats boilerplate and conclusory statements regarding the content's predecisional and deliberative nature. For example, the defendant describes two documents that it has withheld as "a meeting recap of an ICE agency meeting with an NGO which discussed various individuals," Pineiro Decl., Ex. 7 (<u>Vaughn</u> Index) at 17 (entry for Bates No. 370), and "a draft memo about correspondence to [the defendant] from a[n] NGO," <u>id.</u>, Ex. 7 (<u>Vaughn</u> Index) at 24 (entry for Bates No. 404), and asserts that both documents "contain[] pre-decisional information regarding

a draft agency document," as well as "internal discussion between agency officers and/or employees," "non-final agency decisions, options being considered, and recommendations," id., Ex. 7 (Vaughn Index) at 17 (entry for Bates No. 370); id., Ex. 7 (Vaughn Index) at 24 (entry for Bates No. 404) (asserting that the "draft memo about correspondence to ICE from a[n] NGO[] [ ] includes agency plans, procedures, recommendations, and possible reactions or responses to the correspondence"). As another example, the defendant describes a document that it has withheld as a "DRAFT Weekly Enforcement Operations Report" and asserts that it "contain[s] draft statistics including arrests and ICE threat levels," as well as "internal discussion between agency officers and/or employees, . . . non-final agency decisions, options being considered[,] and recommendations." Id., Ex. 7 (Vaughn Index) at 200 (entry for Bates Nos. 3230–34). However, "[s]uch [ ] broad and opaque description[s] of the deliberative process involved do[] not provide the Court with enough detail about whether these documents are deliberative and predecisional." Trea Sr. Citizens League v. U.S. Dep't of State, 923 F. Supp. 2d 55, 68 (D.D.C. 2013); see Judicial Watch v. U.S. Postal Serv., 297 F. Supp. 2d at 264 (rejecting as insufficient the agency's assertion that the deliberative process was "actions taken or proposed in response to the discovery of anthrax in the mail"); Heartland All. for Human Needs & Human Rights v. U.S. Dep't of Homeland Sec., 291 F. Supp. 3d 69, 80–81 (D.D.C. 2018) (rejecting as insufficient the agency's description of withheld documents as "draft statistical reports that . . . 'were part of a continuing process of revisions generated in advance of the adoption of a final DHS policy'" (emphasis removed)).

Second, even where the defendant arguably identifies a decisionmaking process to which the withheld documents purportedly contributed, it fails to adequately describe the "function and significance of the document[s] in that process." Hunton & Williams LLP, 248 F. Supp. 3d at

241.  For example, although the defendant asserts that certain "draft" operational plans relate to the process of obtaining "comments, edits, approval[,] and signature" for CARI operational plans at the national and field office levels, see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 146–47 (entry for Bates Nos. 2011–33), they "do[] not describe in any amount of detail how . . . [this process] works and how the[] withheld pieces of information fit into that process." Nat'l Sec. Counselors, 960 F. Supp. 2d at 190; see SafeCard Serv., Inc., 926 F.2d at 1204 ("The [agency] needs to explain such matters as how decisions like those in issue are reached; the role that staff discussion and memoranda play in such decisions; the manner in which such decisions are memorialized and explained; and whether such decisions are treated, in later agency decisionmaking, as precedents.").  The defendant asserts only that these plans were "sent to various ICE Officers for comments, edits, approval[,] and signature" and that some "contain highlights on material to be changed or discussed further."  See, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 146–47 (entry for Bates Nos. 2011–33).  However, the defendant fails to address the various "levels of review" required for the approval of CARI plans or "the number, identities, and titles of the various persons . . . to whom the drafts were submitted for 'approval' and [any] alterations th[o]se persons made."  Arthur Andersen & Co., 679 F.2d at 259 (evaluating whether a draft IRS revenue ruling qualified for protection under Exemption 5 and concluding that such information "barely" satisfied the defendant's obligation to explain the "function and significance" of the document).  And, although the defendant also asserts that these plans, like nearly every other document the defendant has withheld under Exemption 5, contain "internal discussion between agency officers and/or employees[] involving a draft agency document, . . . non-final agency decisions, options being considered, and recommendations," see, e.g., id., Ex. 7 (Vaughn Index) at 146–47 (entry for Bates Nos. 2011–

33), "[a] general statement of this sort is not sufficient to carry the agency's burden to explain the function and significance of a document in the agency's decisionmaking process," <u>Pub. Emps. for Envtl. Responsibility</u>, 213 F. Supp. 3d at 15 (rejecting as insufficient the agency's statement that a withheld "record reflects analysis, recommendations, and opinions that were considered as part of the Agency's decision making process," which was "repeated for every entry in the <u>Vaughn</u> indices").

Also insufficient to demonstrate the "function and significance" of the withheld documents are the defendant's assertions that the operational plans and other documents withheld are "drafts" and "replete with edits, strike through[s] and other formatting changes, marginal suggestions and comments, and/or embedded questions regarding content." Pineiro Decl. ¶ 47. "The fact that [ ] documents are drafts and contain edits does not, alone, qualify them for protection under the deliberative process privilege[.]" <u>Heartland All. for Human Needs & Human Rights</u>, 291 F. Supp. 3d at 80. "Even if a document is a 'draft of what will become a final document,' the court must also ascertain 'whether the document is deliberative in nature,'" <u>Arthur Andersen & Co.</u>, 679 F.2d at 257–58 (quoting <u>Coastal States Gas Corp.</u>, 617 F.2d at 866), and the defendant's generic descriptions of the edits contained in these documents preclude the Court from determining whether the documents are "part of an articulated decisionmaking process," <u>Heartland All. for Human Needs & Human Rights</u>, 291 F. Supp. 3d at 80; <u>see</u> <u>Trea Sr. Citizens League</u>, 923 F. Supp. 2d at 68 (rejecting as insufficient the defendant's description of withheld documents as "annotated versions of . . . [a particular] agreement" that "contain [ ] employees' analyses of individual clauses of the agreement," which did not "specify what sort of 'analyses' [were] contained in the documents"). And, in some instances, the defendant's descriptions of the information withheld undermine its assertions that the information is

deliberative.  See Pineiro Decl. ¶ 47 (characterizing some edits as "formatting changes"); see

Dudman Commnc'ns Corp. v. U.S. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987)

(instructing that the deliberative process privilege protects against "the disclosure of editorial

judgments—for example, decisions to insert or delete material or to change a draft's focus or

emphasis" (emphasis added)); Pub. Emps. for Envtl. Responsibility v. Bloch, 532 F. Supp. 2d 19,

21 (D.D.C. 2008) (explaining that the privilege protects "ideas or opinions expressed" that are

"actually . . . deliberative in the sense of contributing to the 'give and take of the consultative

process'" (quoting Coastal States Gas Corp., 617 F.2d at 866)).

Finally, the defendant has wholly failed to explain "the nature of the decisionmaking

authority vested in the office or person issuing the disputed document(s)[] and the positions in

the chain of command of the parties to the documents." Arthur Andersen & Co., 679 F.2d at 258

(internal citation and quotation marks omitted).  On this issue, the vast majority of the

defendant's Vaughn entries assert only that withheld documents were sent to "various ICE

Officers" or contain internal discussions between "agency officers and/or employees," see, e.g.,

Pineiro Decl., Ex. 7 (Vaughn Index) at 147 (entry for Bates Nos. 2011–33); however, it provides

no further information about these officers or employees and the nature of their decisionmaking

authority.  Such generalized assertions fall far short of satisfying the defendant's burden to

provide "explicit" information regarding the parties to these documents.  Nat'l Sec. Counselors,

960 F. Supp. 2d at 190 (denying summary judgment to an agency in part because the agency

failed to specify, inter alia, "whether [certain identified] personnel had the authority to approve

[ ] decisions" bearing on the deliberative process at issue or "the positions in the chain of

command of . . . officers referred to in [ ] withheld documents" (internal quotation marks

omitted)).  Moreover, although some entries provide the titles of certain individuals involved in

the alleged deliberative discussions, see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 225 (entry

for Bates No. 3490) (asserting that the redacted information relates to a discussion involving "the

Public Affairs Officer"), and one entry asserts that a withheld document was "sent from a

subordinate to superiors," id., Ex. 7 (Vaughn Index) at 199 (entry for Bates Nos. 3226–27),

"the[se] descriptions do not disclose the decisionmaking authority vested in those individuals . . .

such that the Court can discern whether these communications 'reflect the give and take of the

deliberative process,'" Nat'l Sec. Counselors, 960 F. Supp. 2d at 191 (quoting Pub. Citizen v.

OMB, 598 F.3d 865, 876 (D.C. Cir. 2010)) (rejecting as insufficient under Exemption 5 the

agency's description of a document as a "memorandum from [an] Information Review Officer to

[an] IRO group regarding preliminary determinations in the processing of" a FOIA request).

On the other hand, although the plaintiffs argue with respect to many of these documents

that the defendant's representations or context of the withheld content "make[s] clear [that]

the [defendant's] Vaughn descriptions are inaccurate and the [e]xemption is misapplied," Pls.'

Opp'n at 27, the Court cannot agree.  For example, the plaintiffs argue that certain "draft"

operational plans withheld are not predecisional because the defendant "has afforded . . . [them]

operational effect," id., as demonstrated by the fact that they are "sent by a superior to

subordinates without request for comment and [ ] titled 'final,'" id. at 28.  While the plaintiffs are

correct that a document "can lose [its predecisional] status if it is adopted, formally or

informally, as the agency position on an issue or is used by the agency in its dealings with the

public," Arthur Andersen & Co., 679 F.2d at 258, and that sending a document "from

[s]upervisors to [s]ubordinates" may suggest that an agency has informally adopted the

document as its position on an issue, Martin v. U.S. Equal Emp't Opportunity Comm'n, 19 F.

Supp. 3d 291, 307 (D.D.C. 2014) (alterations in original) (quoting Taxation with Representation

Fund v. IRS, 646 F.2d 666, 678–81 (D.C. Cir. 1981)), the Court must also "consider 'the

function and significance of the document in the agency's decisionmaking process'[] [and] 'the

nature of the decisionmaking authority vested in the office or person issuing the disputed

document,'" id., which, as already explained, the Court cannot do without further information

from the defendant.  Additionally, to the extent that the plaintiffs seek a determination based on

assumptions drawn from the defendant's representations regarding the content of the documents,

compare Pineiro Decl., Ex. 7 (Vaughn Index) at 24 (entry for Bates No. 404) (describing "a draft

memo about correspondence [to the defendant] from a[n] NGO"), with Pls.' Opp'n at 25

(asserting that the withheld document relates to "correspondence . . . in which the NGOs are

advocating their own interests to [the defendant]"), such "speculation" is not a sufficient basis

for the Court to conclude that a document is not protected, see Vento v. IRS, 714 F. Supp. 2d

137, 154 (D.D.C. 2010) (concluding that because the "[p]laintiffs rest[ed] their objection to the

use of the [deliberative process] privilege to withhold documents on mere speculation," the Court

could not determine that the invocation of the privilege was improper).  Therefore, in the absence

of additional information from the defendant, the Court cannot conclude that the withheld

information is not exempt as a matter of law.

Thus, the Court concludes that the defendant has failed to provide "the minimal

information necessary to make a determination concerning application of the deliberative process

privilege."[14]  Hunton & Williams LLP, 248 F. Supp. 3d at 241 (quoting Elec. Frontier Found.,

---

[14] The defendant's failure to adequately describe the records withheld under the deliberative process privilege also precludes the Court from determining whether the defendant has satisfied its obligation to release all reasonably segregable material.  See Pls.' Opp'n at 30 (arguing that the defendant "improperly redacted segregable factual and similar information related to the CARI program under the deliberative process privilege").  Although the Pineiro Declaration attests that "all information not exempted from disclosure pursuant to the FOIA exemptions [claimed] was correctly segregated and non-exempt portions were released," Pineiro Decl. ¶¶ 64–65, "absent a sufficient Vaughn index, an agency must provide other facts, beyond its good-faith assurances, . . . establish[ing] that it released all reasonably segregable, non-exempt information[,] [s]uch [as] . . . a description of 'what proportion of

(continued . . . )

47

826 F. Supp. 2d at 173).  Accordingly, the Court must deny the defendant's motion for summary

judgment as to these documents.  See id.

> ## 2. Exemptions 6 and 7(C)

The plaintiffs next challenge the defendant's withholding of "names or, in some cases,

email addresses or case histories" pursuant to Exemptions 6 and 7(C).  Pls.' Reply at 20 n.9.

Specifically, they argue that the defendant "improperly applied 7(C) exemptions to records not

compiled for law enforcement purposes" and "applied [both] exemptions where a de minimis

privacy interest was at stake and where that interest was heavily outweighed by the public

interest in disclosure of [the defendant's] involvement [in] and planning of enforcement activities

that may have exceeded constitutional bounds."  Id. at 20 (emphasis omitted).

Exemption 6 permits agencies to withhold "personnel and medical files and similar files

the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

5 U.S.C. § 552(b)(6).  Exemption 7(C) protects "records or information compiled for law

enforcement purposes, . . . to the extent that the production of such law enforcement records or

information . . . could reasonably be expected to constitute an unwarranted invasion of personal

privacy."  Id. § 552(b)(7)(C).  "Both exemptions require agencies and reviewing courts to

'balance the privacy interests that would be compromised by disclosure against the public

interest in the release of the requested information.'"  100Reporters LLC v. U.S. Dep't of Justice,

248 F. Supp. 3d 115, 158 (D.D.C. 2017) (quoting Beck v. U.S. Dep't of Justice, 997 F.2d 1489,

---

( . . . continued)
the information in a document is non-exempt and how that material is dispersed throughout the document,'" Trea Sr.
Citizens League, 923 F. Supp. 2d at 70–71 (quoting Mead Data Ctr., Inc v. U.S. Dep't of Air Force, 566 F.2d 242,
261 (D.C. Cir. 1977)), which the defendant has failed to do here, see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 3
(entry for Bates No. 61) (asserting only that "[t]he information being withheld contains pre-decisional, draft, and
deliberative information").  Thus, the Court also concludes that the defendant has failed to satisfy its burden to
demonstrate that it has released all reasonably segregable material, and it will therefore deny the defendant's motion
for summary judgment as to this issue.

1491 (D.C. Cir. 1993)). However, there are two important differences between the exemptions. First, "Exemption 7 in general applies only to information compiled for 'law enforcement purposes.'" Stonehill v. IRS, 534 F. Supp. 2d 1, 11 (D.D.C. 2008). Second, "Exemption 7(C) . . . establishes a lower bar for withholding material," Prison Legal News v. Samuels, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (quoting ACLU v. U.S. Dep't of Justice, 655 F.3d 1, 6 (D.C. Cir. 2011)), because, "while Exemption 6 requires a 'clearly unwarranted invasion of personal privacy' to qualify for withholding, Exemption 7(C) requires only that disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy,'" Stonehill, 534 F. Supp. 2d at 11 (quoting 5 U.S.C. § 552(b)(6)–(b)(7)). Accordingly, the Court must first address Exemption 7(C), because "if the records and information the [defendant] seeks to withhold in this case were 'compiled for law enforcement purposes,' the Court need only address whether the agency has properly withheld these documents under Exemption 7(C)[,] [and i]f so, there is no need to consider the higher bar of Exemption 6." Braga v. FBI, 910 F. Supp. 2d 258, 267 (D.D.C. 2012); see Espino v. U.S. Dep't of Justice, 869 F. Supp. 2d 25, 29 (D.D.C. 2012) (same).

a.      **Exemption 7(C)**

"'In order to withhold documents under Exemption 7, the agency must, as a preliminary matter' make a 'threshold' showing demonstrating 'that the records were compiled for a law enforcement purpose.'" 100Reporters LLC, 248 F. Supp. 3d at 159 (quoting Kay v. FCC, 976 F. Supp. 23, 37 (D.D.C. 1997)). "In assessing whether records are compiled for law enforcement purposes, this [C]ircuit has long emphasized that the focus is on how and under what circumstances the requested files were compiled, and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" Jefferson v. U.S. Dep't of Justice, Office of Prof'l Responsibility, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (quoting Aspin v.

U.S. Dep't of Defense, 491 F.2d 24, 27 (D.C. Cir. 1973)).  Specifically, "[a] record is 'compiled for law enforcement purposes' so long as there is (1) a rational 'nexus' between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law."  Levinthal v. FEC, 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (first citing Campbell, 164 F.3d at 32; then citing Pratt v. Webster, 673 F.2d 408, 420 (D.C. Cir. 1982)).  "Courts generally afford some deference to agencies 'specializing in law enforcement' that claim their records are eligible for Exemption 7(C) protection," Bartko v. U.S. Dep't of Justice, 898 F.3d 51, 64 (D.C. Cir. 2018); however, the Court's review of such claims "is not vacuous," Pratt, 673 F.2d at 421.

It is undisputed that the defendant is a law enforcement agency, see Pineiro Supp. Decl. ¶¶ 15–16; Barnard v. Dep't of Homeland Sec., 598 F. Supp. 2d 1, 15 (D.D.C. 2009) (concluding that "there is no question that ICE . . . perform[s] law enforcement activities"), and, thus, its determination that the withheld documents were compiled for law enforcement purposes may warrant the Court's deference, see Bartko, 898 F.3d at 61; however, the Court must nonetheless conclude that the defendant has failed to satisfy its burden to demonstrate that the withheld records satisfy Exemption 7's threshold requirement.  Notably, the defendant's Vaughn entries make no attempt to address the specific law enforcement purpose of the withheld documents. See, e.g., Supp. Pineiro Decl., Ex. 1 (Supplemental Vaughn Index ("Supp. Vaughn Index")) at 3–4 (entry for Bates No. 79–80) (providing only the date and subject line of the email withheld, general descriptions of the information redacted, e.g., "the names of agency officers," and the alleged privacy interests at stake).  Rather, it makes only the general claim that

> the [ ] information at issue in this case was compiled by ICE because it relates to
> ICE's obligation to enforce the immigration laws of the United States by
> investigating non-U.S. individuals who may be illegally present in the United
> States, including records of interviews, arrest, booking, detention, removal, other

related investigations, etc. Therefore, all the ICE records responsive to Plaintiffs'
FOIA request were compiled for law enforcement purposes and meet the threshold
requirement of FOIA Exemption (b)(7).

Supp. Pineiro Decl. ¶ 17.

The defendant's blanket assertion that all the information withheld "relates to . . .

investigat[ions of] non-U.S. individuals who may be illegally present in the United States,

including records of interviews, arrest, booking, detention, removal, other related investigations,

etc.," id., fails to provide the Court with a "clear understanding of 'how and under what

circumstances the requested files were compiled,'" Am. Immigration Council, 950 F. Supp. 2d at

245 (quoting Jefferson, 284 F.3d at 176–77).   For example, the assertion fails to "identify a

particular individual or a particular incident as the object of [these] investigation[s] and the

connection between that individual or incident and a possible security risk or violation of federal

law." Pratt, 673 F.2d at 420.   The defendant's failure to address the individual circumstances of

these documents is particularly problematic given that the withheld information appears to relate

to a wide variety of subjects, see Campbell, 164 F.3d at 32–33 (rejecting an agency's reliance on

one broad "statement to justify every withholding . . . on different topics in different contexts"),

some of which do not appear to "relate to anything that can fairly be characterized as an

enforcement proceeding," Jefferson, 284 F.3d at 176, such as nominations for personnel awards,

see Pls.' Cross-Mot, Am. Ex. 19 (Withholdings Under Exemptions 6 and 7(C) Challenged by the

Plaintiffs ("Exemptions 6 and 7(C) Withholdings")) at Bates No. 53, and responses to media

inquiries, see, e.g., id., Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings) at Bates No. 3492

(email regarding the defendant's response to questions from the "National Journal . . . on

Alternatives to Detention and the Criminal Alien Removal Initiative in New Orleans").

Moreover, the defendant's broad and conclusory assertion that "all the [ ] records responsive to

[the p]laintiffs' FOIA request were compiled for law enforcement purposes," Supp. Pineiro Decl.

¶ 17, falls far short of satisfying its burden, see Am. Immigration Council, 950 F. Supp. 2d at 246 (rejecting the defendants' "conclu[sion] that, because [the p]laintiff requested information related to 'activities that ICE performs in a law enforcement and national security context,' this Court can take it for granted that all of ICE's withholdings under Exemption 7[] automatically satisfy the 'law enforcement purposes' requirement").

The Court acknowledges that the context for some of the withheld information appears to support the defendant's claim that the records were compiled for a law enforcement purpose. See, e.g., Pls.' Cross-Mot, Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings) at Bates Nos. 2960–61 (record of a call received on the HSI Tip Line "report[ing] a previously deported alien"). However, the Court declines to "physically examin[e] each [withheld] document" and attempt to discern for itself whether the documents satisfy Exemption 7's threshold requirement. Arthur Andersen & Co., 679 F.2d at 258 (citation and internal quotation marks omitted). Such "guesswork is not a proper foundation for [the Court's] review." Judicial Watch, Inc. v. FBI, Civ. Action No. 04-1643 (RWR), 2006 WL 3334996, at *5 (D.D.C. Nov. 16, 2006) (declining to rely on "contextual clues [that were] not uniformly available or telling"). Moreover, as this Circuit has explained, "[t]he burden [to justify withholdings] has been placed specifically by statute on the [g]overnment," and requiring the Court to "make its own investigation[] [ ] is clearly not what Congress had in mind." Vaughn, 484 F.2d at 825–26. And, given the number of records involved, see generally Pls.' Cross-Mot., Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings) (challenging withholdings in nearly 200 pages of records), and the limited value of the context available, or the absence of context altogether, see, e.g., id., Ex. 19 (Exemptions 6 and 7(C) Withholdings) at Bates Nos. 121–28 (fully withheld), "it is unreasonable to expect a trial judge to do as thorough a job of illumination and characterization as would a party

interested in the case," <u>Arthur Andersen & Co.</u>, 679 F.2d at 258 (quoting <u>Vaughn</u>, 484 F.2d at 825)).

In sum, although a criminal law enforcement agency's "decision to invoke [E]xemption 7 is entitled to deference," <u>Campbell</u>, 164 F.3d at 32, the defendant has failed to provide the Court with the information necessary for it to independently evaluate the defendant's claim as to the records withheld in this case. The defendant's position amounts to little more than the plainly insufficient claim that "because [it] is a law enforcement agency, <u>all</u> documents compiled by [it] <u>inherently</u> meet the threshold requirement." <u>Pinson v. U.S. Dep't of Justice</u>, 202 F. Supp. 3d 86, 101 n.1 (D.D.C. 2016) (rejecting such a claim as "erroneous"); <u>see</u> <u>100Reporters LLC</u>, 248 F. Supp. 3d at 159 ("To be sure, not every document compiled by a law enforcement agency is compiled for a law enforcement purpose."). Thus, to the extent that the defendant seeks to continue to withhold the redacted information contained in these records pursuant to Exemption 7(C), it must supplement its <u>Vaughn</u> Index to provide the information necessary for the Court to determine whether these records satisfy that exemption's requirements.

Having concluded that the defendant has failed to satisfy its burden to demonstrate that the redacted information was "compiled for law enforcement purposes," the Court cannot conclude that the defendant properly withheld these records under Exemption 7(C). Thus, the Court turns to whether the defendant has properly withheld these documents under Exemption 6.

**b.     Exemption 6**

"The balancing analysis for FOIA Exemption 6 requires that [the Court] first determine whether disclosure of the files 'would compromise a substantial, as opposed to <u>de minimis</u>, privacy interest,' because '[i]f no significant privacy interest is implicated . . . FOIA demands disclosure." <u>Multi Ag Media LLC v. Dep't of Agriculture</u>, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (second and third alterations in original) (quoting <u>Nat'l Ass'n of Retired Fed. Emps. v. Horner</u>,

879 F.2d 873, 874 (D.C. Cir. 1989)). However, the "use of the word substantial in this context means less than it might seem," as "[a] substantial privacy interest is anything greater than a de minimis privacy interest." Id. at 1229–30. This Circuit has instructed that "[t]he scope of a privacy interest under Exemption 6 will always be dependent on the context in which it has been asserted." Armstrong v. Exec. Office of the President, 97 F.3d 575, 581 (D.C. Cir. 1996). Accordingly, in applying Exemption 6, the Circuit has rejected "categorical rule[s]," id., and, specifically, it has "held that 'the disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a de minimis threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue," Gilman v. U.S. Dep't of Homeland Sec., 32 F. Supp. 3d 1, 11 (D.D.C. 2014) (quoting Nat'l Ass'n of Required Fed. Emps., 879 F.2d at 877); see Armstrong, 97 F.3d at 581 (rejecting "a categorical rule forbidding disclosure of the names of [certain] FBI agents in all activities [as] invalid").[15]

The defendant groups the individuals whose identifying information it seeks to protect into three categories: (1) "federal employees," Supp. Pineiro Decl. ¶ 22; (2) "immigration officers," id. ¶ 23; and (3) "third parties," id. ¶ 24–25. As to the "federal employees" category,

---

[15] The plaintiffs do not dispute that the information withheld under Exemption 6 constitutes "personnel and medical files and similar files." 5 U.S.C. § 552(b)(6). "The term[] 'similar files' is construed broadly," Gov't Accountability Project v. U.S. Dep't of State, 699 F. Supp. 2d 97, 105–06 (D.D.C. 2010), and encompasses "not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[ ] a palpable threat to privacy,'" Judicial Watch, Inc. v. FDA, 449 F.3d 141, 152–53 (D.C. Cir. 2006). Because the names and email addresses withheld by the defendant constitute "bits of personal information," id. at 152, the Court concludes that this information is subject to Exemption 6, see Long v. Immigration & Customs Enf't, 279 F. Supp. 3d 226, 244 (D.D.C. 2017) ("[F]ederal employees' personal identifying information is of the type that Exemption 6 potentially allows to be withheld."); Gilman, 32 F. Supp. 3d at 10–11 (concluding that "the names and addresses of landowners are 'bits of personal information'" subject to protection under Exemption 6 (quoting Judicial Watch, 449 F.3d at 152)). Moreover, although the defendant provides little information regarding the "case history" information withheld by the defendant, it appears likely that it too would satisfy Exemption 6's threshold requirement. See U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982) (instructing that Exemption 6 was "intended to cover detailed [g]overnment records on an individual which can be identified as applying to that individual"); see, e.g., Supp. Pineiro Decl., Ex. 1 (Supp. Vaughn Index) at 16 (entry for Bates Nos. 252–54) (describing redacted information as "specific case information about third party individuals, including their . . . case history").

the defendant represents that these employees, "by virtue of the[ir] positions . . . , [ ] are

permitted access to official law enforcement investigation information," and, thus, they have

> privacy interests . . . in not becoming targets of harassment—whether in the form
> of requests for authorized access to law enforcement information or requests for
> information about ongoing or closed investigations—and . . . in remaining free of
> interference in the performance of their duties by persons who are currently of
> interest to law enforcement or oppose the ICE mission.

Id. ¶ 22.

The defendant's representations are insufficient. Although "[t]he privacy interest of

civilian federal employees includes the right to control information related to themselves and to

avoid disclosures that 'could conceivably subject them to annoyance or harassment in either their

official or private lives,'" Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 384 F. Supp.

2d 100, 116 (D.D.C. 2005) (quoting Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 487 (D.C. Cir.

1980)), this "does not authorize a 'blanket exemption' for the names of all government

employees in all records," id. (quoting Baez v. U.S. Dep't of Justice, 647 F.2d 1328, 1338 (D.C.

Cir. 1980)). Rather, "[t]o justify [its] Exemption 6 withholdings, the defendant[] must show that

the threat to employees' privacy is real rather than speculative." Id. The Court cannot conclude

that the defendant has done that here. As explained in Part III.B.2.a of this Memorandum

Opinion, supra, the defendant makes little to no effort to describe the context in which these

employees' names and email addresses appear in the subject documents, see, e.g., Supp. Pineiro

Decl., Ex. 1 (Supp. Vaughn Index) at 3 (identifying only the subject line of a redacted email as

"RE: CARI Arrests"), and, thus, the Court cannot properly assess "the characteristic(s) revealed

by virtue of [these names] being [i]n [a] particular [record], and the consequences likely to

ensue," Gilman, 32 F. Supp. 3d at 11. Additionally, while public disclosure of a government

employee's access to certain information could pose a real risk of harassment, the existence or

extent of such a risk necessarily depends on the sensitivity of the information to which the

individual has access and the extent of that access.  See Long v. Immigration & Customs Enf't, 279 F. Supp. 3d 226, 244 (D.D.C. 2017) (Long II) (finding a substantial privacy interest under Exemption 6 implicated by release of the "name, telephone number, [and] e[]mail address [of] those individuals responsible for the particular, sensitive task of monitoring snapshots of the" defendant's law enforcement database because it "would subject those individuals to targeted, unauthorized, and potentially malicious inquiries about their work; even harassment").  However, the defendant has failed to provide any detail regarding the "official law enforcement investigation information" at issue or the nature of the government employees' access to that information.  Supp. Pineiro Decl. ¶ 22.[16]

Moreover, although "a categorical approach" to describing the privacy interests of individuals may be appropriate in some instances, Prison Legal News, 787 F.3d at 1151, it is inadequate when the categories "include a wide range of claims covering various degrees of privacy interests," id. at 1150.  Here, absent any description of the types of employees included in the "federal employees" category, the Court can only assume that the "federal employees" at issue include a wide range of employees with varying levels of access to "official law enforcement investigation information."  Supp. Pineiro Decl. ¶ 22.  Thus, the defendant's representations are also insufficient because it has made no effort to differentiate between these individuals and their interests.  See 100Reporters LLC, 248 F. Supp. 3d at 164 (rejecting as insufficient the agency's description of the privacy interests at stake because it failed to "differentiate[] the privacy interests of government employees, including DOJ and SEC

---

[16] Additionally, this Circuit has "suggest[ed] that federal employees' privacy interests" may depend on their "rank within the agency," Miller v. U.S. Dep't of Justice, 872 F. Supp. 2d 12, 25 (D.D.C. 2012) (citing Stern v. FBI, 737 F.2d 84, 91 (D.C. Cir. 1984)) (explaining that "high-ranking officials should more often be disclosed"); however, the defendant has not provided any indication about the titles or ranks of the individuals it refers to as "federal employees," Supp. Pineiro Decl. ¶ 22.

attorneys").[17]  Thus, the defendant has failed to provide the Court with adequate information to assess the privacy interests of the federal employees whose names and email addresses it has withheld.

The "immigration officers" category suffers from similar deficiencies as the "federal employees" category.  Although the "immigration officers" category purports to be a narrower subgroup of "federal employees," the defendant again fails to define this category or "distinguish the privacy interests at stake."  100Reporters LLC, 248 F. Supp. 3d at 164.  Rather, it simply asserts that

> the privacy consideration at issue is the interest of each of these individuals in remaining free from harassment and annoyance in conducting their official duties in the future, their interest in remaining free from harassment and annoyance in their private lives, and their interest in not being targeted by individuals in the future who may begrudge them.

Supp. Pineiro Decl. ¶ 23.  However, this description makes no effort to explain the "context" in which the identities of these officers appear in the subject documents, see Armstrong, 97 F.3d at 581, nor does it explain why disclosure of these officers' identities in that context would result in "harassment and annoyance" or "being targeted by individuals . . . who may begrudge them," Supp. Pineiro Decl. ¶ 23; see Elec. Privacy Info. Ctr., 384 F. Supp. 2d at 116 ("To justify their Exemption 6 withholdings, the defendants must show that the threat to employees' privacy is real rather than speculative.").  Although this Circuit "ha[s] long recognized[] [ ] that . . . persons involved in law enforcement investigations – witnesses, informants, and the investigating agents – 'have a substantial interest in seeing that their participation remains secret,'" Schrecker

---

[17] Although 100Reporters LLC and other cases cited by this Court in its Exemption 6 analysis involved Exemption 7(C), because "the privacy inquiry for each [exemption] is 'essentially the same[,]'" Walsh v. FBI, 952 F. Supp. 2d 71, 78 (D.D.C. 2013), "courts conducting a balancing test under Exemption 6 can [ ] look to Exemption 7(C) cases for assistance in the identification of the interests at stake," Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 384 F. Supp. 2d 100, 116 n.23 (D.D.C. 2005) (collecting cases).

v. U.S. Dep't of Justice, 349 F.3d 657, 666 (D.C. Cir. 2003), it has largely found such an interest to exist when an individual's name "appear[s] in law enforcement records" under Exemption 7, see id. at 661 (quoting Fitzgibbon v. CIA, 911 F.2d 755, 767 (D.C. Cir. 1990)), in recognition that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation," id. at 666, and, in the case of an investigating agent, in recognition that "release of an [a]gent's name in connection with a particular investigation could rekindle an animosity toward the [a]gent," Baez, 647 F.2d at 1339; see Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs., 849 F. Supp. 2d 13, 28 (D.D.C. 2012) ("This protection extends to 'persons who are not the subjects of the investigation [but who] may nonetheless have their privacy invaded by having their identities and information about them revealed in connection with the investigation' because disclosure of their identities 'may result in embarrassment and harassment.'"). However, as already explained earlier, see Part III.B.2.a, supra, the defendant has failed to demonstrate that the records in which these officers' names appear constitute law enforcement records, and it has also failed to demonstrate that these records would associate the officers "with a particular investigation," Baez, 647 F.2d at 1339. Thus, the defendant has also failed to provide the Court with sufficient information to assess the privacy interests of the immigration officers whose information it has withheld.

The defendant's description of the interests at stake with respect to "third parties" is also insufficient. As to these individuals, the defendant argues that "[t]he disclosure of third party information could constitute an unwarranted invasion of personal privacy and subject the individuals to embarrassment, harassment, and undue public attention," "could expose the individual to identity theft[,] and may reasonably lead to unwanted contact from persons that might seek to harm the individual." Supp. Pineiro Decl. ¶ 24. It further argues that "third party

individuals have a recognized privacy interest in not being publicly associated with law enforcement investigations through the release of records compiled for law enforcement purposes[,] . . . in recognition of the stigmatizing connotation carried by the mere mention of individuals in law enforcement files." Id. ¶ 25.

As an initial matter, the defendant undermines its own claims that the information it has provided satisfies the requirements of Exemption 6 because it asserts that public disclosure of the withheld information "could" or "may reasonably lead to" the risks identified, id. ¶ 24, whereas Exemption 6 requires an agency to demonstrate that "disclosure . . . would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6) (emphasis added).[18] Additionally, although, "[a]s a general rule, third-party identifying information contained in [law enforcement] records is 'categorically exempt' from disclosure," Boehm v. FBI, 948 F. Supp. 2d 9, 30 (D.D.C. 2013) (citation omitted); see SafeCard Servs., Inc., 926 F.2d at 1206 ("hold[ing] categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure"), as already explained, the defendant has not satisfied its burden to demonstrate that the records at issue were compiled for law enforcement purposes. Furthermore, while the undefined "third parties" category appears to include a wide variety of individuals, including "alien[s]," see, e.g., Supp. Pineiro Decl., Ex. 1 (Supp. Vaughn Index) at 2, local law enforcement

---

[18] The Court acknowledges that the supplemental Pineiro declaration asserts that the defendant "determined that the disclosure of the information described in Paragraphs 16 though 23 [of his declaration] would constitute a clearly unwarranted invasion of personal privacy," Supp. Pineiro Decl. ¶ 26, which includes the third party information described in paragraph 21, see id., ¶ 21. However, this conclusory assertion does not satisfy the defendant's burden to demonstrate that the requirements of Exemption 6 are satisfied. See, e.g., Story of Stuff Project v. U.S. Forest Serv., 345 F. Supp. 3d 79, 97 (D.D.C. 2018) ("[An] agency may satisfy its burden of showing a substantial invasion of privacy by affidavits containing 'reasonable specificity of detail rather than merely conclusory statements.'" (quoting Prison Legal News, 787 F.3d at 1147).

officers, <u>see, e.g.</u>, Pls.' Cross-Mot, Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings) at Bates No. 22 (redacting the name of an individual from "the Jefferson Parish Sheriff's Office in Gretna, Louisiana"), and public officials, <u>see, e.g.</u>, <u>id.</u>, Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings) at Bates No. 22 (appearing to redact the name of a foreign "Consul"), the defendant makes no effort "to distinguish the privacy interests at stake" for these individuals,. <u>100Reporters LLC</u>, 248 F. Supp. 3d at 164, or explain the context in which these individuals' names appear in the documents, which, as already explained, is critical to the Exemption 6 analysis, <u>see</u> <u>Armstrong</u>, 97 F.3d at 581 (explaining that the privacy interest in an individual's identifying information is "dependent on the context in which [the information] has been asserted").[19]

Finally, the defendant fails to adequately explain the nature of the "case history" information it has withheld. <u>See, e.g.</u>, Supp. Pineiro Decl., Ex. 1 (Supp. <u>Vaughn</u> Index) at 5–6 (entry for Bates Nos. 99–100). As the plaintiffs correctly note, in some instances the defendant has withheld "[t]he entire text of emails" under this rationale without "explain[ing] why [this

---

[19] The defendant also argues that its withholding of the personal identifying information of third parties is appropriate because "the third parties . . . have not provided consent to the release of their personally identifying information as required by 6 C.F.R. §§ 5.3(a) & 5.21(d)." Supp. Pineiro Decl. ¶ 28. However, the regulations cited by the defendant do not expressly require that third parties consent to the release of their information. <u>See</u> 6 C.F.R. § 5.3(a)(4) ("Where a request for records pertains to a third party, a requester <u>may receive greater access</u> by submitting . . . authorization [ ] by that individual[.]" (emphasis added)); <u>see also</u> <u>id.</u> § 5.21(d) ("When you make a request for access to records about yourself, you must verify your identity."); <u>id.</u> § 5.21(f) ("If you are making a request for records concerning an individual <u>on behalf of that individual</u>, you must provide a statement from the individual verifying [his] identity . . . [and] certifying [his] agreement that [his] records . . . may be released to you." (emphasis added)). Moreover, although the Privacy Act generally prohibits the disclosure of an individual's records without the individual's consent, <u>see</u> 5 U.S.C. § 552a(b), it permits "nonconsensual disclosures" if they are "required under . . . []FOIA[,]" <u>Chang v. U.S. Dep't of Navy</u>, 314 F. Supp. 2d 35, 40 (D.D.C. 2004), and thus, a party's consent only becomes relevant if a Court determines disclosure is <u>not</u> required under FOIA, <u>see, e.g.</u>, <u>Smith v. U.S. Dep't of Justice</u>, 115 F. Supp. 3d 48, 52 (D.D.C. 2015) ("[A]s a general rule . . . , information about a third-party contained in law enforcement records is categorically exempt from disclosure <u>absent the subject's consent or waiver.</u>" (emphasis added)); <u>Abuhouran v. U.S. Dep't of State</u>, 843 F. Supp. 2d 73, 82 (D.D.C. 2012) (concluding that where a third party "maintain[ed] a strong privacy interest" in non-public records concerning her "criminal prosecution and conviction," the agency "properly invoked exemptions 6 and 7(C) to deny [the] records to [the] plaintiff in the absence of [the third party's] written consent to disclosure of . . . [the] records or [the] plaintiff's showing of an overriding public interest in their disclosure").

information] could not have been released as information segregable from any personally

identifying information." Pls.' Cross-Mot., Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings)

at 1–2 (addressing the document at Bates No. 65). Absent any further explanation from the

defendant, the Court cannot "agree that all information regarding the circumstances of [ ]

immigration cases is exempt," given that, "[i]n some instances, such information is general

enough that it cannot be said to identify the particular alien at issue." Canaday v. U.S.

Citizenship & Immigration Servs., 545 F. Supp. 2d 113, 118 (D.D.C. 2008). "Moreover, the

release of such information [implicates a public interest because it] sheds light on how the

agency carried out its obligations under the law." Id. Additionally, the defendant appears to

have withheld case information regarding certain named plaintiffs in this case, see, e.g., Pls.'

Cross-Mot., Am. Ex. 19 (Exemptions 6 and 7(C) Withholdings) at Bates Nos. 73–74 (email

regarding request for prosecutorial discretion made on behalf of plaintiff Denis Chirinos-Avila);

however, "[a]bsent a compelling argument to the contrary, the court is reluctant to hold that

FOIA exemptions justify withholding information about [a] requester," Ruston v. U.S. Dep't of

Justice, Civ. Action No. 06-0224 (RMU), 2007 WL 809698, at *6 (D.D.C. Mar. 15, 2007); see

Dean v. FDIC, 389 F. Supp. 2d 780, 794 (E.D. Ky. 2005) ("[T]o the extent that the defendants

have redacted the 'name, address, and other identifying information' of the plaintiff himself in

these documents . . . , reliance on Exemption 6 or 7(C) would be improper."). Thus, again, the

defendant must provide further explanation about the privacy interests implicated by this "case

history" information to justify its decision to withhold it.

For all of these reasons, the Court concludes that the defendant has failed to adequately

describe the privacy interests at stake with respect to the records it has withheld under

Exemption 6.[20]  And, because this failure "makes it impossible for the Court to balance the

private interests with the public's interest in knowing 'what their government is up to,'"

100Reporters LLC, 248 F. Supp. 3d at 165, the Court does not find it useful to conduct an

inquiry into any alleged public interest in these records at this time.  Should the defendant seek to

continue to withhold this information on a categorical basis, "it should, at the least, 'make a more

particularized showing for defined subgroups.'"  Id. (quoting Am. Immigration Lawyers Ass'n v.

Exec. Office for Immigration Review, 830 F.3d 667, 676 (D.C. Cir. 2016)).

### 3.      Exemption 7(E)

The defendant invokes Exemption 7(E)

> to protect from disclosure law enforcement sensitive database, system, and event
> codes, law enforcement equipment, law enforcement operations information, law
> enforcement techniques and procedures, law enforcement system URLs, law
> enforcement system, program, or database names, internal website links, law
> enforcement guidelines and instructions, database screenshots, law enforcement
> staffing or capability information, law enforcement team names or abbreviations,
> internal telephone passcodes, event numbers, records check information, program
> codes, charge codes, system codes, and law enforcement sensitive information
> found in the Enforcement Integrated Database (EID).

Pineiro Decl. ¶ 59.  Exemption 7(E) protects from disclosure records that "would disclose

techniques and procedures for law enforcement investigations or prosecutions[] or would

disclose guidelines for law enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  This Circuit

has stated that "Exemption 7(E) sets a relatively low bar for the agency to justify withholding:

'Rather than requiring a highly specific burden of showing how the law will be circumvented,'"

this exemption "'only requires that the [agency] demonstrate logically how the release of the

---

[20] Because the "the privacy inquiry for [Exemption 7(C)] is 'essentially the same'" as the privacy inquiry for
Exemption 6, Walsh, 952 F. Supp. 2d at 78, the Court concludes that the defendant's failure to adequately describe
these privacy interests also provides an additional basis for the Court's rejection of its Exemption 7(C) withholdings.

requested information might create a risk of circumvention of the law.'" Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009)). In other words, "the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." Id.

The plaintiffs first argue that the defendant improperly invoked Exemption 7(E) because it "has failed to show . . . that the information [withheld] was compiled for law enforcement purposes." Pls.' Opp'n at 39. Specifically, they argue that "[s]everal of the documents redacted under Exemption 7(E) were compiled for purposes other than law enforcement, . . . [including] media inquiries, responses to the media, news articles, correspondence with congressional staff, overtime requests, and many other records not related to an investigation of a person or incident connected to a potential violation of the law," and the defendant "offers no reason why [these documents] . . . are related to law enforcement." Id. at 40. The Court must correct two apparent misperceptions of the law in the plaintiffs' argument. First, an agency need not show that a document from which information is redacted under Exemption 7 was itself compiled for a law enforcement purpose. Rather, Exemption 7 applies to "records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7) (emphasis added), and an agency may properly redact information from "records [that] were not themselves compiled for law enforcement purposes" so long as the "information [itself] was compiled for law enforcement purposes," Shapiro v. U.S. Dep't of Justice, 239 F. Supp. 3d 100, 113 (D.D.C. 2017); see FBI v. Abramson, 456 U.S. 615, 624 (1982) (instructing that Exemption 7 applies to records that "contain[ ] or

essentially reproduce[ ] all or part of a record that was previously compiled for law enforcement reasons").  Second, information redacted under Exemption 7 need not "relate[] to an <u>investigation</u> of a person or incident connected to a potential violation of federal law," Pls.' Opp'n at 40 (emphasis added), as this Circuit has specifically instructed that information "relat[ed] to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions" may be withheld "even when the materials have not been compiled in the course of a specific investigation," <u>Tax Analysts v. IRS</u>, 294 F.3d 71, 79 (D.C. Cir. 2002); <u>see</u> <u>Levinthal</u>, 219 F. Supp. 3d at 7 ("The Court of Appeals consistently has held that records do not have to be linked to a specific investigation to be properly withheld under Exemption 7(E).").

Nonetheless, the Court agrees with the plaintiffs that in many instances, the defendant has failed to demonstrate that the information redacted pursuant to Exemption 7(E) was "compiled for law enforcement purposes."  As already explained, to make this showing, the defendant must provide the Court with sufficient information to understand "how and under what circumstances the requested files were compiled, and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'"  <u>Jefferson</u>, 284 F.3d at 176–77 (internal citation omitted) (quoting <u>Aspin</u>, 491 F.2d at 27).  And although "an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures . . . , even when the materials have not been compiled in the course of a specific investigation," it must demonstrate that these "guidelines, techniques, sources, and procedures [are] <u>for law enforcement investigations and prosecutions</u>."  <u>Tax Analysts</u>, 294 F.3d at 79 (emphasis added).  Again, the defendant's broad assertion that "all the [ ] records responsive to [the p]laintiffs' FOIA request were compiled for law enforcement purposes," Supp. Pineiro Decl. ¶ 17, is alone plainly insufficient to satisfy its burden, <u>see</u> <u>Am. Immigration Council</u>, 950 F.

Supp. 2d at 246.  Moreover, a significant amount of the information withheld by the defendant

under Exemption 7(E) is so vaguely described that the Court cannot discern the nature of the

information being withheld, let alone the circumstances under which the information was

compiled or whether it relates to the defendant's law enforcement responsibilities.  For example,

the defendant describes information withheld as "law enforcement sensitive information

regarding law enforcement techniques, systems used, and procedures," see, e.g., Pineiro Decl.,

Ex. 7 (Vaughn Index) at 28 (entry for Bates No. 480), and "law enforcement sensitive codes,

which are used for law enforcement purposes," see, e.g., id., Ex. 7 (Vaughn Index) at 84 (entry

for Bates No. 1004), without providing any further detail regarding the nature of the information

or how it is linked to "law enforcement sensitive" functions.   The defendant cannot rely on such

"vaguely worded categorical description[s]," but "must provide evidence from which the Court

can deduce something of the nature of the techniques in question."  Clemente v. FBI, 741 F.

Supp. 2d 64, 88 (D.D.C. 2010) (rejecting the agency's characterizations of the information

withheld as "information . . . pertain[ing] to law enforcement 'techniques and procedures'").

Labeling this information as "law enforcement sensitive" or "used for law enforcement

purposes" in such a conclusory fashion must be rejected.  See, e.g., Goldstein v. Treasury

Inspector Gen. for Tax Admin., 172 F. Supp. 3d 221, 229 (D.D.C. 2016) (rejecting as insufficient

the agency's "conclusory statement [that] t[old] the court nothing about the nature" of the alleged

law enforcement purpose).

Furthermore, although some information withheld appears to relate to "guidelines,

techniques, sources, and procedures for law enforcement investigations and prosecutions," Tax

Analysts, 294 F.3d at 79; see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 177 (entry for Bates

No. 2599) (describing withheld information as "instructions regarding the processing of

arrests"), the defendant's Exemption 7(E) withholdings even as to this information fail for an additional reason. As the plaintiffs correctly note, see Pls.' Opp'n at 41, the defendant has failed to adequately demonstrate that the disclosure of the information withheld "could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E). Although the standard for making this showing "is a fairly low hurdle in this Circuit, [ ] it is not a toothless [one]," and "the [g]overnment cannot simply cite Exemption 7(E) and expect the court to rubber stamp its withholdings." Long II, 279 F. Supp. 3d at 234; Campbell, 164 F.3d at 32 (a court's review of an agency's withholding under Exemption 7(E) is not "vacuous"). Rather, "[c]ourts have a responsibility to ensure that an agency is not simply manufacturing an artificial risk and that the agency's proffered risk assessment is rooted in facts." Long v. ICE, 149 F. Supp. 3d 39, 53 (D.D.C. 2015) (Long I). "At a minimum, the [g]overnment must show that its stated expectation of risk is reasonable." Long II, 279 F. Supp. 3d at 234. And, "[a]n affidavit that contains merely a categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." Campbell, 164 F.3d at 30 (internal citation and quotation marks omitted).

Here, the defendant's vague, categorical descriptions of the information withheld under Exemption 7(E) and the alleged risks of disclosure are insufficient. For nearly every Vaughn entry regarding information withheld under Exemption 7(E), the defendant states that disclosure of the information

> could reveal techniques and/or procedures for law enforcement investigations or prosecutions, or disclose guidelines for law enforcement investigations or prosecutions which could reasonably be expected to risk circumvention of the law. Disclosure of these techniques and practices could permit people seeking to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations. Further, how law enforcement officers access databases, conduct investigations, use systems, or

allocate resources, are all law enforcement techniques and procedures that are not commonly known.

See, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 58 (entry for Bates No. 716). Given the apparently varied nature of the information withheld, see Pineiro Decl. ¶ 59, and the defendant's vague descriptions of that information, this "categorical indication of [the] anticipated consequences of disclosure is clearly inadequate," Campbell, 164 F.3d at 30. Moreover, the defendant's conclusory statements fail to explain how the withheld information "could reveal techniques and/or procedures [or guidelines] for law enforcement investigations or prosecutions," see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 58 (entry for Bates No. 716), or why disclosure of this information "could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E). The assertion that "[d]isclosure of these techniques and practices could permit people seeking to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations," see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 58 (entry for Bates No. 716), provides the Court with "no means by which it can determine whether [disclosure] . . . could result in evasion of the law," Clemente, 741 F. Supp. 2d at 83 (rejecting as insufficient the agency's claim that the "effectiveness [of techniques and procedures] could be reduced by disclosure"); see Campbell, 164 F.3d at 30 ("[A]n affidavit that contains merely a categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." (citation and internal quotation marks omitted)).

Although the defendant identifies an additional set of concerns with respect to certain information withheld, the Court cannot conclude that these concerns adequately justify the defendant's Exemption 7(E) withholdings either. For example, for "codes" and database-related

information, such as "law enforcement sensitive code[s]," see, e.g., Pineiro Decl., Ex. 7 (Vaughn

Index) at 70 (entry for Bates No. 836), the defendant asserts variations of the following:

> The disclosure of this information could reasonably be expected to risk the circumvention of law by allowing individuals to access law enforcement sensitive information as well as personally identifying information of DHS personnel thereby potentially interfering with ICE ongoing investigations, obstructing enforcement proceedings, and endangering the safety of DHS employees. Disclosure could also assist third parties in deciphering the meanings of the codes and could allow an individual to alter or manipulate law enforcement databases if they were to gain access to the system. Disclosure of these techniques and practices in navigating the databases could permit people seeking to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations,

see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 7 (entry for Bates No. 121). Although "courts in

this District repeatedly have held that information connected to law enforcement databases

qualifies for exemption under 7(E)," Levinthal, 219 F. Supp. 3d at 8 (collecting cases); see Long

I, 149 F. Supp. 3d at 50 ("[I]nternal database codes, fields, and other types of identifiers used by

law enforcement agencies to conduct, organize, and manage investigations and prosecutions

qualify, at least, as law enforcement guidelines, if not also law enforcement methods and

techniques."), and "have recognized the risk of a cyber-attack or a breach of a law enforcement

database as valid grounds for withholding under Exemption 7(E)," Long I, 149 F. Supp. 3d at 51,

the defendant has not adequately explained why such risks apply to the information sought by

the plaintiffs in this case. Critically, the defendant has wholly failed to explain how the withheld

information would "allow[] individuals to access law enforcement sensitive information as well

as personally identifying information of DHS personnel." See, e.g., Pineiro Decl., Ex. 7

(Vaughn Index) at 7 (entry for Bates No. 121). And, absent any meaningful description of the

information withheld or the "databases" or "systems" to which the withheld information would

allegedly permit access, the Court is unable to say that any such risk is "self-evident." Morley v.

CIA, 508 F.3d 1108, 1229 (D.C. Cir. 2007). Additionally, although the defendant asserts that

"[d]isclosure could . . . allow an individual to alter or manipulate law enforcement databases if they were to gain access to the system," see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 7 (entry for Bates No. 121), in the absence of any explanation as to how individuals would gain access to such databases, or again, any explanation of what databases are at issue, the Court cannot conclude that such a risk is "logical or plausible," Larson v. U.S. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting Wolf, 473 F.3d at 375); see Long II, 279 F. Supp. 3d at 237 (rejecting as insufficient the agency's claim that disclosure of database information could result in unauthorized users gaining access to the database because "there [wa]s a logical gap in [the d]efendant's reasoning" regarding how access would be obtained). And finally, the defendant provides no explanation whatsoever for how disclosure of this information "could [otherwise] permit people [ ] to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations." See, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 7 (entry for Bates No. 121). Thus, the Court must conclude that these "categorical indication[s] of [the] anticipated consequences of disclosure" of codes and database-related information are also "clearly inadequate." Campbell, 164 F.3d at 30.

Additionally, the defendant's assertions regarding the disclosure of "[l]aw enforcement database numeric references/query codes . . . used . . . to index, store, locate[,] and retrieve information," Pineiro Decl. ¶ 60, also fall short of satisfying the burden it bears. Because the defendant makes no effort to further describe this information or associate it with specific Vaughn entries, it is entirely unclear to the Court which of the withheld information this category includes. In any event, the defendant has again failed to adequately describe the "guidelines, techniques, sources, [or] procedures" this information would reveal, Tax Analysts, 294 F.3d at 79, or how disclosure "could reasonably be expected to risk circumvention of the law," 5 U.S.C.

§ 552(b)(7)(E).  Although the defendant claims that these "codes and number sequences <u>can</u> reflect the type of activity under investigation, the location of a case or investigative efforts, and the scope and size of the investigation," Pineiro Decl. ¶ 60 (emphasis added), it does not assert that it has made any determination as to whether the "codes and number sequences" withheld in this case would in fact reflect such investigative information.  Moreover, the defendant again makes only conclusory assertions regarding the alleged risks associated with disclosure. Specifically, it asserts that

> [r]elease of law enforcement database numeric references/query codes could allow a person seeking improper access to law enforcement data to decipher the meaning of the codes, navigate the law enforcement system, and/or compromise the integrity of the data by deleting or manipulating law enforcement information thereby placing law enforcement officers, other DHS personnel, and the public at risk.  The release of this information could also reasonably be expected to allow a person to breach sensitive law enforcement systems and to potentially circumvent detection or manipulate law enforcement sensitive information, thus placing law enforcement officers and the public at risk, or to attempt to sabotage their removal or ICE enforcement proceedings.

<u>Id.</u> ¶¶ 60–62.  Again, absent any meaningful explanation of what the withheld information is or how it could be used to access the defendant's "systems," <u>id.</u> ¶ 61, these conclusory assertions of risk fail to satisfy the defendant's burden.

Finally, the defendant's explanation of the risk associated with disclosing "search results and various fields of analysis relating to queries run against non-ICE law enforcement/databases and case/investigation notes," Pineiro Decl. ¶ 62, is likewise insufficient.  Again, it is entirely unclear which withheld information this category includes, and the defendant has provided only the same type of vague assertions regarding the alleged risks associated with its disclosure.  <u>See</u> Pineiro Decl. ¶ 62 (asserting, without further explanation, that "disclosure could . . . giv[e] subjects or potential subjects of an investigation the ability to anticipate the circumstances under

which a particular investigative technique might be employed and/or identify such techniques as they are being employed in an attempt to obstruct an investigation or evade detection").

The Court acknowledges that for a limited set of information withheld, the risks associated with disclosure may ultimately be obvious.  For example, to the extent that withheld information described by the defendant as "instructions for performing records checks," see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 168 (entry for Bates No. 2447), constitutes "information revealing . . . procedures" for "[b]ackground investigations," this Circuit has held that "[i]t is self-evident that information revealing [such] procedures could render [them] vulnerable and weaken their effectiveness at uncovering background information," Morley, 508 F.3d at 1128–29; see Sheridan v. U.S. Office of Pers. Mgmt., 278 F. Supp. 3d 11, 21, 25 (D.D.C. 2017) (concluding that the agency properly withheld "the [ ] source code and the related design and operations manuals [that] exist[ed] to serve [the agency's] background-investigation function").  However, in the absence of any detailed description of "instructions for performing records checks," see, e.g., Pineiro Decl., Ex. 7 (Vaughn Index) at 168 (entry for Bates No. 2447), the Court cannot assume that this information has been properly withheld.  Similarly, to the extent that "information regarding where and how operational members operate," id., Ex. 7 (Vaughn Index) at 27 (entry for Bates No. 472), refers to field operations by law enforcement agents, the Court could conceive of how revealing this information could pose a risk of circumvention of the law.  However, without additional detail as to the type of operation involved or whether any such operation remains in effect, the Court cannot conclude that the information withheld in this case creates such a risk.  Cf. Clemente, 741 F. Supp. 2d at 88 (rejecting the FBI's claim that disclosure of "the number of [mafia] informants operative in the 1960s . . . qualif[ied] for protection under Exemption 7(E)" because the agency "failed to demonstrate that any of the

[withheld information] . . . ma[d]e references to the number of informants <u>currently</u> reporting to" it).[21]

In sum, the defendant has failed to provide sufficient information to allow the Court to conduct a de novo review of the withholdings that the defendant has made pursuant to Exemptions 5, 6, 7(C), and 7(E).  Accordingly, the Court will deny both parties' motions for summary judgment without prejudice and order the defendant to supplement its <u>Vaughn</u> indices or submit additional affidavits that provide the missing information identified in this Memorandum Opinion.  See <u>Clemente</u>, 741 F. Supp. 2d at 89; <u>see also</u> <u>Spirko v. U.S. Postal Serv.</u>, 147 F.3d 992, 997 (D.C. Cir. 1998) ("If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including . . . requesting further affidavits[.]").[22]

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the defendant has in many respects failed to demonstrate that its search for records responsive to the plaintiffs' Request was reasonably calculated to uncover all responsive documents.  Specifically, the defendant has failed to demonstrate that it searched all locations reasonably likely to contain responsive records

---

[21] Although the plaintiffs raise several arguments for why the Court should conclude that disclosure of the information withheld does not pose a risk of circumvention of the law, <u>see, e.g.</u>, Pls.' Opp'n at 42 (arguing that the defendant's "re-release of certain information without redaction, while leaving apparently similar information redacted on other pages, casts further doubt on [the defendant's] vague assertions of a risk of circumvention of the law"); Pls.' Facts ¶ 97 (asserting that information withheld regarding the defendant's mobile fingerprinting technology is "already known to the public"), and for why the Court should order disclosure notwithstanding any such risk, <u>see</u> Pls.' Opp'n at 43 (arguing that information withheld is "of significant interest to the public and should be released"), absent additional information from the defendant regarding the nature of the information withheld or the nature of the alleged risks of circumvention of the law associated with disclosure, the Court cannot properly evaluate these arguments either.  Thus, the Court will not address them at this time.

[22] Given that the "number of documents involved in this case is substantial[,] [i]f the parties can agree on a representative sample of documents for which the [defendant can] produce a more detailed <u>Vaughn</u> index, they should do so."  <u>Clemente</u>, 741 F. Supp. 2d at 89.

because it failed to search the six additional offices identified by the plaintiffs, failed to search its databases for CARI-related data, and failed to produce responsive email attachments. However, the Court lacks sufficient information to determine whether the defendant conducted an adequate search of its other record systems or employed reasonably tailored search terms. Accordingly, the Court will deny the defendant's motion for summary judgment without prejudice, grant in part and deny without prejudice in part the plaintiffs' motion for summary judgment as to the adequacy of the defendant's search, and order the defendant to conduct additional searches or provide additional affidavits in accordance with this Memorandum Opinion. Additionally, the Court concludes that the defendant has failed to provide sufficient information to allow the Court to evaluate the propriety of its withholdings under Exemptions 5, 6, 7(C), and 7(E). Accordingly, the Court will deny the parties' motions for summary judgment without prejudice as to the applicability of these exemptions and require the defendant to supplement its <u>Vaughn</u> indices or submit additional affidavits that address the Court's concerns as indicated in this Memorandum Opinion.[23]

       **SO ORDERED** this 4th day of March, 2019.

REGGIE B. WALTON
United States District Judge

---

[23] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.